## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PUREWICK CORPORATION, | REDACTED - PUBLIC VERSION |
| Plaintiff, | (Filed January 6, 2023) |
| v. | C.A. No. 22-102-MN-JLH |
| SAGE PRODUCTS, LLC, | ███████████ |
| Defendant. | ███████████ |

## <u>LETTER TO THE HONORABLE JENNIFER L. HALL</u>
## <u>FROM ANNE SHEA GAZA REGARDING SAGE'S MOTION TO COMPEL</u>

Of Counsel:
Robert A. Surrette
Sandra A. Frantzen
Christopher M. Scharff
Ryan J. Pianetto
MCANDREWS, HELD
& MALLOY, LTD
500 West Madison Street, 34th Floor
Chicago, IL 60661
(312) 775-8000
bsurrette@mcandrews-ip.com
sfrantzen@mcandrews-ip.com
cscharff@mcandrews-ip.com
rpianetto@mcandrews-ip.com

Dated:  December 28, 2022

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Sage Products, LLC*



**WILMINGTON**
RODNEY SQUARE

**Anne Shea Gaza**
P 302.571.6727
agaza@ycst.com

**BY CM/ECF & HAND DELIVERY**                    December 28, 2022

The Honorable Jennifer L. Hall
U.S. District Court for the District of Delaware
844 North King Street
Wilmington, DE 19801

                Re:    *PureWick Corp. v. Sage Products, LLC,* C.A. No. 22-102-MN-JLH

Dear Judge Hall:

        Defendant Sage respectfully seeks an Order compelling Plaintiff PureWick to produce communications with its third party patent inventors about PureWick's product (see RFP 11) and documents related to PureWick's "lost" ESI including company-wide emails from critical periods (RFP 94). (Ex. 1 at 9, 24.) PureWick's only basis for refusing production is relevance, but the requests relate to Sage's core defenses in this case. A proposed Order is attached.

        ***Background.*** Sage, a Stryker subsidiary, sells the "PrimaFit 2.0" for female incontinence and is accused of infringing two PureWick patents. (D.I. 8, ¶¶12-13.) PureWick sells a competing product called the "PureWick." The patents-in-suit name PureWick founders Ray and Camille Newton as inventors and have priority dates in 2016 and 2017. (D.I. 8, ¶¶66,94-95.) In 2017, the Newtons sold PureWick Corp. to C.R. Bard, but maintained an active role with PureWick. In an earlier-filed case (No. 19-1508-MN) ("*PureWick I*" or "*PWI*"), PureWick accused Sage's original PrimaFit ("1.0") of infringing two patents and another patent.[1] In *PureWick I*, Sage identified the redesigned PrimaFit 2.0 (launched in 2019) as a non-infringing alternative, but PureWick never accused it of infringement. (D.I. 8, ¶¶71-78.) In this case, PureWick now contends that PrimaFit 2.0 infringes the two patents-in-suit including previously unasserted claims. (Ex. 3 at 10-11.)

        Sage asserts a number of defenses. Sage alleges that the redesigned PrimaFit 2.0 does not infringe. (D.I. 8, ¶¶63-64.) Sage also asserts that the patents are unenforceable including due to inequitable conduct based on the Newtons' failure to disclose key prior art to the PTO, which the Newtons disclosed for the first time at the *PureWick I* trial. (¶¶97-113.) Specifically, to avoid an on-sale bar in 2015 (*PWI*, D.I. 204 at 14-17), at trial, the Newtons changed their deposition testimony regarding PureWick products demonstrated and sold prior to the critical dates, claiming they could not determine what was demonstrated because there were "hundreds and hundreds" of versions. (D.I. 8, ¶¶97-98, 102, 105.) PureWick did not disclose these versions to the PTO during prosecution despite the PTO raising issues with the priority date. (*Id.*) Sage alleges other equitable defenses including unclean hands based on the Newtons' false testimony in *PureWick I* (¶¶80-82) and estoppel based on PureWick's failure to accuse the 2.0 of infringement (¶¶71-78) and PureWick's litigation and prosecution history statements (¶¶67-68). Sage further alleges patent invalidity including invalidity of the newly-asserted claims and invalidity based on new positions taken by PureWick to allege infringement in this case (¶¶66-68). (Ex. 3 at 34-36, 28-31, 38-43, 7-

---

[1] Post-trial motions are pending in *PureWick I* after an infringement finding of the original PrimaFit. (*PWI,* D.I. 331.) Sage invalidated the other patent at the PTAB. (*PWI*, D.I. 277.)

December 28, 2022

Page 2

13, 32-33, 11-13.) This case also involves new damages issues including ones related to the market entry of new competitive products. (*Id.* at 49-50.)

Sage served discovery on its new defenses. (*See, e.g.*, Exs. 1, 4, 5.) **RFP 11** seeks PureWick's recent communications (after May 2020) with the Newtons relating to "testing, offer for sale, sale, public use, disclosure to any third party, or any experimental use of" the PureWick products, which relate to virtually every defense in this case.[2] (Ex. 1 at 9.) Notably, though PureWick agreed that recent communications about its product are relevant (Ex. 12 at RFP 30, 38, 32) and did not object to producing other Newton communications (Ex. 11), PureWick refused to produce the requested documents because they post-date the patents' critical dates. (Ex. 6 at 3.)

PureWick's decision to withhold these communications is particularly problematic given that PureWick admits to misplacing a server containing <u>all</u> the Newtons' ESI from certain time periods. Specifically, in *PureWick I*, well after the date for substantial document production and only after repeated inquiries by Sage, PureWick revealed that it was "unable to locate" a "legacy PureWick server" (and backups), which contained all purewick.com emails. (Ex. 8 at 1.) PureWick repeatedly implied that the "legacy" server only contained ESI from "prior to the 2017 acquisition by Bard," which is when the Newtons purportedly "ceased being PureWick employees." (Ex. 8 at 3-4, 6; Ex. 3 at 43-45.) It was not until this case—when PureWick refused to produce the Newtons' recent communications—that Sage learned the extent of lost/missing documents was more problematic than PureWick previously revealed. Indeed, it appears that the Newtons were sending emails from purewick.com well after 2017 as PureWick representatives. (*See, e.g.,* Ex. 10 (2019).) Sage also recently uncovered that lost documents may have been uploaded to the cloud. Sage thus served **RFP 94** seeking information about "PureWick's allegedly lost or destroyed server or hard-drive" including its "first awareness that such server was lost,…how, when, and why such server was lost, any efforts to investigate" and identification of persons involved including third parties. (Ex. 1 at 24, 9 (RFP 12).) PureWick asserts that information is irrelevant. (Ex. 2 at 112-113.)

***PureWick Should Be Compelled To Produce Recent Communications With Its Inventors.*** RFP 11 seeks information about PureWick's recent communications with the Newtons—third parties with the historical knowledge about the company and its historical products. (Ex. 1 at 9.) But PureWick now asserts that communications "years after the patents' critical date" are "irrelevant to Sage's invalidity and unenforceability defenses." (Ex. 6 at 3.) Contrary to PureWick's allegations, the RFP relates directly to Sage's defenses including unclean hands, inequitable conduct, invalidity, estoppel, and damages. For example, the Newtons' communications about the prior art PureWick products (including the "hundreds and hundreds" of undisclosed versions) may reveal when they were disclosed, what was disclosed, when sales occurred, and what should have been disclosed to the PTO, which is relevant to Sage's inequitable conduct and invalidity defenses including for newly-asserted claims (D.I. 8, ¶¶96-113). PureWick's failure to disclose this known prior art to the PTO occurred <u>after</u> the "patents critical date" (¶¶106-108), and the Newton's recent knowledge on that topic is highly relevant. *Id.* The Newtons' recent communications also bear on unclean hands based on the Newtons' false trial or deposition testimony about those products, which also occurred after the patents' critical dates. (¶¶80-81). Additionally, communications regarding how the PureWick product is marketed and how it compares to competitive products is relevant to issues including damages and non-

---

[2] By agreement and order, documents produced in *PureWick I* can be used in this case. PureWick stated it was not withholding documents based on its estoppel motion. (Ex. 5 at 5.)

infringing alternatives as demonstrated by PureWick's own RFPS. (Ex. 12 at RFP 30, 31, 38, 32.)

Notably, PureWick does not dispute that these communications exist or that producing them would be burdensome. Indeed, PureWick identified the Newtons as having discoverable information related to its products. (Ex. 7 at 2.) And, in *PureWick I*, PureWick never raised a relevance objection and did not arbitrarily limit documents to communications before the critical date (e.g., Ex. 10). PureWick also never objected to producing its own <u>internal</u> communications about its product by date. Contrary to PureWick's claims, its communications with the inventors on these topics are relevant. *See, e.g., Eurand v. Mylan Pharms.,* 266 F.R.D. 79, 86 (D. Del. 2010); *Biomet v. Howmedica Osteonics Corp.*, No. 14-6634, 2015 WL 1543221, *1 (D.N.J. Apr. 7, 2015).

***PureWick Should Be Compelled To Produce Documents About Its Lost Server(s).*** There is no dispute that PureWick lost or misplaced critical ESI located on both a server and its backups, which has significantly hampered Sage's ability to pursue its defenses. (Ex. 3 at 43-45; Ex. 8.) The extent of that loss is completely unknown to Sage and is particularly troublesome given PureWick's failure to produce its more recent inventor communications and its attempt to thwart all other third party discovery.[3] RFP 94 seeks to shed light on those missing documents and potentially uncover third party sources for the information. PureWick never disputed that the lost ESI is relevant to Sage's defenses including to resolve factual issues including related to prior art, first sales, etc. RFP 94 seeks relevant information related to the facts regarding the missing server and backup(s), including actions taken by PureWick. PureWick's misrepresentations and lack of transparency about the documents further call into question the facts surrounding the lost server(s) and need for discovery particularly given Sage's new defenses in this case. As discussed, PureWick did not disclose the missing server until late in *PureWick I* and only after multiple questions by Sage regarding missing emails. (Ex. 8 at 1, 4, 6.) Even then, it now appears that PureWick misrepresented the scope of missing ESI and the inventors' roles in the company.

Contrary to PureWick's relevance objections, information regarding PureWick's failure to preserve documents is facially relevant to Sage's exceptional case allegations (*id.*) and may be sanctionable (e.g., spoliation). *See, e.g., IOENGINE LLC v. Paypal Holdings,* No. CV 18-452-WCB, 2022 WL 1443867, at *4-7 (D. Del. May 3, 2022). Sanctions are available if "a party failed to take reasonable steps to preserve" ESI or "acted with the intent to deprive." Fed. R. Civ. P. 37(e). A corrective jury instruction may also be appropriate. *GN Netcom v. Plantronics,* C.A. No. 12-1318-LPS, D.I. 532, §5 (D. Del. Oct. 18, 2017) (Ex. 13, excerpted). RFP 94 seeks information that will determine how this loss should be handled. *See Micron Tech. v. Rambus Inc.*, 2013 WL 227630, *11-*21 (D. Del. 2013); *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1269-72 (Fed. Cir. 2018). Moreover, PureWick already conceded the relevance in *PureWick I* when it argued that evidence was necessary to prove spoliation. (*PWI,* D.I. 285 at 11 n4.) And PureWick agreed to designate a corporate designee regarding the missing server, but unfortunately that witness could not answer basic factual questions, stating "I don't know" over twenty times. (Ex. 9 at 42, 53-62, 219-222.) The Court should compel PureWick to produce the requested information. *See IOENGINE*, 2022 WL 1443867, at *4-7 (D. Del. May 3, 2022).

---

[3] PureWick refused to produce <u>any</u> documents in the Newtons' possession, requiring a subpoena (Ex. 6 at 3) even though the Newtons were PureWick's trial witnesses and Camille Newton sat at counsel table as the "PureWick representative." Now PureWick refuses to produce even the subpoenaed documents. (*See* PureWick's co-pending motion.)

December 28, 2022
Page 4

Respectfully,

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)

Enclosure (Proposed Order, Exhibits 1 – 13)

cc:    All Counsel of Record (by E-Mail)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PUREWICK CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     C.A. No. 22-102-MN-JLH |
| | ) |
| SAGE PRODUCTS, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## [PROPOSED] ORDER GRANTING SAGE'S MOTION TO COMPEL

Whereas, Defendant Sage Products, LLC ("Sage") has moved for an Order compelling Plaintiff PureWick Corporation ("PureWick") to produce PureWick communications with inventors Camille and Ray Newton, and documents related to PureWick's failure to preserve PureWick's email/document server, and the Court having considered the motion and all papers, argument, and other matters submitted in support of and in opposition to the Motion,

IT IS HEREBY ORDERED THAT Sage's Motion is GRANTED. PureWick shall produce all communications with inventors Camille and Ray Newton (RFP 11) and all documents related to PureWick's failure to preserve PureWick's email/document server (RFP 94).

SO ORDERED, this _____ Day of January, 2023.

_____
THE HONORABLE JENNIFER L. HALL
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PUREWICK CORPORATION, | |
| Plaintiff, | |
| v. | C.A. No. 22-102-MN |
| SAGE PRODUCTS, LLC, | |
| Defendant. | |

**SAGE PRODUCTS' FIRST SET OF DOCUMENT REQUESTS
(NOS. 1-95) TO PUREWICK CORPORATION**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Sage Products, LLC ("Sage") requests that Plaintiff PureWick Corporation ("PureWick") produce the following documents within thirty (30) days at the offices of McAndrews, Held & Malloy, Ltd., 500 West Madison Street, Suite 3400, Chicago, Illinois 60661, or at such other place and time as may be agreed upon by counsel for the parties.

**<u>DEFINITIONS AND INSTRUCTIONS</u>**

As used herein:

1.      The term "document" or "documents" includes documents and things as broadly defined in Rule 34, and includes papers of all kinds and non-paper information storage means, including by way of example and without limitation, originals and copies, however made, of letters, memoranda, emails, notes, calendars, records, minutes, studies, reports, notebooks, messages, telegrams, ledgers, legal instruments, agreements, drawings, sketches, graphs, prints, handwritten notes, rough drafts, secretarial notes, workpads, diaries, films, tapes, pictures, photographs, videotapes, books, pamphlets, publications, advertisements, sales literature,

brochures, manuals, price lists, announcements, or any other writings, records or tangible objects where produced or reproduced mechanically, electrically, electronically, photographically or chemically, including any preliminary versions, drafts or revisions of any kind of the foregoing. Any document bearing marks, including, without limitation, initials, stamped initials, comments or notations not a part of the original test or photographic representation thereof, is a separate document.

2.      The term "Plaintiff" or "PureWick" means PureWick Corporation, and any related or foreign or U.S. parent or associated companies, divisions, or subsidiaries, past or present, and each predecessor business entity whether incorporated or not, and the directors, officers, employees, agents, or attorneys thereof.  For clarity, "Plaintiff" or "PureWick" includes Becton, Dickinson and Company, C.R. Bard, Inc., and any former employee or agent including Robert A. Sanchez, Camille R. Newton, Joseph M. Forehand, or Raymond J. Newton.

3.      The term "Becton Dickinson" means Becton, Dickinson and Company, and any related or foreign or U.S. parent or associated companies, divisions, or subsidiaries, past or present, and each predecessor business entity whether incorporated or not, and the directors, officers, employees, agents, or attorneys thereof.

4.      The term "C.R. Bard" means C.R. Bard, Inc., and any related or foreign or U.S. parent or associated companies, divisions, or subsidiaries, past or present, and each predecessor business entity whether incorporated or not, and the directors, officers, employees, agents, or attorneys thereof.

5.      The term "Defendant" or "Sage" means Sage Products, LLC and the directors, officers, employees, agents, or attorneys thereof.

6.      The term "Stryker" means Stryker Corporation and the directors, officers, employees, agents, or attorneys thereof.

7.      The term "Patents-in-Suit" or "Asserted Patents" means U.S. Patent Nos. 10,226,376 and 10,390,989.  "Asserted Patent" means any of the foregoing Asserted Patents.

8.      The term "the 376 patent" means U.S. Patent No. 10,226,376.

9.      The term "the 989 patent" means U.S. Patent No. 10,390,989.

10.     The term "Named Inventors" means Robert A. Sanchez, Camille R. Newton, Joseph M. Forehand, or Raymond J. Newton.

11.     The term "Related Patents and Applications" or "Related Patents or Applications" means any and all U.S. or foreign patents or patent applications that claim priority to the 376 patent and the 989 patent, or any other patent or patent application to which any Asserted Patent claims priority including, but not limited to, all patents earlier and later in a prosecution chain, all child, parent, and sibling patents, patent applications, continuations, divisionals, continuations-in-part, foreign counterparts, and all patents and applications relying on any of the same priority dates as any of the Patents-in-Suit.

12.     The term "External Urine Management Patents or Applications" means any and all U.S. or foreign patents or patent applications relating to urine collection, disposal, or management outside or external to the urethra (male or female) including, but not limited to, the Patents-in-Suit and Related Patents and Applications.

13.     The term "PureWick Female External Catheter" means each model or iteration of any female urine collection product or system ever tested on an individual, made, offered for sale, or sold by Plaintiff.

14.     The term "person" embraces both natural persons and corporations (including Plaintiff and Defendant), and the acts and knowledge of a "person" as used herein are defined to include acts and knowledge of directors, officers, employees, agents, representatives, and attorneys acting on behalf of such "person."

15.     The terms "identify" or "state the identity of" mean:

        a.     when used with reference to an individual, to state the individual's name, current business address and telephone number, current home address and telephone number, and current employer and title;

        b.     when used in connection with a business entity, organization, or association, to state its name, address, and telephone number and the name of the individual(s) at such business with knowledge of the subject matter of these requests, and to identify the owner(s) of such business;

        c.     when used in connection with a communication, to identify every person involved in and every document relating to the communication and to state the date, type (e.g., telephone conversation, face-to-face conversation, letter) and substance of the communication; and

        d.     when used in connection with a document, to state the type of document (e.g., email, letter, memoranda, computer hard drive) and its date, author(s), addressee(s), recipient(s), and subject matter.

16.     The term "communications" means the transmittal of information, including, but not limited to, transmittals in the form of facts, ideas, inquiries, or otherwise.

17.     The terms "and" and "or" shall be construed either disjunctively or conjunctively, whichever makes the request most inclusive.

18.     Each of the terms "any," "all," and "each" shall be construed as "any, all, and/or each."

19.     The terms "including" and "include" shall be construed in such a way as to suggest or provide an example or examples.  The terms "including" and "include" shall not be construed in such a way as to limit or confine the broader term or concept for which a suggestion or example is being given.

20.     The term "PrimaFit 2.0" refers to the product accused of infringing the Patents-in-Suit in this lawsuit as identified, for example, in Exhibit 3 to Plaintiff's Complaint.

21.     The term "PureWick I Litigation" means the district court litigation captioned *PureWick Corporation v. Sage Products, LLC*, C.A. No. 19-1508-MN (D. Del.).

22.     The terms "concern(s)" or "concerning" include: relate(s) or relating to, refer(s) or referring to, mention(s) or mentioning, reflect(s) or reflecting, and constitute(s) or constituting.

23.     The use of the singular form of any word includes the plural and vice-versa.

24.     Any pronoun shall be construed to refer to the masculine, the feminine, or to be neuter gender as in each case is most appropriate.

25.     With respect to any claim of a privilege by Plaintiff regarding any communication, document, or information sought by any of Sage's discovery requests, Plaintiff is expected to individually identify each such communication, document, or information withheld on grounds of an alleged privilege, and specifically set forth: the nature of the privilege claimed; the author(s); the addressee(s); the persons who received copies; the date of the communication, document, or information; and the subject matter of the communication, document, or information.

26.     Any purportedly privileged document containing non-privileged matter must be produced, with the purportedly privileged portion redacted.

27.     These requests for production seek all information available to Plaintiff or each of Plaintiff's respective employees, representatives, agents, servants, consultants, or investigators, and unless otherwise privileged, their counsel or its employees, representatives, agents, servants, investigators, or consultants.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**

All documents relating to, referring to, or concerning the Patents-in-Suit, or Related Patents and Applications.

**REQUEST NO. 2:**

All documents relating to, referring to, or concerning the conception, reduction to practice, design, or development of any invention claimed in the Patents-in-Suit.

**REQUEST NO. 3:**

All documents relating to, referring to, or concerning the alleged ownership or licensing of the Patents-in-Suit and Related Patents and Applications.

**REQUEST NO. 4:**

All documents relating to, referring to, or concerning the prosecution of the Patents-in-Suit and Related Patents and Applications. This request includes the entire prosecution file for U.S. Pat. App. Nos. 61/955,537, 14/625,469, 62/082,279, 14/947,759, 62/084,078, 14/952,591, 15/171,968, PCT/US2016/049274, 15/260,103, 15/611,587, 62/414,963, 62/485,578, 29/624,661, PCT/US2017/035625, 16/245,726, 16/369,676, 17/088,272, 17/330,657, 16/452,145, 17/179,116, 17/378,015, and any other application that claims priority to U.S. Pat. App. Nos. 15/171,968 and 15/260,103, and including any document that is or may be prior art for each such patent or application.

**REQUEST NO. 5:**

The prosecution files of all foreign patents or foreign patent applications that disclose or claim any of the subject matter claimed in the Patents-in-Suit or Related Patents and Applications,

including prior art that was cited during the prosecution of any foreign patent or foreign patent application.

**REQUEST NO. 6:**

All documents that were considered, studied, or referred to by any person involved in the preparation or prosecution of the Patents-in-Suit or Related Patents and Applications in connection with such preparation or prosecution proceeding, including prior art.

**REQUEST NO. 7:**

All documents concerning any affidavit, oath, or declaration filed, proposed to be filed, or considered for filing by any person involved in the preparation or prosecution of the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 8:**

All documents relating to the priority date of the Patents-in-Suit.

**REQUEST NO. 9:**

All documents relating to, referring to, constituting, or concerning prior art, or alleged prior art, to the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 10:**

All documents concerning the offer for sale, sale, public use, disclosure to any third party, and any experimental use of any alleged invention claimed in the Patents-in-Suit or Related Patents and Applications or of any urine collection device made by PureWick between January 2015 and December 2016.

**REQUEST NO. 11:**

All communications of Camille Newton and Ray Newton after May 1, 2020 relating to any testing, offer for sale, sale, public use, disclosure to any third party, or any experimental use of any PureWick Female External Catheter.

**REQUEST NO. 12:**

All communications relating to PureWick's allegedly lost or destroyed server or hard-drive potentially containing email, documents and other electronically stored information, and any backup server or hard-drive including all emails and other communications to locate the information.

**REQUEST NO. 13:**

Each iteration of PureWick's website (including .html files or other electronic files) prior to June 1, 2017, including the iteration of PureWick's website that was publicly available on February 13, 2015, that references any female urine collection device including the content contained therein and the date and substance of any changes.

**REQUEST NO. 14:**

One physical sample of each model or iteration of the PureWick Female External Catheter.

**REQUEST NO. 15:**

Five physical samples of the current version of the PureWick Female External Catheter.

**REQUEST NO. 16:**

All publications dated or published prior to June 1, 2017 concerning any AMXDmax product or system including the AMXDmax In-Flight Bladder Relief product, any Omni Medical urine management product or system, the Ur24 Automated Personal Urine Collector, any Ur24

Technology urine management product or system, any Hollister female urine management product or system, or any female external urine management products or systems known to Plaintiff.

**REQUEST NO. 17:**

All documents concerning any demonstrations, trials, offers for sale, and/or sales of any PureWick product or any PureWick Female External Catheter at Tri-City Medical Center prior to June 1, 2017.

**REQUEST NO. 18:**

All documents concerning any demonstrations, trials, offers for sale, and/or sales of any PureWick product or any PureWick Female External Catheter (including information about the product demonstrated, trialed, offered for sale, or sold and the collateral materials available) during any conference in 2012 through 2016 including any conferences in June 2016.

**REQUEST NO. 19:**

All documents or materials relating to the disclosure and videotaping of the device disclosed to Connect in 2016 as described by Camille Newton at trial.

**REQUEST NO. 20:**

All documents relating to, referring to, or concerning validity or invalidity, infringement or noninfringement by the PrimaFit 2.0, or enforceability or unenforceability of any of the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 21:**

Except for documents provided to Sage during the PureWick I Litigation, all documents relating to, referring to, or concerning any proceeding (including, but not limited to, any court proceeding, patent office proceeding, reexamination, nullity or opposition proceedings) involving

or relating to the infringement, non-infringement, validity, invalidity, enforceability, or unenforceability of the Patents-in-Suit or any Related Patents and Applications.

**REQUEST NO. 22:**

All documents relating to, referring to, or concerning this lawsuit.

**REQUEST NO. 23:**

All documents relating to, referring to, or concerning any opinion, request for opinion, evaluation, analysis, investigation, or search relating to the validity, invalidity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement by the PrimaFit 2.0 of any of the claims of any of the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 24:**

All documents concerning Robert A. Sanchez, Camille R. Newton, Joseph M. Forehand, or Raymond J. Newton and external urine management systems dated on or before June 1, 2017. This request includes all laboratory notebooks or other notes of the Named Inventors that concern, relate to, or involve external urine management systems.

**REQUEST NO. 25:**

All communications between PureWick, C.R. Bard, and/or Becton Dickinson and any Named Inventor concerning or relating to any agreements or potential agreements between PureWick, C.R. Bard, and/or Becton Dickinson and a Named Inventor concerning or relating to the Patents-in-Suit or Related Patents or Applications, the subject matter of the Patents-in-Suit, External Urine Management Patents or Applications, the acquisition of PureWick, or this litigation. This request includes any ongoing consultancy agreements between PureWick, C.R. Bard, and/or Becton Dickinson and any Named Inventor.

**REQUEST NO. 26:**

Agreements or communications with third parties regarding the Patents-in-Suit or Related Patents and Applications including potential prior art to the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 27:**

All documents concerning whether the Named Inventors on the Patents-in-Suit or Related Patents and Applications are the sole inventors of the subject matter claimed in the Patents-in-Suit or Related Patents and Applications including all documents concerning any claim or assertion by any other person that he or she is an inventor of the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 28:**

All documents relating to, referring to, or concerning Plaintiff's claim for damages in this lawsuit and the amount of any such damages including any documents relating to the economic value or lack of economic value of the Patents-in-Suit and Related Patents or Applications.  This request includes any documents relating to, referring to, concerning, supporting or refuting any claim that Plaintiff is entitled to damages prior to the filing of the Complaint.

**REQUEST NO. 29:**

All documents relating to, referring to, or concerning Plaintiff's policies, procedures, or practices, if any, relating to licensing of patents and technology.

**REQUEST NO. 30**:

All patent licensing agreements or agreements settling any patent dispute, actual or potential, that Plaintiff has entered into, including, but not limited to, agreements relating to the

Patents-in-Suit, a Related Patent or Application, the PureWick Female External Catheter, the subject matter of the Patents-in-Suit, or any agreements that PureWick asserts are comparable.

**REQUEST NO. 31:**

All documents concerning any agreement, negotiation, or discussion for an assignment, license, settlement of litigation, transfer, consideration for, economic value, lack of economic value, or disposition of any legal or equitable rights to any External Urine Management Patents or Applications including the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 32:**

All documents concerning any party's right, title, or interest in and to the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 33:**

Any agreement or agreements between C.R. Bard and/or Becton Dickinson and/or PureWick that relate to the acquisition of PureWick.

**REQUEST NO. 34:**

Any agreement or agreements between C.R. Bard and/or Becton Dickinson and/or PureWick that relate to the transfer of any PureWick technology or the PureWick Female External Catheter.

**REQUEST NO. 35:**

All communications between C.R. Bard and/or Becton Dickinson and/or PureWick exchanged prior to the acquisition of PureWick that relate to, concern, or involve Sage.

**REQUEST NO. 36:**

All communications between C.R. Bard and/or Becton Dickinson and/or PureWick exchanged prior to the acquisition of PureWick that relate to, concern, or involve the Patents-in-

Suit or Related Patents and Applications.

**REQUEST NO. 37:**

All prior art relating to urine management products identified or obtained by C.R. Bard and/or Becton Dickinson prior to the acquisition of any PureWick technology including prior art patents, publications, and products identified during due diligence.

**REQUEST NO. 38:**

All communications between PureWick and any third party concerning a potential business relationship between PureWick and any third party (including potential investors and licensees and parties interested in any PureWick technology, including but not limited to First Quality and Mölnlycke) that relate to, concern, or involve PureWick technology, the PureWick Female External Catheter, the Patents-in-Suit, or Related Patents and Applications.

**REQUEST NO. 39:**

All due diligence reports that relate to, concern, or involve PureWick technology, the PureWick Female External Catheter, the Patents-in-Suit, or Related Patents and Applications including any reports from Scientific and Market Life Science Advising.

**REQUEST NO. 40:**

Except for documents provided to Sage during the PureWick I Litigation, all documents concerning any assertion by any third party that any claim of the Patents-in-Suit or Related Patents and Applications is invalid, unenforceable, or not infringed.

**REQUEST NO. 41:**

All documents concerning Sage and the market for external urine management products or the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 42:**

All documents concerning Plaintiff's decision to file this lawsuit including any communications regarding Plaintiff's decision not to file suit after it learned of the PrimaFit 2.0 in the PureWick I Litigation.

**REQUEST NO. 43:**

All documents concerning the PrimaFit 2.0.

**REQUEST NO. 44:**

All documents concerning Plaintiff's awareness of any alleged use, offer for sale, sale, or manufacture of the PrimaFit 2.0 prior to January 2021, including but not limited to documents concerning Plaintiff's awareness of trials of PrimaFit 2.0 in 2019 and 2020 and communications regarding PrimaFit 2.0 prior to January 2021.

**REQUEST NO. 45:**

All documents concerning Plaintiff's first knowledge of Sage's alleged infringement of the 376 patent by the PrimaFit 2.0.

**REQUEST NO. 46:**

All documents concerning Plaintiff's first knowledge of Sage's alleged infringement of the 989 patent by the PrimaFit 2.0.

**REQUEST NO. 47:**

All documents concerning Plaintiff's allegations in this lawsuit that Sage has been and still is directly infringing, inducing others to infringe, and contributing to the infringement of one or more claims of the Patents-in-Suit. This request concerns Plaintiff's allegations regarding the PrimaFit 2.0.

**REQUEST NO. 48:**

All documents concerning Plaintiff's allegations that Sage's alleged infringement in this lawsuit was willful.

**REQUEST NO. 49:**

All documents concerning Plaintiff's request for a judgment holding that this is an exceptional case.

**REQUEST NO. 50:**

All documents, including communications with third parties, concerning infringement of any claims of the Patents-in-Suit by any device, product, or system other than those of Sage, including tests, evaluations, examinations, and reports of such device(s), product(s), or system(s).

**REQUEST NO. 51:**

Documents sufficient to identify each model or iteration of product or system ever made, offered for sale, or sold by Plaintiff.

**REQUEST NO. 52:**

Documents sufficient to show the structure, function and operation of each female catheter provided to any third party between January 2015 and December 2016 including, for example, instructions for use, user manuals, and product or service manuals.

**REQUEST NO. 53:**

For each model of product or system ever made, offered for sale, or sold by Plaintiff that is allegedly covered by any claim of the Patents-in-Suit, all literature or marketing such as press releases, advertisements, new product announcements, brochures, instructions for use, hospital instructions, presentations (including all versions of the September 23, 2015 "Incontinence Relief

for Women" presentation and any similar documents), catalogs, catalog sheets, price lists, descriptive literature, articles in trade or technical journals, and packaging.

**REQUEST NO. 54:**

All communications with or related to Dorris Duffy, Kate Pawlik, or Lorena Eckert prior to June 2017.

**REQUEST NO. 55:**

All documents relating to, referring to, concerning or demonstrating marking of any products with any or all of the patent numbers of the Patents-in-Suit.

**REQUEST NO. 56:**

Documents sufficient to identify the names, titles, and responsibilities of any persons involved in the conception, research and development, design, manufacture, patent activities, engineering, production, marketing, use, or sale of any technology and/or alleged invention claimed in the Patents-in-Suit.

**REQUEST NO. 57:**

All submissions to the United States Food and Drug Administration relating to each external urine management system ever designed, made, offered for sale, or sold by Plaintiff.

**REQUEST NO. 58:**

All documents concerning any non-infringing alternatives or acceptable substitutes to any invention allegedly covered by, or part of a claimed combination of, any claim of the Patents-in-Suit.

**REQUEST NO. 59:**

All documents concerning market or competitive analyses or projections performed by Plaintiff or on its behalf concerning competition with Sage in the external urine management industry.

**REQUEST NO. 60:**

All communications with or relating to Sagentia relating to any female urine collection device.

**REQUEST NO. 61:**

All documents concerning any minutes or notes from any C.R. Bard and/or Becton Dickinson board of directors or other management meetings referring to, relating to or involving Sage or Stryker and external urine management products or the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 62:**

All documents requested to be identified in, or reviewed or relied upon to formulate responses to Sage's interrogatories.

**REQUEST NO. 63:**

All documents referred to or identified in any of Plaintiff's disclosures pursuant to Fed. R. Civ. P. 26(a).

**REQUEST NO. 64:**

To the extent not already requested, all documents and things that may be used at any proceeding in this action, including, but not limited to, a claim construction hearing, any other hearing, or a trial.

**REQUEST NO. 65:**

All documents concerning the first offer for sale, first sale, first public use, first disclosure to any third party, and any experimental use or pilot study of any model or iteration of a female external catheter product or system made, offered for sale, or sold by PureWick or the Named Inventors.

**REQUEST NO. 66:**

All patent licensing agreements or agreements settling any patent dispute, actual or potential, that Plaintiff has entered into that relate to, concern, or involve a urine collection device.

**REQUEST NO. 67:**

Any agreement or agreements between C.R. Bard and/or Becton Dickinson and/or PureWick that relate to the transfer of technology relating to a urine collection device.

**REQUEST NO. 68:**

All communications between PureWick and any third party concerning a potential business relationship between PureWick and any third party (including potential investors and licensees and parties interested in any PureWick technology) that relate to, concern, or involve any PureWick technology relating to urine collection or management including any female catheter.

**REQUEST NO. 69:**

All due diligence reports that relate to, concern, or involve any PureWick technology relating to urine collection or management including any female catheter.

**REQUEST NO. 70:**

To the extent not already requested, documents sufficient to identify each model or iteration of any female urine collection device made, sold, or offered for sale, or demonstrated by PureWick or the Named Inventors.

**REQUEST NO. 71:**

All confidentiality and non-disclosure agreements between PureWick and any third party executed prior to 2017 that relate to, concern, or involve PureWick technology, any female external catheter, the Patents-in-Suit, or Related Patents and Applications.

**REQUEST NO. 72:**

All documents reflecting any offer to purchase PureWick technology, any female external catheter technology, know-how, or intellectual property, or any PureWick External Urine Management Patents or Applications.

**REQUEST NO. 73:**

All documents reflecting a lack of acceptance in the market of PureWick's product designs including any female external catheter designs.

**REQUEST NO. 74:**

All documents reflecting advice given to PureWick by Sage regarding how to improve the design of PureWick's products including the PureWick Female External Catheter.

**REQUEST NO. 75:**

All documents relating to license or transfer agreements, settlement agreements, covenants-not-to-sue, license or transfer proposals or license or transfer negotiations concerning patents or technology used in any PureWick female external catheters, relating to external urine management or catheters, or comparable to the Patents-in-Suit.

**REQUEST NO. 76:**

All documents and things that PureWick obtains through third-party discovery in connection with this litigation.

**REQUEST NO. 77:**

To the extent not already requested, all documents that relate to the testing (including feasibility trials or product evaluations) and demonstration of each version or iteration of any PureWick female urine collection product between January 2015 and December 2016.

**REQUEST  NO. 78:**

All documents produced in the PureWick I Litigation by or on behalf of PureWick or any third party controlled by or represented by counsel for PureWick, including the Named Inventors.

**REQUEST NO. 79:**

To the extent not already requested, all agreements, including consulting agreements, licensing agreements, royalty agreements, non-disclosure agreements or any other agreement, between the Named Inventors and PureWick, Becton Dickinson, or C.R. Bard, or any agent or individual or entity under the control or controlled by any of the foregoing.

**REQUEST NO. 80:**

To the extent not already requested, all documents, including communications, reflecting payments or compensation by PureWick, Becton Dickinson, or C.R. Bard to any Named Inventor or any agent or individual or entity under the control or controlled by any Named Inventor.

**REQUEST NO. 81:**

To the extent not already requested, all documents, including communications, concerning any ownership or other financial interest in or PureWick, Becton Dickinson, or C.R. Bard by any Named Inventor or any agent or individual or entity under the control or controlled by any Named Inventor.

**REQUEST NO. 82:**

To the extent not already requested, all documents, including agreements, related to the manufacture of the PureWick Female External Catheter, or the subject matter of the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 83:**

To the extent not already requested, all agreements that include a license to the Patents-in-Suit or Related Patents or Applications.

**REQUEST NO. 84:**

To the extent not already requested, all in-licenses for the PureWick Female External Catheter, or the subject matter of the Patents-in-Suit or Related Patents and Applications.

**REQUEST NO. 85:**

To the extent not already requested, all documents reflecting criticisms, complaints, failures, and injuries (regardless of cause) related to the PureWick Female External Catheter and its design.

**REQUEST NO. 86:**

To the extent not already requested, all documents related to reports to the FDA for any issues or problems with any PureWick female urine collection device including any Manufacturer and User Facility Device Experience (MAUDE) events.

**REQUEST NO. 87:**

All documents relating to any statements of the Named Inventors related to the Patents-in-Suit or Related Patents or Applications, including without limitation affidavits, declarations, and deposition, hearing, or trial testimony.

**REQUEST NO. 88:**

To the extent not already requested, all documents relating to any secondary indicia of nonobviousness of the Patents-in-Suit, including:

    (a)    any long-felt need for the purported inventions claimed or technology disclosed in the Patents-in-Suit;

    (b)    any failure in the relevant art to solve the problems that are the subjects of the purported inventions claimed or technology disclosed in the Patents-in-Suit;

    (c)    any commercial success of the purported inventions claimed or technology disclosed in the Patents-in-Suit;

    (d)    any industry recognition or praise of the purported inventions claimed or technology disclosed in the Patents-in-Suit;

    (e)    any alleged copying or adoption by others of the purported inventions claimed or technology disclosed in the Patents-in-Suit; and

    (f)    any skepticism towards the purported inventions claimed or technology disclosed in the Patents-in-Suit.

**REQUEST NO. 89:**

All documents relating to any alleged nexus between any alleged secondary indicia of nonobviousness and the subject matter of any asserted claim of the Patents-in-Suit.

**REQUEST NO. 90:**

To the extent not already requested, all documents relating to any testing, analysis, or examination of the PrimaFit 2.0 by or on behalf of PureWick, including, but not limited to, documents sufficient to identify all persons who participated in the testing, analysis or examination of any such product.

**REQUEST NO. 91:**

All documents and things that PureWick reviewed or analyzed in anticipation of, and prior to, the filing of PureWick's Complaint concerning the operation, function, structure or design of any Sage product that PureWick alleges infringes any claim of the Patents-in-Suit.

**REQUEST NO. 92:**

Any agreements relating to the subject matter or outcome of this lawsuit, including agreements reflecting any financial or other interest in the lawsuit's outcome.

**REQUEST NO. 93:**

Documents sufficient to identify and describe PureWick's policies or practices regarding the retention and/or destruction of documents in whatever format, including paper, electronic, and/or e-mail.

**REQUEST NO. 94:**

All documents related to PureWick's allegedly lost or destroyed server or hard-drive potentially containing email, documents and other electronically stored information, and any backup server or hard-drive. This request includes, but is not limited to, all documents and communications concerning PureWick's first awareness that such server was lost, the circumstances related to how, when, and why such server was lost, any efforts to investigate the circumstances related to the allegedly lost or destroyed server, any efforts to recover the allegedly lost or destroyed server, and any documents sufficient to identify all individuals and entities (including third parties) involved in any of the foregoing.

**REQUEST NO. 95:**

All documents responsive to the following Requests for Production from Sage's First, Second, Third, and/or Fourth Set of Document Requests to PureWick Corporation in the

PureWick I Litigation: Req. for Prod. Nos. 11-16, 18-22, 27, 32, 37-39, 41-42, 46, 58, 61-63, 66, 68-70, 75-76, 82, 90-92.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*

Of Counsel:

Robert A. Surrette
Sandra A. Frantzen
Christopher M. Scharff
Ryan J. Pianetto
McAndrews, Held & Malloy, Ltd
500 West Madison Street
Chicago, IL 60661
(312) 775-8000
bsurrette@mcandrews-ip.com
sfrantzen@mcandrews-ip.com
cscharff@mcandrews-ip.com
rpianetto@mcandrews-ip.com

Dated: August 16, 2022

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant Sage Products, LLC*

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PUREWICK CORPORATION,

      Plaintiff,

v.

SAGE PRODUCTS, LLC,

      Defendant.

C.A. No. 22-102-MN

## OBJECTIONS AND RESPONSES TO SAGE PRODUCTS' FIRST SET OF DOCUMENT REQUESTS (NOS. 1-95) TO PUREWICK CORPORATION

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), Plaintiff PureWick Corporation ("PureWick" or "Plaintiff") hereby responds to Sage Products, LLC's ("Sage" or "Defendant") First Set of Document Requests (Nos. 1-95).

Pursuant to Fed. R. Civ. P. 26(e), Plaintiff reserves the right to supplement its responses to these Requests if it learns of additional responsive information.

## GENERAL RESPONSES

1.    Plaintiff's Responses to Defendant's First Set of Document Requests are made to the best of Plaintiff's present knowledge, information, and belief. These Responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Plaintiff's recollection, are subject to such refreshing of recollection, and such additional knowledge of facts, as may result from Plaintiff's further discovery or investigation. Plaintiff reserves the right to make use of, or to introduce at any hearing and trial, information, and/or documents responsive to Defendant's Requests but

discovered subsequent to the date of these Responses, including, but not limited to, any such information or documents obtained during discovery.

2.      Plaintiff's statement that it "will produce" documents means that Plaintiff will produce responsive, non-privileged documents in its possession, custody, or control based upon a reasonable search to the extent that they exist, and is not an admission that responsive, nonprivileged, or otherwise producible documents exist.

3.      Plaintiff reserves all objections or other questions as to the competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever of Plaintiff's Responses herein and any document or thing identified or provided in response to Defendant's Requests.

4.      Plaintiff reserves the right to object on any ground at any time to such other or supplemental requests as Defendant may at any time propound involving or relating to the subject matter of these Requests.

5.      Plaintiff incorporates each of the following General Objections and Objections and Responses to Instructions and Definitions into its Responses to each of Defendant's Requests, whether or not expressly referred to in each such Response.

6.      Plaintiff reserves the right to supplement its answers, objections, or production if Plaintiff uncovers additional documents or information called for by Defendant's Requests.

## GENERAL OBJECTIONS

Plaintiff makes the following General Objections, whether or not separately set forth in response to each Request, to each and every instruction, definition, and Request. By responding to any of the Requests or failing to specifically refer to or specify any particular General Objection

in response to a particular Request, Plaintiff does not waive any of these General Objections, or admit or concede the appropriateness of any Requests or any assumptions contained therein.

1.      Plaintiff objects to Defendant's Requests to the extent they are directed to matters and seek information, documents, or things that relate to Defendant's defenses of invalidity and unenforceability of U.S. Patent Nos. 10,226,376 ("the '376 Patent") and 10,390,989 ("the '989 Patent") ("the Asserted Patents"), which are barred by collateral estoppel and/or res judicata and are the subject of Plaintiff's pending motion for judgment on the pleadings (D.I. 13).

2.      Plaintiff objects to Defendant's Requests to the extent they are directed to matters and seek information, documents, or things that are not relevant to the subject matter at issue in this action.

3.      Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things that are not proportional to the needs of the case, considering the importance of the issues at stake in the actions, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

4.      Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things protected by the attorney-client privilege, work-product doctrine, common interest immunity or any other privilege, immunity, or protection afforded by law.  Documents withheld from production on the basis of privilege will be scheduled in accordance with Fed. R. Civ. P. 26(b)(5).  Any inadvertent disclosure or production of such information, documents, or things shall not be deemed a waiver of any privilege, immunity, or work-product with respect to such information, documents, or things.

5.     Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things that are no longer in existence.

6.     Plaintiff objects to Defendant's Requests to the extent they are duplicative, vague, ambiguous, overly broad, or unduly burdensome.

7.     Plaintiff objects to Defendant's Requests to the extent they seek to assign meaning to words different from their plain and ordinary meaning.

8.     Plaintiff objects to Defendant's Requests to the extent they call for expert testimony or opinions.

9.     Plaintiff objects to Defendant's Requests to the extent they call for a legal opinion or conclusion.

10.     Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things that are not in Plaintiff's possession, custody, or control.

11.     Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things that are readily accessible to Defendant from other sources, such as publicly available documents.

12.     Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things that are already in Defendant's possession.

13.     Plaintiff objects to Defendant's Requests to the extent they require Plaintiff to provide "all" or "any" documents.

14.     Plaintiff objects to Defendant's Requests to the extent they seek information, documents, or things subject to confidentiality agreements, protective orders, or any other obligation pursuant to which Plaintiff is required to protect or maintain the confidentiality of any third party's information or documents. Inadvertent disclosure of any confidential information,

documents, or things shall not operate as a waiver of any applicable confidentiality protection or obligations.

15.     Plaintiff objects to Defendant's Requests to the extent they attempt to impose obligations upon Plaintiff that are not required by the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, or any Order entered by the Court in this action.

16.     Plaintiff objects to Defendant's Requests to the extent they seek electronic discovery of information, documents, or communications prior to any agreement by the parties defining the parameters of such electronic discovery.

17.     Plaintiff objects to Defendant's Requests to the extent they seek production of emails and other electronically stored information in a manner that is inconsistent with the Stipulation and Order Regarding Modified Default Standard for Discovery, Including Production of Electronically Stored Material (ESI).

## OBJECTIONS AND RESPONSES TO DEFINITIONS AND INSTRUCTIONS

1.     Plaintiff objects to the definition of "document" and "documents" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "papers of all kinds and non-paper information storage means" and "originals and copies, however made, of letters, memoranda, emails, notes, calendars, records, minutes, studies, reports, notebooks, messages, telegrams, ledgers, legal instruments, agreements, drawings, sketches, graphs, prints, handwritten notes, rough drafts, secretarial notes, workpads, diaries, films, tapes, pictures, photographs, videotapes, books, pamphlets, publications, advertisements, sales literature, brochures, manuals, price lists, announcements, or any other writings, records or tangible objects where produced or reproduced mechanically, electrically, electronically, photographically or chemically, including any preliminary versions, drafts or revisions of any kind of the foregoing." Plaintiff also objects

to the definition of "document" and "documents" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "[a]ny document bearing marks, including, without limitation, initials, stamped initials, comments or notations not a part of the original test or photographic representation thereof," is considered "a separate document."

2.      Plaintiff objects to the definition of "Plaintiff" or "PureWick" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "any related or foreign or U.S. parent or associated companies, divisions, or subsidiaries, past or present, and each predecessor business entity whether incorporated or not, and the directors, officers, employees, agents, or attorneys thereof" and to the extent it includes "any former employee or agent" of Becton, Dickinson and Company and C.R. Bard, Inc.

3.      Plaintiff objects to the definition of "Becton Dickinson" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "any related or foreign or U.S. parent or associated companies, divisions, or subsidiaries, past or present, and each predecessor business entity whether incorporated or not, and the directors, officers, employees, agents, or attorneys thereof."

4.      Plaintiff objects to the definition of "C.R. Bard" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "any related or foreign or U.S. parent or associated companies, divisions, or subsidiaries, past or present, and each predecessor business entity whether incorporated or not, and the directors, officers, employees, agents, or attorneys thereof."

5.      Plaintiff objects to the definition of "Related Patents and Applications" and "Related Patents or Applications" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "any and all U.S. or foreign patents or patent applications that claim priority

to the 376 patent and the 989 patent, or any other patent or patent application to which any Asserted Patent claims priority including, but not limited to, all patents earlier and later in a prosecution chain, all child, parent, and sibling patents, patent applications, continuations, divisionals, continuations-in-part, foreign counterparts, and all patents and applications relying on any of the same priority dates as any of the Patents-in-Suit."

6.      Plaintiff objects to the definition of "External Urine Management Patents or Applications" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "any and all U.S. or foreign patents or patent applications relating to urine collection, disposal, or management outside or external to the urethra (male or female) including, but not limited to, the Patents-in-Suit and Related Patents and Applications."

7.      Plaintiff objects to the definition of "PureWick Female External Catheter" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "each model or iteration of any female external catheter product or system ever made, offered for sale, or sold by Plaintiff."

8.      Plaintiff objects to the definition of "person" as overly broad, unduly burdensome, vague, and ambiguous to the extent it includes "acts and knowledge of directors, officers, employees, agents, representatives, and attorneys acting on behalf of such 'person.'"

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All documents relating to, referring to, or concerning the Patents-in-Suit, or Related Patents and Applications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Plaintiff incorporates by reference all of its General Objections as if fully set forth herein. Plaintiff objects to this Request to the extent it seeks the production of documents relating to Defendant's defenses of invalidity and unenforceability of the Asserted Patents, which are barred

Plaintiff further objects to this Request to the extent it seeks the production of documents that are protected by the attorney-client privilege, work-product doctrine, and/or any other privilege, immunity, or protection afforded by law.  Plaintiff also objects to this Request to the extent that it seeks documents subject to confidentiality agreements, protective orders, or any other obligation pursuant to which Plaintiff is required to protect or maintain the confidentiality of any such documents.  Plaintiff additionally objects to this Request to the extent that it seeks documents that are outside of Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing general and specific objections, Plaintiff produced non-privileged documents responsive to this request, to the extent such documents were within its possession, custody, or control, and to the extent such documents existed and could be located following a reasonable search, in *PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN.  Thus, pursuant to Paragraph 8 of the Scheduling Order (D.I. 20), those documents are already available to Defendant in this action and Plaintiff will not conduct an additional search for documents responsive to this request.

## REQUEST FOR PRODUCTION NO. 11:

All communications of Camille Newton and Ray Newton after May 1, 2020 relating to any testing, offer for sale, sale, public use, disclosure to any third party, or any experimental use of any PureWick Female External Catheter.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

Plaintiff incorporates by reference all of its General Objections as if fully set forth herein. Plaintiff objects to this Request to the extent it seeks the production of documents relating to Defendant's defenses of invalidity and unenforceability of the Asserted Patents, which are barred by collateral estoppel and/or res judicata and are the subject of Plaintiff's pending motion for

judgment on the pleadings (D.I. 13).  Plaintiff also objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all communications," including communications that are not relevant to any product, claim, or defense in this action, and documents not calculated to lead to the discovery of admissible evidence.  Plaintiff objects to this Request to the extent it seeks the production of documents that are protected by the attorney-client privilege, work-product doctrine, and/or any other privilege, immunity, or protection afforded by law.  Plaintiff further objects to this Request to the extent that it seeks documents subject to confidentiality agreements, protective orders, or any other obligation pursuant to which Plaintiff is required to protect or maintain the confidentiality of any such documents.  Plaintiff additionally objects to this Request to the extent that it seeks documents that are outside of Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing general and specific objections, Plaintiff is willing to meet and confer with Defendant to attempt to reduce the burden and narrow the scope of this Request to information that is reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 12:**

All communications relating to PureWick's allegedly lost or destroyed server or hard-drive potentially containing email, documents and other electronically stored information, and any backup server or hard-drive including all emails and other communications to locate the information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Plaintiff incorporates by reference all of its General Objections as if fully set forth herein. Plaintiff objects to this Request to the extent it seeks the production of documents relating to

22

Defendant's defenses of invalidity and unenforceability of the Asserted Patents, which are barred by collateral estoppel and/or res judicata and are the subject of Plaintiff's pending motion for judgment on the pleadings (D.I. 13).  Plaintiff also objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks documents that are not relevant to any product, claim, or defense in this action, and documents not calculated to lead to the discovery of admissible evidence.  Plaintiff objects to this Request to the extent it seeks the production of documents that are protected by the attorney-client privilege, work-product doctrine, and/or any other privilege, immunity, or protection afforded by law.  Plaintiff further objects to this Request to the extent that it seeks documents subject to confidentiality agreements, protective orders, or any other obligation pursuant to which Plaintiff is required to protect or maintain the confidentiality of any such documents.  Plaintiff also objects to this Request to the extent it is not limited in time or the time period is vague and ambiguous.  Plaintiff additionally objects to this Request to the extent that it seeks documents that are outside of Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing general and specific objections, Plaintiff is willing to meet and confer with Defendant to attempt to reduce the burden and narrow the scope of this Request to information that is reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 13:**

Each iteration of PureWick's website (including .html files or other electronic files) prior to June 1, 2017, including the iteration of PureWick's website that was publicly available on February 13, 2015, that references any female urine collection device including the content contained therein and the date and substance of any changes.

**REQUEST FOR PRODUCTION NO. 94:**

All documents related to PureWick's allegedly lost or destroyed server or hard-drive potentially containing email, documents and other electronically stored information, and any backup server or hard-drive. This request includes, but is not limited to, all documents and communications concerning PureWick's first awareness that such server was lost, the circumstances related to how, when, and why such server was lost, any efforts to investigate the circumstances related to the allegedly lost or destroyed server, any efforts to recover the allegedly lost or destroyed server, and any documents sufficient to identify all individuals and entities (including third parties) involved in any of the foregoing.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 94:**

Plaintiff incorporates by reference all of its General Objections as if fully set forth herein. Plaintiff objects to this Request to the extent it seeks the production of documents relating to Defendant's defenses of invalidity and unenforceability of the Asserted Patents, which are barred by collateral estoppel and/or res judicata and are the subject of Plaintiff's pending motion for judgment on the pleadings (D.I. 13). Plaintiff also objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all documents and communications," including documents and communications that are not relevant to any product, claim, or defense in this action, and documents, patents, and patent applications not calculated to lead to the discovery of admissible evidence. Plaintiff objects to this Request to the extent it seeks the production of documents that are protected by the attorney-client privilege, work-product doctrine, and/or any other privilege, immunity, or protection afforded by law. Plaintiff further objects to this Request to the extent that it seeks documents and things subject to confidentiality agreements, protective orders, or any other obligation pursuant to which Plaintiff

is required to protect or maintain the confidentiality of any such documents and things.  Plaintiff also objects to this Request to the extent it is not limited in time or the time period is vague and ambiguous.  Plaintiff further objects to this Request to the extent it is cumulative and duplicative of other Requests, including at least Request No. 12.

Subject to and without waiving the foregoing general and specific objections, Plaintiff is willing to meet and confer with Defendant to attempt to reduce the burden and narrow the scope of this Request to information that is reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 95:**

All documents responsive to the following Requests for Production from Sage's First, Second, Third, and/or Fourth Set of Document Requests to PureWick Corporation in the PureWick I Litigation: Req. for Prod. Nos. 11-16, 18-22, 27, 32, 37-39, 41-42, 46, 58, 61-63, 66, 68-70, 75-76, 82, 90-92.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 95:**

Plaintiff incorporates by reference all of its General Objections as if fully set forth herein. Plaintiff objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all documents," including documents that are not relevant to any product, claim, or defense in this action, and documents, patents, and patent applications not calculated to lead to the discovery of admissible evidence.  Plaintiff also objects to this Request to the extent it seeks the production of documents that are protected by the attorney-client privilege, work-product doctrine, and/or any other privilege, immunity, or protection afforded by law.  Plaintiff further objects to this Request to the extent that it seeks documents and things subject to confidentiality agreements, protective orders, or any other obligation pursuant to

which Plaintiff is required to protect or maintain the confidentiality of any such documents and things. Plaintiff also objects to this Request to the extent it is not limited in time or the time period is vague and ambiguous. Plaintiff further objects to this Request to the extent it is cumulative and duplicative of other Requests, including at least Request Nos. 13, 14, 15, 17, 18, 24, 29, 33, 34, 35, 36, 51, 53, 57, 58, 61, 62, 65, and 71.

Subject to and without waiving the foregoing general and specific objections, Plaintiff produced non-privileged documents responsive to this request, to the extent such documents were within its possession, custody, or control, and to the extent such documents existed and could be located following a reasonable search, in *PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN. Thus, pursuant to Paragraph 8 of the Scheduling Order (D.I. 20), those documents are already available to Defendant in this action and Plaintiff will not conduct an additional search for documents responsive to this request.

DATE:  September 15, 2022

/s/ *Brian P. Biddinger*
SHAW KELLER LLP
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com

OF COUNSEL:

Steven C. Cherny
Raymond Nimrod
Brian P. Biddinger
Matthew A. Traupman
Nicola R. Felice
Jason C. Williams
Bianca A. Fox
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
(212) 849-7000

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PUREWICK CORPORATION, | |
| Plaintiff, | |
| v. | C.A. No. 22-102-MN |
| SAGE PRODUCTS, LLC, | |
| Defendant. | |

**DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES TO DEFENDANT (NOS. 2, 3, 4)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Sage

Products, LLC ("Sage") hereby supplements its objections and responses to Plaintiff's First Set of

Interrogatories to Defendant (Nos. 1-4).

**GENERAL OBJECTIONS**

1.      Sage objects to each of Plaintiff's interrogatories, instructions, and definitions to

the extent they attempt to impose any obligations on Sage beyond and/or inconsistent with those

set forth in the Federal Rules of Civil Procedure, the District of Delaware Local Rules, the Default

Standard for Discovery Including Discovery of ESI ("Default Standard") including any

modifications thereafter agreed upon by the parties, the Court's July 7, 2022 Scheduling Order

(D.I. 20) ("Case Scheduling Order"), the Court's July 19, 2022 Stipulated Protective Order (D.I.

26) ("Protective Order"), or any Order of the Court. Sage further incorporates its objections and

responses to PureWick's document requests.

2.      Sage objects to Plaintiff's interrogatories to the extent they seek information

protected from disclosure by the attorney-client privilege, the work product doctrine, or any other

privilege or protection afforded by law. Sage further objects to the extent that any interrogatory, definition, or instruction seeks logging of privileged information or communications generated after the filing of this lawsuit or any other category of information protected under Paragraph 1(d) of the Default Standard.

3.      Sage objects to Plaintiff's interrogatories to the extent they seek information not relevant to a claim or defense or to the subject matter of this litigation or not proportional to the needs of the case, considering the importance of the issues at stake, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

4.      Sage objects to Plaintiff's interrogatories as unduly burdensome to the extent that they seek discovery of information already within the possession, custody, and control of Plaintiff or Plaintiff's counsel or information that is available from public sources.

5.      Sage objects to each interrogatory to the extent it seeks identification of "all" documents or information and not identification of representative documents or information, making the interrogatories even more overly broad and unduly burdensome.

6.      Sage objects to Plaintiff's interrogatories to the extent they seek information that is subject to non-disclosure agreements, confidentiality agreements, court protective orders, or other obligations of confidentiality including, for example, patient medical records, to the extent Plaintiff's interrogatories seek such information in a manner inconsistent with such non-disclosure agreement, confidentiality agreement, court protective order, and/or another obligation of confidentiality. Sage will provide responsive, non-privileged, confidential information and documents pursuant to the Protective Order in accordance with its obligations of confidentiality.

7.    Sage objects to the definitions of "Sage" and "Defendant" as overly broad and unduly burdensome and to the extent the definitions and instructions attempt to impose an obligation on Sage to produce, identify, or locate information or documents not in its possession, custody, or control through inclusion of individuals and entities other than Sage Products, LLC in the definition. Sage will only provide information within the possession, custody, and control of Sage.

8.    Sage objects to the definition of "Accused Product" as vague, overly broad, and unduly burdensome to the extent that it includes products other than Sage's PrimaFit® 2.0 product accused of infringing the Patents-in-Suit in this lawsuit as identified, for example, in Exhibit 3 to Plaintiff's Complaint (D.I. 1) and in PureWick's Infringement Contentions. Sage further objects to Plaintiff's interrogatories as overly broad and unduly burdensome to the extent they seek technical information and documents for products not relevant to any claim or defense in this case, for example, to the extent Plaintiff's interrogatories seek information and documents related to the accused Sage product at issue in *PureWick Corporation v. Sage Products, LLC*, C.A. No. 19-1508-MN (D. Del.) ("PureWick I Litigation"). Throughout its discovery responses, Sage is interpreting "Accused Product" to be the Sage PrimaFit® 2.0 product identified and depicted in Plaintiff's Complaint, e.g., at Exhibit 3, and in PureWick's Infringement Contentions. Moreover, Sage incorporates by reference General Objection No. 13.

9.    Sage objects to the definition of "PureWick's FEC" as vague and indefinite as PureWick has sold a variety of different products, including structurally different products, under the name "PureWick Female External Catheter." Unless PureWick further clarifies its definition of "PureWick's FEC," Sage is interpreting "PureWick's FEC" to be the PureWick System

including the PureWick Female External Catheter depicted on https://www.purewickathome.com/ as of September 6, 2022.

10.     Sage object to the definition of "Prior Art" as vague and indefinite. Sage will interpret "Prior Art" to the best of its understanding of the term as used in the context of patent law.

11.     Sage objects to Plaintiff's interrogatories to the extent they require Sage to review, search, identify, or collect information and documents from other litigations including documents and things in the possession of Sage's outside counsel.

12.     Sage objects to Plaintiff's interrogatories as overly broad and unduly burdensome to the extent they require searching and collection from custodians and data sources other than those identified in Sage's disclosures pursuant to Paragraph 3 of the Default Standard or any modification thereof agreed-upon by both Parties.

13.     Sage further objects to Plaintiff's interrogatories to the extent they are unbounded in time and therefore seek irrelevant information. For example, Sage objects to Plaintiff's interrogatories that seek information from prior to six years before the filing of the complaint to the extent such interrogatories are not in accordance with Paragraph 4(e) of the Default Standard. Sage further objects to the extent the interrogatories seek infringement-related or damages-related information regarding the accused Sage product at issue in the PureWick I Litigation and/or during a time period that predates the issuance of the Patents-In-Suit or prior to Sage receiving notice of the Patents-In-Suit.

14.     Sage objects to Plaintiff's interrogatories as premature to the extent they seek information in advance of the timelines set forth in the Default Standard or the Case Scheduling

Order. For example, expert-related discovery will proceed as required by the Case Scheduling Order.

15.     Sage's investigation and preparation for trial in the above-captioned litigation is continuing and discovery in this action has just commenced. All responses to the following interrogatories are based on information presently known to Sage after a reasonable effort to locate information called for by these interrogatories. Thus, Sage's responses are based on preliminary information in its possession and Sage reserves the right to supplement its responses to the extent Sage learns of additional information that may develop or come to Sage's attention at a later time. In addition, Sage's objections as set forth herein are made without prejudice to Sage's right to assert any additional or supplemental objections should Sage discover additional grounds for such objections.

16.     Sage is willing to meet and confer to discuss its objections in a good faith attempt to resolve or narrow any differences between the parties. Sage otherwise incorporates its General and specific objections set forth in its prior responses to Plaintiff's Interrogatories and Requests for Production of Documents and Things.

## **INTERROGATORIES**

2.      For any asserted claim of the Patents-in-Suit that Defendant contends its Accused Product does not infringe, either directly, indirectly, literally, or under the doctrine of equivalents, provide the full bases for Defendant's contention, including by identifying each limitation in each claim that Defendant contends the Accused Product does not infringe, stating and explaining in full for each such limitation the entire legal and factual basis for the contention of non-infringement, identifying by production number all documents that support Defendant's contention, and identifying all persons (expert or otherwise) with knowledge regarding Defendant's contentions and/or upon whom Defendant intends to rely to support its contentions.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 2:**

In addition to the General Objections set forth above, Sage objects to this interrogatory as a premature contention interrogatory that has been served before a substantial amount of discovery has been completed. Discovery has just started in this case and there has been no deposition discovery. Sage objects to this interrogatory as premature to the extent it seeks information that is the subject of expert discovery, which will be provided according to the Case Scheduling Order. Sage also objects to this interrogatory as premature because the parties have not yet proffered their proposed constructions of the asserted claims, and the Court's final claim constructions may affect Sage's non-infringement contentions. Sage objects to this interrogatory as overly broad, unduly burdensome, and seeking information not relevant to the claims or defenses of any party or proportional to the needs of the case. For example, Sage objects to this interrogatory as vague, overly broad, unduly burdensome, and seeking information not relevant to the claims or defenses of any party or proportional to the needs of the case to the extent the definition of "Accused Product" includes products other than Sage's PrimaFit® product identified in Plaintiff's Complaint and its infringement contentions. Sage also objects to this interrogatory as overly broad, unduly burdensome, and seeking information not relevant to the claims or defenses of any party or proportional to the needs of the case to the extent it requests Sage provide non-infringement bases

6

for unasserted claims. Sage objects to this interrogatory as overly broad and unduly burdensome in that it requests Sage "stat[e] and explain[] in full for each such limitation the entire legal and factual basis for the contention of non-infringement." Sage objects to this interrogatory because it contains multiple discrete parts, which should be counted as separate interrogatories pursuant to Fed. R. Civ. P. 33. The request that Sage identify "all documents" rather than representative documents or documents sufficient to show the relevant information is overly broad and unduly burdensome. That is particularly burdensome since all of Sage's documents relating to the PrimaFit® product could potentially show why and how there is no infringement since many of the claim elements are missing.

Subject to and without waiving any general or specific objections, Sage incorporates the factual and legal bases for its allegations of non-infringement with respect to the PrimaFit® product identified in Sage's Answer and Defenses (D.I. 8), and also incorporates by reference the factual and legal basis set forth in its July 1, 2022 Opposition to PureWick's Motion for Judgment on the Pleadings, as well as Sage's response to Interrogatory No. 4 (below). The PrimaFit® 2.0 product is a completely new design of the product at issue in the PureWick I litigation, offering new features as well as removing features that PureWick claimed were infringing. The PrimaFit® 2.0 was identified as a non-infringing alternative during the course of the PureWick I litigation. (PureWick I Litigation, D.I. 209, Ex. 24 at 174-184.) Even though the PrimaFit® 2.0 product was publicly available in 2019 and PureWick obtained extensive discovery on it as a non-infringing alternative in the PureWick I litigation, PureWick never brought a claim asserting infringement of that design in the PureWick I litigation. PureWick is estopped and precluded from doing so now in a second lawsuit. With respect to the 376 patent, for example, the PrimaFit® 2.0 product does not include several elements of the claims of the 376 patent, including at least the claimed

7

"apparatus" that includes "a fluid impermeable casing having a fluid reservoir at a first end, a fluid outlet at a second end," "a fluid permeable casing . . . defining a longitudinally elongated opening between the fluid reservoir and the fluid outlet," "a fluid permeable support disposed within the casing," "a fluid permeable support . . . with a portion extending across the elongated opening," "fluid reservoir," "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir," "a fluid impermeable layer," a "longitudinally elongated opening," "a fluid permeable membrane disposed on the support . . . so that the membrane is supported on the support and disposed across the elongated opening," and/or a "tube having a first end disposed in the reservoir" as required by asserted claim 1 of the 376 patent. This is at least because the PrimaFit® 2.0 product does not include at least a casing, much less an impermeable one or one that has or defines a fluid reservoir. The PrimaFit® 2.0 product does not have a fluid reservoir, much less one where the fluid permeable support is distinct from and at least proximate to the fluid reservoir. Nor does the PrimaFit® 2.0 have a tube having a first end disposed in the reservoir. The PrimaFit® 2.0 product also does not include a membrane supported on an inner support or the other elements enumerated above.

The PrimaFit® 2.0 also does not have a support and casing that are "substantially cylindrical," and the PrimaFit® 2.0 is not "configured to be: disposed with the elongated opening adjacent the urethral opening of a human female; oriented with the reservoir adjacent to the user's anus and the outlet disposed above the urethral opening; and arranged with a curved shape with the elongated opening disposed on the inside of the curve.". The PrimaFit® 2.0 does not have a fluid permeable membrane that "includes a wicking material." The PrimaFit® 2.0 also does not have a reservoir that is "defined between the fluid impermeable casing and the fluid permeable support."

With respect to the 989 patent, the PrimaFit® 2.0 product does not include several elements of the claims of the 989 patent, including at least the claimed "method" that includes "disposing in an operative relationship with the urethral opening of a female user a urine collecting apparatus" where the "urine collection apparatus" includes "a fluid impermeable casing having a fluid reservoir at a first end, a fluid outlet at a second end," "a fluid impermeable casing . . . defining a longitudinally elongated opening between the fluid reservoir and the fluid outlet," "elongated opening," "a fluid impermeable casing having . . . a longitudinally extending fluid impermeable layer," a "fluid impermeable layer," "a fluid permeable support disposed within the fluid impermeable casing," "a fluid permeable support . . . with a portion extending across the elongated opening," "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir," "fluid permeable support" and "a fluid permeable membrane disposed on the fluid permeable support . . . so that the fluid permeable membrane is supported on the fluid permeable support and disposed across the longitudinally elongated opening," "allowing urine discharged from the urethral opening to be received through the longitudinally elongated opening of the longitudinally extending fluid impermeable layer, the fluid permeable membrane, the fluid permeable support, and into the fluid reservoir, " "allowing the received urine to be withdrawn from the fluid reservoir via the tube and out of the fluid discharge end of the tube," and/or a "tube having a first end disposed in the reservoir" as required by asserted claim 1 of the 989 patent. This is at least because the PrimaFit® 2.0 product does not include at least a casing, much less an impermeable one or one that has or defines a fluid reservoir. The PrimaFit® 2.0 product does not have a fluid reservoir, much less one where the fluid permeable support is distinct from and at least proximate to the fluid reservoir. Nor does the PrimaFit® 2.0 have a tube having a first end disposed

in the reservoir. The PrimaFit® 2.0 product also does not include a membrane supported on an inner support. The use of the PrimaFit® 2.0 product therefore does not infringe any of the claims.

Use of the PrimaFit® 2.0 also does not include "fluidically coupling the fluid discharge end of the tube to a source of vacuum to assist in withdrawing the urine from the fluid reservoir via the tube," "fluidically coupling the fluid discharge end of the tube to a fluid receptacle and allowing urine withdrawn from the fluid reservoir of the urine collecting apparatus via the tube to be received in the fluid receptacle," or "removing the urine collecting apparatus from the operative relationship with the urethral opening of the user." Use of the PrimaFit® 2.0 also does not include a urine collecting apparatus that is "a first urine collecting apparatus and further comprising disposing in operative relationship with the urethral opening of a female user a second urine collecting apparatus substantially similar to the first urine collecting apparatus." Use of the PrimaFit® 2.0 also does not have a fluid permeable support and fluid impermeable casing that are "cylindrical and have a curved shape with the longitudinally elongated opening disposed on the inside of the curve, the disposing including disposing the urine collecting apparatus with the longitudinally elongated opening adjacent the urethral opening of the user and oriented with the fluid reservoir adjacent the user's anus and the outlet disposed above the urethral opening."

The PrimaFit® 2.0 also does not include the claimed "apparatus" that includes a "fluid permeable support disposed between a fluid permeable membrane and fluid reservoir," "the fluid permeable support is distinct from and at least proximate to the fluid reservoir," "a fluid outlet; "a fluid impermeable layer," "a fluid impermeable layer disposed over at least a portion of the fluid permeable support and over at least a portion of the fluid permeable membrane, the fluid impermeable layer including the fluid reservoir at a first end thereof," a fluid impermeable layer "defining a fluid impermeable casing," a fluid permeable support that is "disposed within the fluid

impermeable casing," "the fluid impermeable layer defining a longitudinally elongated opening, the fluid permeable membrane extending across the longitudinally elongated opening," "the apparatus configured to be disposed with the longitudinally elongated opening, and a portion of the fluid permeable membrane, adjacent to a urethral opening of a user, to receive urine discharged from the urethral opening through the fluid permeable membrane, the fluid permeable support, and into the fluid reservoir, and to have the received urine withdrawn from the fluid reservoir via the fluid outlet," and "the fluid impermeable layer including a vacuum relief opening therethrough spaced from the longitudinally elongated opening and arranged to provide a flow path for air in the event that the skin of the user occludes the longitudinally elongated opening" as recited by claim 7 of the 989 patent including for at least the reasons outlined above.

Sage further incorporates its response to Interrogatory No. 4 as well as the expert reports of Donald Sheldon in the PureWick I litigation regarding noninfringement of the PrimaFit 2.0.

In addition, PureWick's allegations of infringement by the PrimaFit 2.0 in PureWick II are barred under the doctrine of estoppel including judicial estoppel and claim preclusion.  With regard to the claims of both patents-in-suit, PureWick's current positions are in direct contradiction to its claim interpretation in PureWick I, upon which it has prevailed to date, including its positions regarding no invalidity based upon WO2007042823A2 ("Van Den Heuvel 823").  For example, in PureWick I, PureWick repeatedly contended that an area at the tapered end of a product between a permeable support and a casing, such as that disclosed in Van Den Heuvel 823 (item 4), is not a "reservoir" because a reservoir must "aggregate urine."  For example, PureWick repeatedly contended that, unlike a product that had a cap (such as the product at issue in PureWick I), a product that had an area at the end (such as the product in Van Den Heuvel) was not a reservoir, because for example there is allegedly no evidence "that urine could accumulate in that space" and

"no place for fluid to aggregate." (Trial Tr. at 1174, 1162; D.I. 345, PureWick's May 19, 2022

Opp. to Sage's Post-Trial Motions at 14-15.)



Yet, now that Sage's product has been modified to remove the cap, PureWick now argues the opposite and asserts infringement against PrimaFit 2.0 even though it removes the very features that PureWick had alleged was the reservoir in PureWick I (the cap) and uses the prior art features that PureWick claimed were not covered by its patent (see also infra) or were not invalidating. PureWick made no effort to establish that an alleged area at the tapered end of the PrimaFit 2.0 product is a "reservoir," e.g., that it "aggregates urine," as it previously asserted was required by that term. Nor has PureWick established that urine could accumulate during use in the area at the end of the PrimaFit 2.0 or that it is a place for fluid to aggregate. PureWick is legally estopped from taking such a position, including under the doctrine of judicial estoppel. PureWick is currently taking a position that is clearly inconsistent with its earlier position in PureWick I. PureWick's earlier position was accepted by the prior tribunal in PureWick I as of this writing.

And PureWick's change in position creates an unfair advantage or detriment absent estoppel. Moreover, based on PureWick's representations in the prior litigation as well as the prosecution history (discussed infra in response to Interrogatory No. 4, which is incorporated by reference), the claims cannot be reasonably construed to cover the PrimaFit 2.0 product.

As Sage explained in its September 22, 2022 Preliminary Identification of Claim Constructions, the claim elements have their plain and ordinary meaning (to the extent not indefinite) in view of the specifications, prosecution histories (including prosecution disclaimers), and the knowledge of the ordinarily skilled artisan. That ordinary meaning is also reflected by PureWick's litigation statements that bear on the meaning of the term and likewise offer a preclusive effect. For example, based on PureWick's own representations, a "reservoir" must "aggregate urine." PureWick's infringement contentions fail to support that any aspect of the PrimaFit 2.0 has a structure that "aggregates urine," much less the area at the end of the device as claimed.

Sage has also not contributorily infringed or induced infringement of any valid and enforceable claim of the Patents-In-Suit. Sage does not have the requisite specific intent to infringe or knowledge of infringement of the Patents-In-Suit required for inducement of infringement or contributory infringement. Sage does not offer to sell or sell within the United States or import into the United States any component knowing that it is especially made or especially adapted for use in infringement of the Patents-In-Suit. Moreover, there is also no direct infringement because PureWick has not established that there is any party that performs all of the steps of any claimed method claim. For example, PureWick has not established that there is any party that performs the steps of "disposing …a urine collection apparatus" and also performs the steps of "allowing the urine discharged…to be received [in the device]", and "allowing the received urine to be

13

withdrawn." Under Plaintiff's own allegations, various unrelated parties and actors that do not act in concert would perform such steps, and Sage does not direct or control others' performance. This is also true for at least the steps of the "fluidically coupling the fluid discharge end of the tube [to vacuum]", "allowing urine ….to be received in the fluid receptacle," and "disposing in operative relationship . . . a second urine collecting apparatus." For each claim, PureWick has failed to show that any single party performs all of these steps. Moreover, despite its burden, PureWick has provided no evidence of direct infringement whatsoever even with disparate parties.

Sage further states that discovery is ongoing and Sage will supplement its response to this interrogatory as necessary pursuant to Fed. R. Civ. P. 26(e) after further discovery has been conducted. Sage expressly reserves the right to supplement, modify, or amend its responses contained herein.

3.      State the basis for any contention that any infringement of the Patents-in-Suit was not or will not be willful, including identifying all facts, literature, or other documents or evidence that Defendant asserts support its contention, and identifying each person with knowledge of such facts.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 3:**

In addition to the General Objections set forth above, Sage objects to this interrogatory as premature because it seeks information that is the subject of ongoing discovery and investigation, both of which are in the early stages. Discovery has just started in this case and there has been no deposition discovery. Plaintiff bears the burden of establishing willful infringement and Plaintiff has proffered no facts that indicate that Sage has willfully infringed any Patent-In-Suit. Responding to this interrogatory prior to any affirmative identification of evidence by Plaintiff is premature. Sage objects to this interrogatory to the extent it seeks information which is protected by any applicable privilege, including attorney-client privilege and/or work product immunity

doctrine. Sage objects to this interrogatory as overly broad, unduly burdensome, and seeking information not relevant to the claims or defenses of any party or proportional to the needs of the case. For example, Sage objects to this interrogatory as overly broad and unduly burdensome in that it requests that Sage identify "all facts, literature, or other documents or evidence" rather than representative facts, literature, documents or other evidence sufficient to show the relevant information. Sage objects to this interrogatory as overly broad, unduly burdensome, and seeking information not relevant to the claims or defenses of any party or proportional to the needs of the case in requesting Sage identify "each person with knowledge of such facts." Sage objects to this interrogatory because it contains multiple discrete parts, which should be counted as separate interrogatories pursuant to Fed. R. Civ. P. 33.

Subject to and without waiving any general or specific objections, Sage states that Plaintiff has not explained why it believes Defendant's alleged infringement was willful despite being its burden, and thus this request is premature at this time. Sage will supplement its response at an appropriate time after Plaintiff provides its alleged basis, if any, for why Sage's alleged infringement is allegedly willful in this case and after a substantial amount of discovery has been completed. Sage further responds that it has not, does not, and will not willfully infringe any of the Patents-In-Suit, at least because the accused PrimaFit® 2.0 product, and the use of the accused PrimaFit® 2.0 product, does not infringe any claim of the Patents-In-Suit and because the Patents-In-Suit are invalid and unenforceable.

In particular, Sage states that at all times since it developed the PrimaFit® 2.0 it has had a good-faith belief that the PrimaFit® 2.0 product does not infringe any asserted claim of the Patents-In-Suit, and incorporates its response to Interrogatory No. 2. Sage also incorporates by reference the factual and legal bases set forth in Sage's Answer and Defenses (D.I. 8) for its allegations that

15

the accused PrimaFit® 2.0 product does not infringe any claim of the Patents-In-Suit, that the claims of the Patents-In-Suit are invalid for failure to meet one or more of the conditions of patentability as specified in Title 35 of the United States Code, including 35 U.S.C. §§ 102, 103, and/or 112, et seq., and unenforceable including for inequitable conduct, and that Plaintiff's claims are barred or otherwise limited under principles of equity, including waiver, estoppel including judicial estoppel and claim preclusion, unclean hands (including inequitable conduct), and/or acquiescence and render the patents-in-suit unenforceable. Further details have been and will be outlined in forthcoming invalidity contentions and expert reports as well as Sage's response to Interrogatory Nos. 2 and 4 herein.

In addition, Sage states that it has not willfully infringed the Patents-in-Suit because it has at all times since it developed the PrimaFit® 2.0 had a good faith belief that the PrimaFit® 2.0 is a bona-fide non-infringing redesign.  In particular, the PrimaFit 2.0 product is a completely different design and redevelopment of a urine management product. Though PureWick has been aware of the PrimaFit 2.0 product since at least February 2021 before the first deposition was taken by PureWick in the PureWick I case and knew that Sage contended it was a non-infringing alternative to the product at issue in PureWick I, PureWick never sought to add PrimaFit 2.0 as an infringing product to that case or claim infringement (and PureWick is estopped and precluded from doing so now). PureWick knew that Sage had designed, developed, and launched PrimaFit 2.0, which Sage contended was a non-infringing alternative in the PureWick I litigation; however, PureWick never alleged infringement of PrimaFit 2.0 during that case.

In the PureWick I litigation, PureWick did not identify PrimaFit 2.0 as an infringing product and did not accuse the product of infringing (despite numerous interrogatories on the topic and PureWick bearing the burden of proving the lack of non-infringing alternatives to support its

damages claims). The first time any allegation of infringement arose was in Reply expert reports when Sage had no chance to respond.

PureWick knew that Sage contended that the PrimaFit 2.0 product was a non-infringing alternative design to the PureWick product and PureWick took no action to allege that it was not, allowing Sage to continue on with full launch of that design alternative. In an interrogatory response relating to non-infringing alternatives, Sage identified numerous documents relating to the PrimaFit 2.0 design including, among other things, directions for use, pictures of the product, specifications and drawings, and a business plan relating to the development and release of the product. Sage also identified documents about PrimaFit 2.0 that PureWick had included in its own witness binders. PureWick questioned virtually every Sage fact witnesses about the PrimoFit 2.0 product during PureWick I. Sage even deposed a witness whose sole relevance to the PureWick I litigation was to discuss the structure and function of that product as a non-infringing alternative. Another Sage witness deposed in March 2021 testified that the PrimaFit 2.0 product had been launched in 2019. In March 2021, PureWick also inspected the PrimaFit 2.0 after having been provided detailed schematics. Yet, PureWick never brought a claim of infringement against Sage, again allowing Sage to move forward with the product.

Additional details regarding Sage's disclosures to PureWick regarding PrimaFit 2.0 are discussed in the following filings in the PureWick I litigation, which Sage incorporates by reference: Sage's Opening and Reply briefs on its motion to exclude and strike the testimony of John Collins (including, for example, D.I. 205 at 8-10 and D.I. 255 at 5); Sage's Opposition to PureWick's Motion to exclude the expert opinions of Donald Sheldon and Vincent Thomas (D.I. 232 at 1-4); and Sage's Opposition to PureWick's Motion In Limine No. 3 to Preclude Evidence or Argument that Sage's PrimaFit 2.0 Non-Infringing Alternative is Commercially Available (D.I.

308). 75. Yet despite the pending lawsuit on the 376 and 989 patents, PureWick never attempted to add an infringement claim relating to PrimaFit 2.0 to the PureWick I litigation. Nor did PureWick respond to Sage's interrogatory asking PureWick to identify why any asserted non-infringing alternatives (such as PrimaFit 2.0) were not infringing. Despite knowing about the PrimaFit 2.0, PureWick never raised any infringement or potential infringement issues relating to the PrimaFit 2.0 and the 989 or 376 patents in any correspondence between the parties, during any meet and confers between the parties, or during any conferences with the Court. That is because PureWick knew the design was not infringing just as Sage had repeatedly alleged. Discovery closed in April 2021 and PureWick never raised any infringement allegations with regard to that product.

After the close of fact discovery, the PureWick I litigation proceeded through the close of expert discovery and motions for summary judgment. Indeed, despite PureWick's burden of establishing the absence of non-infringing alternatives, PureWick's opening expert reports never attempted to prove that PrimaFit 2.0 was "infringing." It was not until its Reply expert report, filed months later, that PureWick unexpectedly asserted infringement and even then, PureWick did not seek to add the PrimaFit 2.0 into the case or raise cognizable claims of patent infringement.

Thus, in its correspondence and meetings with Sage and the Court throughout the PureWick I litigation, PureWick never accused the PrimaFit 2.0 of infringement and never referenced any issues related to infringement and the PrimaFit 2.0. PureWick's actions and inactions led Sage to believe that PureWick did not believe that the PrimaFit 2.0 infringed any PureWick patents. Instead of lodging new infringement allegations during the PureWick I litigation such that the cases could have been tried together, PureWick misleadingly allowed Sage to continue to move forward with the PrimaFit 2.0 product. In moving forward with the PrimaFit

18

2.0 product, Sage relied on PureWick's actions and inactions and the fact that Sage had not been accused of infringement or sued for infringement by PureWick.

Almost a year after PureWick became aware of PrimaFit 2.0 product (and Sage's contention that it was a non-infringing alternative), PureWick changed course with the filing of this PureWick II lawsuit. PureWick's allegations of infringement by the PrimaFit 2.0 in PureWick II, however, are contrary to the arguments it made in the PureWick I lawsuit to overcome WO2007042823A2 ("Van Den Heuvel") as discussed above in response to Interrogatory No. 2.

In addition, as discussed above in Sage's response to Interrogatory No. 2, PureWick's allegations of infringement by the PrimaFit 2.0 in PureWick II are barred under the doctrine of estoppel including judicial estoppel and claim preclusion.  With regard to the claims of both patents-in-suit, PureWick's current positions are in direct contradiction to its claim interpretation in PureWick I, upon which it has prevailed to date, including its positions regarding no invalidity based upon WO2007042823A2 ("Van Den Heuvel 823").  For example, in PureWick I, PureWick repeatedly contended that an area at the tapered end of a product between a permeable support and a casing, such as that disclosed in Van Den Heuvel 823 (item 4), is not a "reservoir" because a reservoir must "aggregate urine."  For example, PureWick repeatedly contended that, unlike a product that had a cap (such as the product at issue in PureWick I), a product that had an area at the end (such as the product in Van Den Heuvel) was not a reservoir, because for example there is allegedly no evidence "that urine could accumulate in that space" and "no place for fluid to aggregate." (Trial Tr. at 1174, 1162; D.I. 345, PureWick's May 19, 2022 Opp. to Sage's Post-Trial Motions at 14-15.)

Yet, now that Sage's product has been modified to remove the cap, PureWick now argues the opposite and asserts infringement against PrimaFit 2.0 even though it removes the very features

that PureWick had alleged was the reservoir in PureWick I (the cap) and uses the prior art features that PureWick claimed were not covered by its patent (see also infra) or were not invalidating. PureWick made no effort to establish that an alleged area at the tapered end of the PrimaFit 2.0 product is a "reservoir," e.g., that it "aggregates urine," as it previously asserted was required by that term. Nor has PureWick established that urine could accumulate during use in the area at the end of the PrimaFit 2.0 or that it is a place for fluid to aggregate. PureWick is legally estopped from taking such a position, including under the doctrine of judicial estoppel. PureWick is currently taking a position that is clearly inconsistent with its earlier position in PureWick I. PureWick's earlier position was accepted by the prior tribunal in PureWick I as of this writing. And PureWick's change in position creates an unfair advantage or detriment absent estoppel. Moreover, based on PureWick's representations in the prior litigation as well as the prosecution history (discussed infra in response to Interrogatory No. 4, which is incorporated by reference), the claims cannot be reasonably construed to cover the PrimaFit 2.0 product.

In addition, to the extent that PureWick argues that any alleged willful infringement in the PureWick I litigation with respect to the original PrimaFit can be imputed to or applied to PrimaFit 2.0, Sage denies and disputes those allegations. First the products at issue in both cases are completely different and were, in fact, designed to be different with Sage specifically removing features that PureWick claimed were infringing and features that PureWick asserted were not covered by its patents (in prior art) at trial and throughout its contentions. Moreover, in any case, Sage has at all times since the verdict in PureWick I believed that the jury's verdicts of infringement and willfulness in the PureWick I litigation were erroneous and should be overturned either by the District Court on Sage's post-trial motions or by the Federal Circuit on appeal. Sage reiterates and incorporates by reference its briefing in the *PureWick I* litigation in support of its

Motions for renewed judgment as a matter of law and for a new trial, which explain that with respect to the original PrimaFit® product, PureWick offered no evidence of any post-issuance willfulness by Sage, that Sage's pre-issuance activity cannot as a matter of law establish willfulness, and that Sage did not copy any PureWick device, much less any patented device. Sage further states that discovery is ongoing and Sage will supplement its response to this interrogatory as necessary pursuant to Fed. R. Civ. P. 26(e) after further discovery has been conducted. Sage expressly reserves the right to supplement, modify, or amend its responses contained herein.

4.    Provide the complete factual and legal bases for each of Defendant's affirmative defenses raised in its Answer to Plaintiff's Complaint.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY 4:**

In addition to the General Objections set forth above, Sage objects to this interrogatory as compound, overly broad and unduly burdensome in that it requests Sage identify "the complete factual and legal bases for each of Defendant's affirmative defenses." Sage objects to this interrogatory because it contains multiple discrete parts, which should be counted as separate interrogatories pursuant to Fed. R. Civ. P. 33. Indeed, there are at least eleven enumerated affirmative defenses, many of which have sub defenses, including at least:

1. The Complaint fails to state a claim upon which relief can be granted, including, but not limited to, failing to adequately plead indirect or willful infringement and failing to plead infringement.

2. Sage has not engaged and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of any of the patents-in-suit.

3.  Sage has not engaged and is not engaging in any act that constitutes willful infringement of any valid and enforceable claim of any of the patents-in-suit.

4.  The claims of the patents-in-suit are invalid for failure to meet one or more of the conditions of patentability as specified in Title 35 of the United States Code, including 35 U.S.C. §§ 102, 103, and/or 112, *et seq*. No claim of the patents-in-suit can be validly construed to cover any product or action of Sage.

5.  Plaintiff's claims are barred in whole or in part by prosecution history estoppel.

6.  Plaintiff's claims are barred or otherwise limited under principles of equity, including waiver, estoppel, unclean hands, and/or acquiescence and render the patents-in-suit unenforceable.

7.  Plaintiff's right to seek damages is limited or barred, including, without limitation, by 35 U.S.C. § 287.

8.  Plaintiff is barred by 35 U.S.C. § 288 from recovering any costs associated with this suit.

9.  Plaintiff may not seek injunctive relief against Sage because the alleged damages are not immediate or irreparable.

10. Plaintiff has suffered no damages.

11. This is an exceptional case, and Sage is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285.

12. The 376 and 989 patents are unenforceable as a result of inequitable conduct before the United States Patent and Trademark Office.

Thus, the interrogatory is unduly compound and improper under established law.

Sage further objects to this interrogatory as premature because it seeks information that is the subject of ongoing discovery and investigation, both of which are in the early stages. Discovery has just started in this case and there has been no deposition discovery. Sage objects to this interrogatory as premature to the extent it seeks information in advance of the timelines set forth in the Default Standard or the Case Scheduling Order, including the date for invalidity contentions. Sage objects to this interrogatory to the extent it seeks information which is protected by any applicable privilege, including attorney-client privilege and/or work product immunity doctrine. Sage objects to this interrogatory because it attempts to impose obligations on Sage beyond and/or inconsistent with those set forth in the Federal Rules of Civil Procedure, the District of Delaware Local Rules, the Default Standard, the Case Scheduling Order, the Protective Order, or any Order of the Court.

Subject to and without waiving any general or specific objections, Sage hereby incorporates Sage's Answer and Defenses (D.I. 8), which explain the basis of its defenses. Sage also incorporates its responses to Interrogatories Nos. 1-3, which relate to at least some of its affirmative defenses, as well as its Invalidity Contentions, including its Initial Invalidity Contentions dated September 15, 2022. Further, Sage incorporates by reference its Fourth Supplemental Response to PureWick's Interrogatory No. 5 in PureWick I, which sought similar information as it related to that case.

For example, Sage has not engaged and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of any of the patents-in-suit. Sage incorporates Sage's response to Interrogatory No. 2 and Sage's Answer and Defenses (D.I. 8). In addition to there being no direct infringement, Sage does not have the requisite specific intent to

infringe or knowledge of infringement of the '989 patent required for inducement of infringement or contributory infringement. Sage does not offer to sell or sell within the United States or import into the United States any component knowing that it is especially made or especially adapted for use in infringement of the '989 patent. No third party directly infringes the '989 patent via use of a PrimaFit® 2.0 product.

In addition, for example, Sage has not engaged and is not engaging in any act that constitutes willful infringement of any valid and enforceable claim of any of the patents-in-suit. It is PureWick's burden to establish willful infringement. Sage has not and cannot willfully infringe the 376 and 989 patents as explained previously in response to Interrogatory No. 2. Not only does PureWick fail to provide any evidence that would satisfy the requisite elements for willfulness, Sage cannot willfully infringe an invalid and/or not infringed patent.

The claims of the patents-in-suit are invalid for failure to meet one or more of the conditions of patentability as specified in Title 35 of the United States Code, including 35 U.S.C. §§ 102, 103, and/or 112, et seq. No claim of the patents-in-suit can be validly construed to cover any product or action of Sage. As a preliminary matter, in the PureWick I litigation, the priority date of the patents-in-suit were determined to be the filing dates (September 8, 2016, and June 1, 2017). The patents-in-suit are therefore invalid in view of admitted sales, offers for sales, and disclosures made by PureWick starting in fall 2015.

Moreover, based at least in part on the claim constructions being presented by PureWick to allege infringement in the present litigation against PrimaFit 2.0 (which differ from the constructions offered by PureWick in the PureWick I litigation), the claims are also anticipated by and obvious in view of at least U.S. Patent Nos. 3,349,768, 4,747,166, 4,886,508, 4,886,509, 5,002,541, 5,678,564, 6,888,044, 7,220,250, 7,695,460, 7,749,205, and/or 8,287,508, U.S. Patent

Publication Nos. 2004/0128749, 2005/00549981, 2006/0015080, 2009/0264840 and/or 2013/0006206, European Patent Publication Nos. EP0613355 and/or EP1504737, Japanese Patent Publication Nos. JP2003126242, JP11113946, British Patent Publication GB2148126, the OMNI AMXD/Dmax product, and/or International Publication and/or WO2000/057784, which disclose every element of the claims. Sage additionally hereby incorporates by reference its Invalidity Contentions, including its Initial Invalidity Contentions dated September 15, 2022.

As Sage explained in its September 22, 2022 Preliminary Identification of Claim Constructions, the claim elements have their plain and ordinary meaning (to the extent not indefinite) in view of the specifications, prosecution histories (including prosecution disclaimers), and the knowledge of the ordinarily skilled artisan.  That ordinary meaning is also reflected by PureWick's litigation statements that bear on the meaning of the term and likewise offer a preclusive effect. For example, based on PureWick's own representations, a "reservoir" must "aggregate urine." PureWick's infringement contentions fail to support that any aspect of the PrimaFit 2.0 has a structure that "aggregates urine," much less the area at the end of the device as claimed. To the extent that an element is missing from any one of the foregoing references or references disclosed in Sage's Invalidity Contentions, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

That is particularly true, here, where Plaintiff alleges that a product with no reservoir includes a fluid reservoir. Indeed, in the PureWick I litigation, PureWick took the position that a product with a reservoir at the end of the casing has no reservoir. For example, claims of the 376 and 989 Patents are anticipated by and obvious in view of at least Sanchez (U.S. Patent No. 8,287,508) and Kuntz (U.S. Patent No. 4,747,166), particularly as PureWick is now interpreting the claims. After the claims were rejected by the Patent Office as anticipated by Kuntz, PureWick

represented to the Patent Office that Kuntz did not include a reservoir at a first end because the support within the Kuntz casing extended to the end of the product (as it does in the accused PrimaFit 2.0) product. PureWick now takes a contrary position in this litigation alleging that a product with the configuration of Kuntz infringes. Later, the Patent Office rejected pending claims as obvious in view of Sanchez and Kuntz. The independent claims were then amended to require "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir" to overcome this art and the Examiner subsequently allowed the claims. However, numerous prior art references disclosed a fluid permeable support that extended to the end of the casing as well as a fluid permeable support distinct from the fluid reservoir.

In addition, PureWick's allegations of infringement by the PrimaFit 2.0 in PureWick II are barred under the doctrine of estoppel including judicial estoppel and claim preclusion. With regard to the claims of both patents-in-suit, PureWick's current positions are in direct contradiction to its claim interpretation in PureWick I, upon which it has prevailed to date, including its positions regarding no invalidity based upon WO2007042823A2 ("Van Den Heuvel 823"). For example, in PureWick I, PureWick repeatedly contended that an area at the tapered end of a product between a permeable support and a casing, such as that disclosed in Van Den Heuvel 823 (item 4), is not a "reservoir" because a reservoir must "aggregate urine." For example, PureWick repeatedly contended that, unlike a product that had a cap (such as the product at issue in PureWick I), a product that had an area at the end (such as the product in Van Den Heuvel) was not a reservoir, because for example there is allegedly no evidence "that urine could accumulate in that space" and "no place for fluid to aggregate." (Trial Tr. at 1174, 1162; D.I. 345, PureWick's May 19, 2022 Opp. to Sage's Post-Trial Motions at 14-15.)



Yet, now that Sage's product has been modified to remove the cap, PureWick now argues the opposite and asserts infringement against PrimaFit 2.0 even though it removes the very features that PureWick had alleged was the reservoir in PureWick I (the cap) and uses the prior art features that PureWick claimed were not covered by its patent (see also infra) or were not invalidating. PureWick made no effort to establish that an alleged area at the tapered end of the PrimaFit 2.0 product is a "reservoir," e.g., that it "aggregates urine," as it previously asserted was required by that term. Nor has PureWick established that urine could accumulate during use in the area at the end of the PrimaFit 2.0 or that it is a place for fluid to aggregate. PureWick is legally estopped from taking such a position, including under the doctrine of judicial estoppel. PureWick is currently taking a position that is clearly inconsistent with its earlier position in PureWick I. PureWick's earlier position was accepted by the prior tribunal in PureWick I as of this writing. And PureWick's change in position creates an unfair advantage or detriment absent estoppel. Moreover, based on PureWick's representations in the prior litigation as well as the

27

prosecution history (discussed infra and supra), the claims cannot be reasonably construed to cover the PrimaFit 2.0 product.

As Sage explained in its September 22, 2022 Preliminary Identification of Claim Constructions, the claim elements have their plain and ordinary meaning (to the extent not indefinite) in view of the specifications, prosecution histories (including prosecution disclaimers), and the knowledge of the ordinarily skilled artisan. That ordinary meaning is also reflected by PureWick's litigation statements that bear on the meaning of the term and likewise offer a preclusive effect. For example, based on PureWick's own representations, a "reservoir" must "aggregate urine." PureWick's infringement contentions fail to support that any aspect of the PrimaFit 2.0 has a structure that "aggregates urine," much less the area at the end of the device as claimed.

As another example, the claims of the 376 patent are also invalid for being indefinite, lacking written description support, and/or lacking enablement under 35 U.S.C. § 112, particularly given PureWick's current litigation positions. For example, at least the elements "casing," "reservoir," "fluid impermeable layer," "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir," "tube having a first end disposed in the reservoir," "substantially cylindrical," and "cylindrical," lack written description support, lack enablement, and are indefinite. PureWick's shifting definitions of claim elements between the PureWick I and this litigation demonstrate the Section 112 problems with the claims.

In addition, for example, Plaintiff's claims are barred or otherwise limited under principles of equity, including waiver, estoppel including judicial estoppel and claim preclusion, unclean hands, and/or acquiescence and render the patents-in-suit unenforceable. The PrimaFit 2.0 product is a completely different design and redevelopment of a urine management product as discussed

in Interrogatory No. 3, which is incorporated herein. Though PureWick has been aware of the PrimaFit 2.0 product since at least February 2021 before the first deposition was taken by PureWick in the PureWick I case and knew that Sage contended it was a non-infringing alternative to the product at issue in PureWick I, PureWick never sought to add PrimaFit 2.0 as an infringing product to that case or claim infringement. PureWick knew that Sage had designed, developed, and launched PrimaFit 2.0, which Sage contended was a non-infringing alternative in the PureWick I litigation; however, PureWick never alleged infringement of PrimaFit 2.0 during that case but instead chose to bring this serial litigation.

In the PureWick I litigation, PureWick did not identify PrimaFit 2.0 as an infringing product and did not accuse the product of infringing (despite numerous interrogatories on the topic and PureWick bearing the burden of proving the lack of non-infringing alternatives to support its damages claims). The first time any allegation of infringement arose was in Reply expert reports when Sage had no chance to respond.

PureWick knew that Sage contended that the PrimaFit 2.0 product was a non-infringing alternative design to the PureWick product. In an interrogatory response relating to non-infringing alternatives, Sage identified numerous documents relating to the PrimaFit 2.0 design including, among other things, directions for use, pictures of the product, specifications and drawings, and a business plan relating to the development and release of the product. Sage also identified documents about PrimaFit 2.0 that PureWick had included in its own witness binders. PureWick questioned virtually every Sage fact witnesses about the PrimoFit 2.0 product. Sage even deposed a witness whose sole relevance to the PureWick I litigation was to discuss the structure and function of that product as a non-infringing alternative. Another Sage witness deposed in March 2021 testified that the PrimaFit 2.0 product had been launched in 2019. In March 2021, PureWick

also inspected the PrimaFit 2.0 after having been provided detailed schematics. Yet, PureWick never brought a claim of infringement against Sage.

Additional details regarding Sage's disclosures to PureWick regarding PrimaFit 2.0 are discussed in the following filings in the PureWick I litigation, which Sage incorporates by reference: Sage's Opening and Reply briefs on its motion to exclude and strike the testimony of John Collins (including, for example, D.I. 205 at 8-10 and D.I. 255 at 5); Sage's Opposition to PureWick's Motion to exclude the expert opinions of Donald Sheldon and Vincent Thomas (D.I. 232 at 1-4); and Sage's Opposition to PureWick's Motion In Limine No. 3 to Preclude Evidence or Argument that Sage's PrimaFit 2.0 Non-Infringing Alternative is Commercially Available (D.I. 308). Yet despite the pending lawsuit on the 376 and 989 patents, PureWick never attempted to add an infringement claim relating to PrimaFit 2.0 to the PureWick I litigation. Nor did PureWick respond to Sage's interrogatory asking PureWick to identify why any asserted non-infringing alternatives (such as PrimaFit 2.0) were not infringing. Despite knowing about the PrimaFit 2.0, PureWick never raised any infringement or potential infringement issues relating to the PrimaFit 2.0 and the 989 or 376 patents in any correspondence between the parties, during any meet and confers between the parties, or during any conferences with the Court. Discovery closed in April 2021 and PureWick never raised any infringement allegations with regard to that product.

After the close of fact discovery, the PureWick I litigation proceeded through the close of expert discovery and motions for summary judgment. Indeed, despite PureWick's burden of establishing the absence of non-infringing alternatives, PureWick's opening expert reports never asserted with any detail that PrimaFit 2.0 was "infringing." It was not until its Reply expert report, filed months later, that PureWick unexpectedly asserted infringement and even then, PureWick did not seek to add the PrimaFit 2.0 into the case or raise cognizable claims of patent infringement.

30

Thus, in its correspondence and meetings with Sage and the Court throughout the PureWick I litigation, PureWick never accused the PrimaFit 2.0 of infringement and never referenced any issues related to infringement and the PrimaFit 2.0. PureWick's actions and inactions led Sage to believe that PureWick did not believe that the PrimaFit 2.0 infringed any PureWick patents. Instead of lodging new infringement allegations during the PureWick I litigation such that the cases could have been tried together, PureWick misleadingly allowed Sage to continue to move forward with the PrimaFit 2.0 product. In moving forward with the PrimaFit 2.0 product, Sage relied on PureWick's actions and inactions and the fact that Sage had not been accused of infringement or sued for infringement by PureWick.

Almost a year after PureWick became aware of PrimaFit 2.0 product (and Sage's contention that it was a non-infringing alternative), PureWick changed course with the filing of this lawsuit. Sage has suffered prejudice as a result of PureWick's actions and inactions. Sage would be materially prejudiced if PureWick was allowed to proceed with its charge of infringement of the 376 and 989 patents after never previously referencing any alleged rights in its dealings with Sage. Because PureWick misleadingly allowed Sage to improve and expand its product by investing in research and development, PureWick's deceptive conduct bears directly upon its allegations of infringement of the 376 and 989 patents. Moreover, as explained further below, PureWick further exacerbated the prejudice to Sage in this lawsuit by failing to preserve documents in anticipation of litigation (namely the PureWick email server). It now appears that, while PureWick initially represented that emails prior to its acquisition by C.R. Bard ("Bard") were misplaced, the extent of lost emails extends beyond that. This resulted in the loss of documents relating to Sage's invalidity defenses, among other things, including evidence of

PureWick's invalidating sales and evidence supporting Sage's inequitable conduct claim and other equitable defenses.

Additionally, PureWick is barred by principles of estoppel from asserting infringement of the PrimaFit 2.0 product, as discussed above. Again, with regard to the claims of both patents-in-suit, PureWick's current positions are in direct contradiction to its claim interpretation in PureWick I, upon which it has prevailed to date, including its positions regarding no invalidity based upon WO2007042823A2 ("Van Den Heuvel 823"). For example, in PureWick I, PureWick repeatedly contended that an area at the tapered end of a product between a permeable support and a casing, such as that disclosed in Van Den Heuvel 823 (item 4), is not a "reservoir" because a reservoir must "aggregate urine." For example, PureWick repeatedly contended that, unlike a product that had a cap (such as the product at issue in PureWick I), a product that had an area at the end (such as the product in Van Den Heuvel) was not a reservoir, because for example there is allegedly no evidence "that urine could accumulate in that space" and "no place for fluid to aggregate." (Trial Tr. at 1174, 1162; D.I. 345, PureWick's May 19, 2022 Opp. to Sage's Post-Trial Motions at 14-15.)



Yet, now that Sage's product has been modified to remove the cap, PureWick now argues the opposite and asserts infringement against PrimaFit 2.0 even though it removes the very features that PureWick had alleged was the reservoir in PureWick I (the cap) and uses the prior art features that PureWick claimed were not covered by its patent (see also infra) or were not invalidating. PureWick made no effort to establish that an alleged area at the tapered end of the PrimaFit 2.0 product is a "reservoir," e.g., that it "aggregates urine," as it previously asserted was required by that term. Nor has PureWick established that urine could accumulate during use in the area at the end of the PrimaFit 2.0 or that it is a place for fluid to aggregate. PureWick is legally estopped from taking such a position, including under the doctrine of judicial estoppel. PureWick is currently taking a position that is clearly inconsistent with its earlier position in PureWick I. PureWick's earlier position was accepted by the prior tribunal in PureWick I as of this writing. And PureWick's change in position creates an unfair advantage or detriment absent estoppel. Moreover, based on PureWick's representations in the prior litigation as well as the

33

prosecution history (discussed supra), the claims cannot be reasonably construed to cover the PrimaFit 2.0 product.

Further, there are additional grounds for unenforceability including unclean hands. In the current litigation, PureWick is asserting claim construction positions that are contrary to the positions that it took in the PureWick I litigation in advocating no invalidity and PureWick is estopped from doing so under principles of waiver, estoppel including judicial estoppel and claim preclusion, and acquiescence. In addition to its misleading statements, PureWick further acted inequitably with regard to the PrimaFit 2.0 including making false representations about PrimaFit 2.0 and about its purported lack of knowledge regarding that product and its launch in the PureWick I litigation. 80. Additionally, during the course of the PureWick I litigation, PureWick representatives, Camille and Ray Newton, gave false testimony either during their depositions or at trial regarding sales of their female external catheter to the Connect Foundation, wasting significant resources litigating an issue, which they knew to be false.

An example of this testimony from Mr. Newton is reflected below:

| Mr. Newton's Deposition Testimony | Mr. Newton's Trial Testimony |
|---|---|
| Q. And did you indicate in the award submission that the PureWick female external catheter was sold on July 26th, 2015? THE WITNESS: Yes.<br><br>Q. And were you honest in your submission that the product had been launched on July 23rd, 2015? THE WITNESS: Yes, we were honest.<br><br>Q. Were you honest in your submission that the product was sold on July 26th, 2015? THE WITNESS:· Yes.<br><br>Q. Okay. And did you make a sale of the product on July 26th, 2015? THE WITNESS: Well, that's the date that we put on the form, so I would say so.<br><br>(D.I. 211, Ex. 47 at 204:3-205:1.) | Q. And did you indicate in the award submission that the PureWick female external catheter was sold on July 26, 2015? A. Yes, the dry dock was sold, we sold them a dry dock.<br><br>(Tr. at 319:22-25.)<br><br>Q. But the female external catheter product, the dry dock is not an external natural catheter, female external catheter whatsoever, right? A. Well my undergo [sic] was a PureWick product had to be sold, so we sold the PureWick product at that time. Because we didn't have any of the wicks ready for sales at that time.<br><br>(Tr. at 320:6-12.) |

An example of this testimony from Camille Newton is reflected below:

| Dr. Newton's Deposition Testimony | Dr. Newton's Trial Testimony |
|---|---|
| Q. In looking at the second page of the document, the last two lines of the second page, did PureWick indicate in the award submission that the <u>PureWick female external catheter</u> was launched on July 3rd, 2015? THE WITNESS:· <u>That is what it says on here, yes.</u><br><br>BY MS. FRANTZEN: Q. And did PureWick indicate in the award submission that the <u>PureWick female external catheter</u> was sold for -- the date of first sale was July 26th, 2015? ***<br>THE WITNESS:· <u>It does say that on there, yes.</u><br><br>(D.I. 211, Ex. 46 at 214:1-8.) | Q. And if we go to the second page of the award, we talked about this earlier, you told CONNECT that you sold the product on July 26th, 2015?<br>A. We sold it -- that was <u>for the dry dock</u> that we sold ▮▮▮▮▮ -- DD and, or DD, that was for the dry dock that we sold her, and that was a component of our product.<br><br>***<br><br>Q. So when you applied in July 27th, 2015, and said you had a first sale on July 26th, 2015, you didn't say it was just for the dry dock, right?<br>A. No, we did not.<br><br>Q. And did PureWick indicate in the award submission that the PureWick female external catheter that the date of first sale was July 26th, 2015?<br>A. We indicated that July 26th, 2015, was the date of our first sale in our application for the MIP product.<br><br>Q. Did you indicate that it was for the PureWick female external catheter?<br>A. We indicated that was the date of our first sale.<br>Q. For the catheter?<br>A. <u>For the dry dock.</u><br>(232:10-233:9.)<br><br>Q. So it's your testimony that you thought you had the most innovative product when you didn't even have a product and when you knew you had to generate sales to even apply?<br>A. We were optimistic, yes. |

Other examples of PureWick's changed testimony are reflected in D.I. 312, pages 2 to 7, in the PureWick I litigation, which is hereby incorporated by reference. The misconduct outlined has an immediate and necessary relationship to the relief PureWick now seeks.

36

For example, the 376 and 989 patents are also unenforceable as a result of inequitable conduct before the United States Patent and Trademark Office. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Patent Office including inventors and prosecuting attorneys. Specifically, at least one of the individuals who owed a duty of candor and good faith to the Patent Office relating to the prosecution of the 376 and 989 patents, including Marcus Simon, an attorney who prosecuted the 376 and 989 patents, and Camille and Ray Newton, named inventors of the 376 and 989 patents, withheld material information from the U.S. Patent Office.

The 989 Patent was filed on September 8, 2016. The 989 Patent claims priority to several patent applications including a patent application filed in June 2016 ("the 968 application") as well as three provisional applications filed in March 2014 and November 2014 and their three follow-on utility applications. The 989 patent does not share a common specification with any of these seven applications and is identified as a continuation-in-part of these applications.

The 989 patent also claims priority to, and purports to be a continuation of, Application No. PCT/US2016/049274, which was filed on August 29, 2016 ("the August 2016 PCT Application"). The August 2016 PCT Application included material from the seven earlier applications but also added additional new matter. The 989 patent contains generally the same specification as the August 2016 PCT Application.

The 376 patent was filed on June 1, 2017. The 376 patent claims priority to, and purports to be a continuation-in-part of, the 989 patent. The 376 patent also claims priority to the several applications as well as the August 2016 PCT Application. The 376 patent also claims priority to two additional applications filed in October 2016 and April 2017. The 376 patent does not share a common specification with any of these applications and is identified as a continuation-in-part of

37

the 989 patent. The established effective filing date of the 989 patent based on the PureWick I litigation is no earlier than September 8, 2016. The established effective filing date of the 376 patent based on the PureWick I litigation is no earlier than June 1, 2017.

Even though the Patent Office had repeatedly determined that claims of the '989 patent were not entitled to earlier priority date, these individuals withheld information about the public disclosure, use, offer for sale, and sale more than one year prior to the filing dates of PureWick products that embody the claimed inventions and obvious variations thereof from the Patent Office during the prosecution of those patents with the intent to deceive the Patent Office. At least Marcus Simon and/or Camille and Ray Newton, who each owed a duty of candor to the Patent Office, were aware of one or more of these public disclosures, uses, and offers for sale prior to September 8, 2015 and June 1, 2017. Yet, no one involved in the prosecution of the applications disclosed them to the Patent Office.

For example, in the trial of the PureWick I litigation, the Newtons testified that "hundreds and hundreds and hundreds" of products were made and tested, that they were preparing product advertisements for products by May 2015, that they were seeking marketing opportunities with the Connect Foundation for the products by July 2015, and had even submitted information to Connect about a product that they had claimed had been "launched" and "sold," but which they later testified was falsely made so as to obtain an award. Contrary to what was represented at trial, during their depositions, the Newtons testified that they were manufacturing and selling products by July 2015 (consistent with what was said to Connect). At trial, the Newtons said the opposite— that they were not making or selling products). The trial testimony also shows that products were used and tested with no obligation of confidentiality. The "hundreds and hundreds" of undisclosed products that were used and tested with no obligation of confidentiality and the marketing efforts

were material to patentability. For example, evidence of products manufactured by PureWick that includes all the elements of the claimed inventions (or an obvious variant thereof) is depicted in PureWick22332-22333, rendering the claims both anticipated and obvious. But for the failure to disclose to the Patent Office that the PureWick products–which included all of the elements of the pending claims or obvious variations thereof–were publicly disclosed and used more than a year before the September 8, 2016, and June 1, 2017, filing dates of the 989 and 376 patents, the Patent Office would have rejected the claims of the 989 and 376 patent as anticipated or obvious in view of those products.

The most reasonable inference to be drawn from the evidence is that Simon and/or the Newtons, who each owed a duty of candor and good faith to the Patent Office, knew of the materiality of PureWick's products, yet failed to disclose any of them during the prosecution of the 376 and 989 patents and did so with the specific intent of deceiving the Patent Office and prevented the Patent Office from considering highly material publicly-available information. The Newtons testified at trial that they were involved in the prosecution of the patents-in-suit with Ray Newton testifying that he often distinguished prior art with his attorney. This intent is further evidenced by additional statements made about the lack of relevant references during this time period that were made during the prosecution of the 989 patent as discussed herein. At least this omission renders the claims of the 989 and 376 patents unenforceable.

Moreover, during the prosecution of the '989 patent, PureWick attorney Marcus Simon made repeated material false and misleading statements to the Patent Office suggesting that there was no relevant prior art between March 2014 (the earliest potential priority date) and August 29, 2016 (the effective priority date determined by the Patent Office). During the prosecution of the '989 patent application, the Patent Office issued an Office Action on or about September 26,

2018, stated that pending claims 9-14 of the '989 Patent application (which correspond to issued claims 1-6 of the '989 Patent) were not supported by multiple earlier filed applications. The Patent Office thus concluded that "Claims 9-14 have an effective filing date of August 29, 2016," which was the filing date of the August 2016 PCT Application. The Patent Office stated in the September 2018 Office Action: "Should the applicant disagree with the examiner's conclusion, please kindly point out the specific passages in the parent application that provides support for the claims."

On or about December 20, 2018, PureWick attorney Marcus Simon responded to the September 2018 Office Action. Despite the Patent Office's request to "point out the specific passages in the parent application that provides" claim support, PureWick refused to do so in its response. Rather, PureWick represented that it need not provide the priority date information because relevant prior art references between the earliest potential priority date (March 2014) and the application's date of filing (September 2016) had not been identified. PureWick misleadingly did not advise the Patent Office of any of the "hundreds and hundreds and hundreds" of PureWick products that were being tested as well as PureWick's market efforts despite having knowledge of them and despite their high materiality to patentability.

Specifically, PureWick's attorney represented to the Patent Office:

Applicant will not "point out the specific passages in the parent application that provides support for the claims" at this time because the PTO should not have made a determination regarding the support for the claims. For example, the MPEP states that "[t]he only times during ex parte prosecution that the examiner considers the merits of an applicant's claim of priority is when a reference is found with an effective date between the data of the [reference's] filing and the [present application's] date of filing." MPEP § 216.

By making these statements, PureWick's attorney was representing to the Patent Office that there were no relevant references or public disclosures during the intervening period between March 19, 2014 (the earliest potential priority date) and August 29, 2016 (the priority date identified by the Patent Office).

40

PureWick's statements to the Patent Office in the December 2018 PureWick Response were false and misleading. These statements were false and misleading given that PureWick's products were demonstrated, offered for sale, and purported to be sold between March 2014 and September 8, 2015 (as well as up to and including June 1, 2016). At the time PureWick's attorney made these statements, he was aware of public disclosures of PureWick's products described in the patent applications during the period between March 2014 and August 2016 including certain of the PureWick products. Moreover, the Newtons were also aware of public testing of their products as well as marketing efforts and disclosures to the Connect Foundation.

On or about February 14, 2019, the Patent Office issued another Office Action. The Patent Office again asserted that pending claims 9-14 were not supported by any of the earlier filed applications, and again concluded that "[c]laims 9-14 have an effective filing date of August 29, 2016." The Patent Office stated that it made this assessment of the priority date "for clarity of the record."

On or about May 13, 2019, PureWick submitted a response to the February 14, 2019 Office Action. In the May 2019 PureWick response, rather than disclosing any of the "hundreds and hundreds and hundreds" of PureWick products, any of its non-confidential testing, its marketing efforts, or advising the Patent Office about its public application to the Connect Foundation, PureWick's attorney again represented to the PTO that PureWick was not required to identify the specific passages in the parent applications that provided support for the claims because there were no relevant references or public disclosures between March 2014 (the earliest potential priority date) and August 29, 2016 (the priority date identified by the Patent Office).

Specifically, PureWick's attorney stated:

[The] PTO should not have made a determination regarding the support for the claims. For example, the MPEP states that "[t]he only times during ex parte

prosecution that the examiner considers the merits of an applicant's claim of priority is when a reference is found with an effective date between the data of the [reference's] filing and the [present application's] date of filing." MPEP § 216.

By making this statement, PureWick's attorney again represented to the Patent Office that there were no relevant references or public disclosures during the intervening period even though numerous individuals were aware of relevant and highly material information. These statements were false and misleading given that PureWick's products were publicly used, demonstrated, offered for sale, and alleged to have been sold during that period and PureWick's representatives who owed a duty of candor and good faith to the Patent Office knew about those public disclosures. Immediately following those representations that there was no intervening prior art record, the Patent Office issued a notice of allowance allowing the patent claims without ever having the opportunity to assess the materiality of PureWick's products or its multiple public disclosures. These false and misleading representations were material. But for the false and misleading statements by PureWick's attorney and the Newtons, who owed a duty of candor and good faith to the Patent Office, the Patent Office would have rejected the pending claims of the '989 patent in view of the invalidating public disclosures given that the Patent Office had already determined that the priority date was August 29, 2016.

The most reasonable inference to draw from the evidence is that the false and misleading statements, which suggested that there were no relevant intervening prior art, were made with an intent to deceive the Patent Office into allowing the pending claims without evaluating relevant prior art and without forcing PureWick to adequately support any priority claim. That is particularly true because there clearly was intervening prior art, which PureWick, including Ray and Camille Newton, knew about, and there was no reason to suggest that there was no such prior art other than to mislead the Patent Office and avoid a determination of the priority date. The false

42

and misleading statements resulted in the Patent Office issuing a Notice of Allowance by wrongly misleading the Patent Office as to the relevance and existence of intervening public disclosures.

These representations and omissions were particularly egregious given that PureWick had applied for the Most Innovative New Product award allegedly for the claimed invention and relied on that award as evidence of secondary considerations of nonobviousness. The award application required that sales of the product be made and, in the award application, the Newtons represented that the product was launched and sold by July 23 and July 25, 2015, respectively. At trial in the PureWick I litigation, the Newtons testified that they told Connect about selling the female catheter and sold an unpatented vacuum pump, which was used with the catheters. Nevertheless, neither the Newtons nor Marcus Simon disclosed the information to the Patent Office. 114. At least these false and misleading statements made during the prosecution of the 989 patent render the claims of the 989 patent unenforceable. Moreover, this inequitable conduct during the prosecution of the 989 patent also renders the 376 patent, which claims priority to the 989 patent, unenforceable including under the doctrine of infectious unenforceability.

This inequitable conduct during the prosecution of the 989 patent renders the 376 patent, which claims priority to the 989 patent, unenforceable. Neither Simon nor anyone involved in the prosecution of the 376 patent advised the Patent Office of the false and misleading statements during the prosecution of the 376 patent. Based on the foregoing, Sage is entitled to a judgment that the 376 patent is unenforceable due to this inequitable conduct committed during the prosecution of the 989 patent including under the doctrine of infectious unenforceability. In addition, PureWick advised Sage (after the parties had already exchanged and agreed upon search procedures for electronic searching) that PureWick failed to preserve what PureWick described as a legacy PureWick server. As detailed in correspondence on this issue in PureWick I, including in

an email from Ryan Pianetto dated February 12, 2021, this server contained critical information relating to Sage's defenses, including its prior art defense relating to the on-sale bar and information regarding the valuation of the patents. Sage understands that the server contained PureWick emails (including emails with inventors) from prior to PureWick's acquisition. Sage has also recently ascertained for the first time that it appears the "missing" or "lost" server actually also contained information post-dating the acquisition—a fact previously withheld from Sage. PureWick's email is highly germane to issues in this case. At least several of the identified PureWick custodians are legacy PureWick employees. The email server would contain historical communications and information related to development of the PureWick products and patents, invalidating disclosures to third parties, prior art, and other information regarding inventors, to name a few items, most or all of which would have been from a time period prior to the PureWick acquisition by Bard. For example, as discussed above, Camille Newton testified at trial that "hundreds and hundreds and hundreds" of products were made and tested, yet PureWick did not produce corresponding documentation.  Also as discussed above, PureWick had submitted information to Connect about a product that they had claimed had been "launched" and "sold," but at trial in the PureWick I litigation, the Newtons changed their testimony and claimed the catheter was never sold at all. Information resolving this contradiction could also have been present on the missing server.  Further yet, Camille Newton revealed for the first time at trial that PureWick had engaged in discussions with several third party companies (including First Quality, Molnlycke and Medline) regarding a potential acquisition of PureWick and its technology, yet despite Sage seeking discovery on this issue, PureWick never identified these entities as having relevant knowledge and relevant documents may have been on the missing server. Indeed, one of the invalidity issues here revolved around PureWick's disclosures to third parties (including via email)

prior to the priority date, which occurred before the acquisition. Moreover, recent discovery appears to suggest that documents well after the acquisition date are missing as well, which was withheld from Sage. PureWick never disputed that it was under the obligation to preserve PureWick email at the time the server was "shut down" in early to mid-2019, mere months before PureWick filed its Complaint in this case. PureWick indicated that it searched Bard employee email for correspondence with PureWick. Bard employees, however, would not have been privy to PureWick legacy correspondence. Particularly troubling is that Sage was unaware until late in PureWick I that PureWick emails were irrecoverable, when the parties were negotiating the email searching protocols for that case, because PureWick did not inform Sage that PureWick/Bard failed to preserve them at that time. Many of the search terms that Sage identified in PureWick I were prior art terms or terms relating to prior communications on invalidating disclosures. And, again, Sage has only recently learned that the loss of PureWick emails is likely more extensive than previously disclosed and may extend well after the PureWick acquisition as originally claimed. Sage has been significantly prejudiced in its ability to present its defenses due to PureWick's failure to preserve evidence. Moreover, PureWick has recently exacerbated this prejudice by refusing to adequately search for documents from its own inventors. Sage is being forced to file a motion to compel to obtain information about the missing server as well as communications from the inventors.

This is also an exceptional case, including for all of the reasons discussed above. The baseless allegations of patent infringement made by PureWick against Sage are causing irreparable damage to Sage. Since the conduct of PureWick renders this case to be "exceptional" under 35 U.S.C. § 285, Sage has a right to recover its reasonable costs, expenses and attorneys' fees, For example, PureWick's inequitable conduct in procuring the Asserted Patents, inconsistent claim

construction, validity, and infringement positions between PureWick I and PureWick II despite being estopped, its conduct relating to the missing server, bad faith litigation, and the false statements of its witnesses at trial all render this case exceptional.  Sage further reincorporates all of its statements above and its Answer and Defenses to Plaintiff's Complaint (D.I. 8), which explain the basis for Sage's affirmative defense that this is an exceptional case, and the basis for Sage's right to an award of attorneys' fees pursuant to 35 U.S.C. § 285. The other deficiencies have been discussed repeatedly in this case. Moreover, Plaintiff's litigation misconduct also warrants fees. For example, Plaintiff has resisted responding to interrogatories and requests for production on critical issues, most notably with regard to its own prior art products and other prior art in its possession, as explained in an October 28, 2022 letter from Ryan J. Pianetto to Nicola Felice, a November 7, 2022 letter from Ryan J. Pianetto to Nicola Felice, and a November 28, 2022 email from Ryan J. Pianetto to Nicola Felice,  which are hereby incorporated by reference (and many other pieces of correspondence). Indeed, PureWick has to date produced little document production.

Plaintiff is also barred by 35 U.S.C. § 288 from recovering any costs associated with this suit. For example, Sage has set forth the factual and legal bases for its contention that the asserted claims of the Patents-In-Suit are invalid in its Invalidity Contentions. PureWick has not disclaimed these invalid claims and therefore is barred by 35 U.S.C. § 288 from recovering any costs associated with this suit.

Plaintiff may not seek injunctive relief against Sage because the alleged damages are not immediate or irreparable. A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). Here, an injunction would not be warranted for many of the same reasons set forth by Sage in its Opposition to PureWick's post-trial motions in PureWick I, which is incorporated by reference herein. In particular, public policy weighs against an injunction given that the PrimaFit 2.0 is superior in both efficacy and patient-safety to the PureWick device. Moreover, PureWick has not demonstrated that its alleged damages are immediate or irreparable, particularly given that PureWick waited approximately two years to sue Sage for infringement of any patent by the PrimaFit 1.0 in PureWick I and did not seek a preliminary injunction in PureWick I. PureWick also delayed in filing suit against the PrimaFit 2.0 and likewise did not seek a preliminary injunction. Again, as discussed above, PureWick knew about the 2.0 at least as early as February 2021 and knew that it had been launched in 2019. In March 2021, PureWick also inspected the PrimaFit 2.0 after having been provided detailed schematics. Additional details regarding Sage's numerous disclosures to PureWick regarding PrimaFit 2.0 are discussed above. Yet, PureWick never brought a claim of infringement against Sage until January 26, 2022, showing that PureWick would not be irreparably harmed absent an injunction. Additionally, monetary damages are adequate to compensate for any injury and PureWick has not suffered any irreparable injury, for the same reasons set forth in Sage's Opposition brief to PureWick's post-trial motions in PureWick I.

Plaintiff has suffered no damages. For example, Sage has not engaged and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of any of

the patents-in-suit. To the extent that PureWick is entitled to a reasonable royalty, Sage states that

each of the Georgia-Pacific factors supports Sage's position that a reasonable royalty based on a

hypothetical negotiation between the parties at the time of first alleged infringement would be

minimal.  Moreover, PureWick is not entitled to lost profits. PureWick cannot show the absence

of noninfringing alternatives (nor has PureWick even attempted to despite its burden), demand for

the patented product, or manufacturing and marketing capacity to make all of the sales that Sage

has made of the PrimaFit 2.0 product.  Non-infringing alternatives to the 989 patent and the 376

patent include:

- a urine collection apparatus that does not include a casing

- a urine collection apparatus that does not include a reservoir including one where the alleged permeable support extends to the end of the alleged casing

- a urine collection apparatus that does not have a longitudinally elongated opening, for example a urine collection apparatus may include an array of openings

- a urine collection apparatus where the fluid permeable support is not distinct from and at least proximate to the fluid reservoir

- a urine collection apparatus where the fluid outlet is not at an end of the device opposite the reservoir

- a urine collection apparatus without a separate fluid permeable support and a fluid permeable membrane, such that the apparatus does not have a membrane supported on a support

- a urine collection apparatus where the fluid permeable membrane is only disposed across part of the elongated opening of the casing, which PureWick never disputed in the prior case.

48

- a urine collection device that does not have a membrane

- a urine collection device that does not have a tube with an end extending into a reservoir including one where the end of the tube is within the alleged permeable support

- a urine collection device that does not have a tube extending behind at least the portion of the support and the portion of the membrane disposed across the elongated opening, including one where any tube(s) extend only on the sides of the casing and not behind the elongated opening.

Many of the above variations are shown in the prior art of record and are standard features of the art in multiple prior art devices including, for example, as discussed in depth in Sage's Invalidity Contentions (see for example Mahnensmith 080, Mahnensmith 262, Keane 768, Lawrence 564, Okabe 547, Lawrence 222, Cheng 133, Wolff 784, Wolff 066, Triunfol 675, Sweetser 793, Kuntz 166, Kuntz 355, Washington 508, Conkling 541, Van Den Heuvel 823, Van Den Heuvel 894, Sanchez 508 (with respect to the 376 and 989 patents), Suzuki 250, Chiku 946, Cottenden 126, Harvie 027, Hanifl 377, Ozenne 138, Bevan 395, Ishii 107, Cheng 321). They are also modifications that can be made to the PrimaFit 2.0 device. Sage identifies the Sage employees identified in its Rule 26 disclosures as knowledgeable on these topics.

In addition, there are numerous commercially-available noninfringing alternatives, including the Consure Qivi Female External Urine Management System, the Boehringer CareDry® System, the Medline Versette female external catheter device, the Convatec female external urinary device, the Omni AMXD/DMax female product, the Brunel University Non-Invasive Continence Management System. Patents relevant to one or more of these products include U.S. Patent No. 11,253,389 and U.S. Patent No. 8,303,554. Information about these

products is publicly available including on the internet and in PureWick's own records. Moreover, testimony and documents produced by Omni were provided in PureWick I. Sage hereby incorporates the expert reports of Dr. Diane Newman and Donald Sheldon from PureWick I on this art and on the issues of non-infringing alternatives.

In addition to the foregoing, Sage further identifies at least the following documents relevant to this interrogatory regarding non-infringing alternatives: STRSAGE00023017, STRSAGE00024739, STRSAGE0002470, STRSAGE00024741-42, STRSAGE00024743-44, STRSAGE00024745, STRSAGE00024746, STRSAGE00024747, STRSAGEA00024748, STRSAGE00024749, STRSAGE00024750-51. Sage further states that Sage witnesses are knowledgeable about this topic including the individuals identified in Sage's Rule 26 disclosures.

Sage further states that PureWick has failed to establish that it sells any product covered by any of the patents-in-suit. Sage incorporates its responses and motions for judgment as a matter of law in PureWick I regarding PureWick's failure to establish that its commercial product is covered.

Sage further states that discovery is ongoing and Sage will supplement its response to this interrogatory as necessary pursuant to Fed. R. Civ. P. 26(e) after further discovery has been conducted. Sage expressly reserves the right to supplement, modify, or amend its responses contained herein.

Dated: December 9, 2022

*As to objections only,*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*

Of Counsel:

Anne Shea Gaza (No. 4093)

Robert A. Surrette
Sandra A. Frantzen
Christopher M. Scharff
Ryan J. Pianetto
McAndrews, Held & Malloy, Ltd
500 West Madison Street
Chicago, IL 60661
(312) 775-8000
bsurrette@mcandrews-ip.com
sfrantzen@mcandrews-ip.com
cscharff@mcandrews-ip.com
rpianetto@mcandrews-ip.com

Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant Sage Products,
LLC*

51

# EXHIBIT 4



Ryan J. Pianetto
(T) 312 775 8000
rpianetto@mcandrews-ip.com

October 28, 2022

**VIA EMAIL**

Nicola Felice
nicolafelice@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

### RE: *PureWick Corporation v. Sage Products, LLC*, D. Del. 22-0102-MN

Dear Nicola:

We write to follow up on PureWick's lack of document production in this matter. To date, we have not received a single document from PureWick, including any documents related to the new accused product, or any supplemental production of documents for the time period beginning from PureWick's last production in the prior litigation over a year and half ago. We thus follow up on PureWick's responses to Sage's document requests. While numerous deficiencies will be addressed in due course, Sage focuses here on several specific deficiencies below given their pressing nature and PureWick's lack of any document production to date.

As a preliminary matter, we note that many of PureWick's responses and objections appear to be cut and pasted from PureWick's responses to the same document requests in PureWick I. Sage's requests and PureWick's objections, however, were addressed in the prior litigation and objections were withdrawn. It is our understanding that, if an objection to a particular document request was withdrawn or resolved in PureWick I, then that objection is resolved here and PureWick is not re-raising previously-resolved disputed issues. Please confirm that this is the case. Moreover, we anticipated that you would be producing documents (despite objections) as PureWick did in the prior proceedings, but we received nothing to date, which has raised broader concerns.

First, for RFP Nos. 28, 30, 40-42, 44-50, 55, 58-60, 62-64, 73, 76, 79-81, 85, 90-93 related generally to infringement, marking, non-infringing alternatives, to the accused PrimaFit 2.0, complaints about PureWick's device, and the like, PureWick stated that it "will produce non-privileged documents responsive to this request." Yet, PureWick has not produced any responsive documents to date. When will these documents be produced? We need to review them to assess whether further discovery is necessary.

Nicola Felice
October 28, 2022
Page 2

Further, RFP No. 30 seeks "[a]ll patent licensing agreements or agreements settling any patent dispute, actual or potential, that Plaintiff has entered into, including, but not limited to, agreements relating to the Patents-in-Suit, a Related Patent or Application, the PureWick Female External Catheter, the subject matter of the Patents-in-Suit . . . ." PureWick, however, limited the request by stating that it "will produce any responsive, non-privileged agreements that it intends to assert are comparable." We are not simply looking for agreements that you assert are comparable; all agreements are relevant. Please confirm that PureWick will produce all the requested agreements.

Second, for a number of document requests (e.g., RFP Nos. 2, 3, 8-10, 13, 15-19, 25-27, 29, 31-39, 52-54, 56, 65-72, 74-75, 77, 82-84, 88-89, 95), related generally to the patents-in-suit, prior art, invalidity, inequitable conduct, agreements with inventors, Sage, manufacturing, licenses, physical samples, etc., we initially understood that PureWick would be supplementing its production with responsive documents. Given the lack of production to date, however, it is unclear whether PureWick refuses to search for or produce any documents beyond that which was produced in the PureWick I litigation. PureWick's responses stated that "<u>Plaintiff will not conduct an additional search</u> for documents responsive to this request." To the extent that PureWick is relying on this response, Plaintiff's objection is improper. PureWick filed this second case and PureWick is not excused from its discovery obligations because it produced some responsive materials during the discovery period in a <u>different</u> matter where discovery ended over a year and a half ago <u>in April 2021</u>. Additional responsive documents may exist that were never produced, were generated subsequent to PureWick's document production in PureWick I, were learned of since that time, or would be uncovered if a proper search were performed. PureWick implicitly understands this as it did not indicate that additional materials do not exist; it stated that it would turn a blind eye by refusing to search at all. Please confirm that PureWick agrees to search for and produce additional documents responsive to these requests, and supplement its responses accordingly.

Third, for a number of other document requests (e.g., RFP 1, 4-7, 11-12, 14, 20-24, 43, 51, 57, 61), PureWick stated that "Plaintiff is willing to meet and confer with Defendant to attempt to reduce the burden and narrow the scope of this Request to information that is reasonably calculated to lead to the discovery of admissible evidence." However, PureWick already agreed in Purewick I to produce responsive documents and disputes over objections were resolved. Given that PureWick generally copied in the same objections from the first matter (see above), we had anticipated that you would be producing documents as PureWick has done in the prior proceeding. Again, please confirm responsive documents will be produced subject to your prior agreement to produce them. If PureWick refuses, please state specifically your basis for withholding and advise your availability to meet and confer next week. Moreover, for Request Nos. 86-87 and 94, which relate to FDA adverse events, statements by the named inventors, and specifics regarding PureWick's allegedly lost server, PureWick similarly stated that it wanted to meet and confer to discuss those requests. We are happy to do so even though

Nicola Felice
October 28, 2022
Page 3

these requests are already subsumed by earlier requests (*see, e.g.*, RFP Nos. 12, 25, 27, 57).

Fourth, PureWick objected to RFP Nos. 1-2, 4-12, 16-21, 23-24, 26, 37, 40, 51-54, 56, 65, 70-71, 77, 88-89, 94 "to the extent [they] seek[] the production of documents relating to Defendant's defenses of invalidity and unenforceability of the Asserted Patents, which are barred by collateral estoppel and/or res judicata and are the subject of Plaintiff's pending motion for judgment on the pleadings." PureWick also included a general objection that stated that it "objects to Defendant's Requests to the extent they are directed to matters and seek information, documents, or things that relate to Defendant's defenses of invalidity and unenforceability…, which are barred by collateral estoppel and/or res judicata…." <u>PureWick may not unilaterally withhold documents based on its own estoppel theories</u>, and is obligated to produce responsive documents including new documents that it did not produce in the first case. In fact, PureWick raised this issue in the Scheduling Order (D.I. 11-1) and the Court rejected them by setting a schedule that includes deadlines for invalidity discovery (*see e.g.*, D.I. 20 at 4). Sage already served preliminary invalidity contentions in accordance with the scheduling order. Sage's invalidity defenses are part of this case and are the proper subject of discovery. PureWick's tactics are hampering our ability to prepare our case. In any event, <u>regardless of PureWick's theories of estoppel</u>, these requests also relate to other defenses for the PrimaFit 2.0 product (including ones that were never litigated in the first case) such as non-infringing alternatives, limitations on damages, inequitable conduct, equitable estoppel, lack of willfulness, noninfringement, unclean hands, waiver, estoppel, and acquiescence. Please confirm that PureWick agrees to search for and produce additional documents responsive to these requests, and supplement its responses accordingly.

By **November 3**, please confirm that PureWick agrees to search for and produce additional documents responsive to Sage's requests as indicated above, and supplement its responses accordingly. Otherwise, if PureWick refuses, please state specifically your basis for withholding, and advise your availability to meet and confer next week.

Sincerely,

*/s/ Ryan Pianetto*

Ryan Pianetto

# EXHIBIT 5

**Ryan J. Pianetto**

| | |
|---|---|
| **From:** | Ryan J. Pianetto |
| **Sent:** | Monday, November 28, 2022 6:00 PM |
| **To:** | Nicola Felice; Jason Williams; Brian Biddinger; jshaw@shawkeller.com; Steven Cherny; Bianca Fox |
| **Cc:** | Bob Surrette; Sandra Frantzen; Christopher Scharff; Wilson, Samantha |
| **Subject:** | RE: PureWick Corp. v. Sage Products, LLC. (22-102-MN) - Letters re: Discovery |

Nicola:

Thank you for meeting and conferring before the holiday on November 23 regarding discovery issues. To follow up on a few points, as we discussed:

- PureWick confirmed that we are at an impasse on Sage's Req. for Prod. ("RFP") Nos. 12 and 94 related generally to "documents related to PureWick's allegedly lost or destroyed server or hard-drive potentially containing email, documents and other electronically stored information, and any backup server or hard-drive." (*See* RFP 94.) As Sage explained, the documents are relevant to Sage's defenses in this case including inequitable conduct, invalidity, Sage's equitable defenses, and spoliation of evidence related thereto. The server contained, among other things, emails of named inventors such as Camille Newton during the relevant time period and were not properly preserved. In the prior matter between PureWick and Sage, PureWick agreed that such information was relevant by designating a 30(b)(6) witness on the server issue (*see* PureWick v. Sage, No. 19-1508-MN, D.I. 138), but now PureWick has changed its tune and refuses to produce any relevant documents related to the same. For example, as PureWick is aware, PureWick's witnesses testified at trial that it had "hundreds and hundreds" of versions of its device that were apparently never disclosed to the USPTO (or Sage in the prior case) and offered conflicting testimony in the prior case that its devices were and, contradictorily, were not, sold in 2015.

- PureWick also confirmed that we are at an impasse on Sage's RFP No. 11 related to "all communications of Camille Newton and Ray Newton . . . relating to any testing, offer for sale, sale, public use, disclosure to any third party, or any experimental use of any PureWick Female External Catheter" that were not produced in the prior case (e.g., from the time period beginning after PureWick collected such documents in the prior case). As Sage explained, the Newton's communications are relevant at least to issues of invalidity and unenforceability, and PureWick is likely to hold communications with them. PureWick did not raise an undue burden. PureWick stated that such communications were not relevant because they occurred after the alleged "critical date" of the patents-in-suit. As we explained, however, such communications are relevant. As an example, at trial, Camille Newton changed her testimony and identified "hundreds and hundreds" of devices that were never disclosed to us. As a further example, Dr. Newton also recalled for the first time video taping of certain products by Connect. Many of these facts relate to our inequitable conduct, equitable estoppel, unclean hands, and invalidity contentions. Communications by the Newtons should be produced.

- Sage expects to make its next production this week. Sage will provide a supplement to its responses to interrogatory no. 3 and others as indicated in my previous email of November 15. Sage will look into some of the points that PureWick raised in Sage's responses to PureWick's RFPs, including those related to customer data, profit, and price.

- PureWick will evaluate Sage's production, and will also follow-up on its requests for production as needed. PureWick will supplement its responses to at least Sage's Interrog. Nos. 2, 3, 4, 6 by the week of December

5. As a follow-up point regarding Interrog. No. 4, as we previously confirmed, the sales sheet we produced in this case identified in response to PureWick's Interrog. No. 1 begins in December 2021 and is directed to the product at issue in this case. As we conveyed to you several times, the product at issue in the prior case (original PrimaFit) was manufactured for sale through November 2021. (*See, e.g.*, Sage's March 13, 2022, Supplemental Damages Report at ¶7.)

- Sage also clarified its RFP No. 22 related to "[a]ll documents relating to, referring to, or concerning this lawsuit." As explained, this would include communications about the lawsuit, for example, by PureWick custodians/employees. The parties also discussed that they will confer regarding exchanging product samples, and PureWick confirmed that it still maintains the prior PureWick devices and may be amenable to inspection if needed. (*See* Sage RFP Nos. 14, 51, 70.)

- PureWick will follow up regarding whether it will be representing Lorena Eckert and Kate Pawlik.

Please also confirm when we can be expecting PureWick's next production. PureWick indicated during our prior meet and confer of November 8 that PureWick would be rolling productions. We have received only one small production.

Ryan



**Ryan Pianetto**
**Attorney**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St., 34th floor | Chicago, IL 60661
P: 312-775-8000
RPianetto@mcandrews-ip.com
bio | v-card | website

CONFIDENTIALITY NOTICE:
This material is intended for the named recipient and, unless otherwise expressly indicated, is confidential and privileged information. Any dissemination, distribution or copying of this material is prohibited. If you received this message in error, please notify the sender by replying to this message and then deleting it from your system. Your cooperation is appreciated.

**From:** Ryan J. Pianetto <RPianetto@mcandrews-ip.com>
**Sent:** Tuesday, November 22, 2022 11:00 AM
**To:** Nicola Felice <nicolafelice@quinnemanuel.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; jshaw@shawkeller.com; Steven Cherny <stevencherny@quinnemanuel.com>; Bianca Fox <biancafox@quinnemanuel.com>
**Cc:** Bob Surrette <BSURRETTE@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: PureWick Corp. v. Sage Products, LLC. (22-102-MN) - Letters re: Discovery

Nicola:

For the call tomorrow (10 am CT/11 am ET), we can use the dial-in info below.

Ryan

**Join by phone**
1-844-621-3956 United States Toll Free
+1-312-535-8110 United States Toll (Chicago)

Meeting number (access code): 2467 549 6020

**Tap to join from a mobile device**
1-844-621-3956,,24675496020## United States Toll Free
+1-312-535-8110,,24675496020## United States Toll (Chicago)



**Ryan Pianetto**
**Attorney**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St., 34th floor | Chicago, IL 60661
P: 312-775-8000
RPianetto@mcandrews-ip.com
bio | v-card | website

CONFIDENTIALITY NOTICE:
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

**From:** Nicola Felice <nicolafelice@quinnemanuel.com>
**Sent:** Monday, November 21, 2022 11:10 AM
**To:** Ryan J. Pianetto <RPianetto@mcandrews-ip.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Brian
Biddinger <brianbiddinger@quinnemanuel.com>; jshaw@shawkeller.com; Steven Cherny
<stevencherny@quinnemanuel.com>; Bianca Fox <biancafox@quinnemanuel.com>
**Cc:** Bob Surrette <BSURRETTE@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Christopher
Scharff <CSCHARFF@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: PureWick Corp. v. Sage Products, LLC. (22-102-MN) - Letters re: Discovery

**CAUTION: External Email From:** nicolafelice@quinnemanuel.com

Ryan,

We are available on Wednesday, November 23rd at 10 am CT/11 am ET.

Best,
Nicola

**Nicola Felice**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor

New York, NY 10010
212-849-7346 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
nicolafelice@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Ryan J. Pianetto <RPianetto@mcandrews-ip.com>
**Sent:** Friday, November 18, 2022 5:33 PM
**To:** Nicola Felice <nicolafelice@quinnemanuel.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; jshaw@shawkeller.com; Steven Cherny <stevencherny@quinnemanuel.com>; Bianca Fox <biancafox@quinnemanuel.com>
**Cc:** Bob Surrette <BSURRETTE@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: PureWick Corp. v. Sage Products, LLC. (22-102-MN) - Letters re: Discovery

**[EXTERNAL EMAIL from rpianetto@mcandrews-ip.com]**

---

Nicola:

Following up on your November 3 letter, upon closer review, we believe it would be most efficient to have a call to work through the issues in the letter.  At that point, we can discuss the discovery items in our November 7 letter (we have not yet received a response from you). We are available on Tuesday, November 22 at 1 pm CT or Wednesday November 23 at 10 am CT. Please let me know if either time works.

We note that we have also not received a response to the pending items from our meet and confer last Tuesday regarding our October 28 letter (see below).

Ryan



**Ryan Pianetto**
**Attorney**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St., 34th floor | Chicago, IL 60661
P: 312-775-8000
RPianetto@mcandrews-ip.com
bio | v-card | website

**CONFIDENTIALITY NOTICE:**
This material is intended for the named recipient and, unless otherwise expressly indicated, is confidential and privileged information. Any dissemination, distribution or copying of this material is prohibited. If you received this message in error, please notify the sender by replying to this message and then deleting it from your system. Your cooperation is appreciated.

**From:** Ryan J. Pianetto
**Sent:** Tuesday, November 15, 2022 3:44 PM
**To:** 'Nicola Felice' <nicolafelice@quinnemanuel.com>; 'Jason Williams' <jasonwilliams@quinnemanuel.com>; 'Brian Biddinger' <brianbiddinger@quinnemanuel.com>; 'jshaw@shawkeller.com' <jshaw@shawkeller.com>; 'Steven Cherny' <stevencherny@quinnemanuel.com>; 'Bianca Fox' <biancafox@quinnemanuel.com>
**Cc:** Bob Surrette <bsurrette@mcandrews-ip.com>; Sandra Frantzen <sfrantzen@mcandrews-ip.com>; Christopher Scharff <cscharff@mcandrews-ip.com>; 'Wilson, Samantha' <SWilson@ycst.com>
**Subject:** PureWick Corp. v. Sage Products, LLC. (22-102-MN) - Letters re: Discovery

Nicola and Jason:

Thank you for meeting and conferring on Tuesday regarding Sage's October 28 letter related to deficiencies in PureWick's responses to Sage's requests for production. As we discussed:

- PureWick will begin rolling production this week (we could not load the production that was sent).

- PureWick is not withholding documents based on its general objection or specific objections related to its pending motion for judgment on the pleadings (e.g., RFP Nos. 1-2, 4-12, 16-21, 23-24, 26, 37, 40, 51-54, 56, 65, 70-71, 77, 88-89, 94).

- For RFP No. 30, PureWick preliminarily agreed that it would produce all responsive agreements as requested, and not limit production only to "agreements that it intends to assert are comparable."

- For the requests that PureWick stated that it would "not conduct an additional search for documents responsive to this request" (e.g., RFP Nos. 2, 3, 8-10, 13, 15-19, 25-27, 29, 31-39, 52-54, 56, 65-72, 74-75, 77, 82-84, 88-89, 95), the parties discussed that Sage was not seeking the same documents from the prior case as those are already available in this case. PureWick must go and update its search to produce what may have not been produced in the prior case, additional responsive documents that PureWick may have generated or became aware of since discovery in the prior case, etc., including any updates on the purportedly missing server. PureWick agreed that it would search for and produce licenses related to the Patents-in-Suit and Related Patents and Applications (e.g., RFP No. 3), documents concerning relating to agreements with inventors (e.g., RFP No. 25), and agreed to review the remaining requests to see if it would withdraw its objection to all or most of the requests, possibly returning to Sage a list of a small subset of requests for which it maintained its objection. Please confirm that PureWick will produce the requested documents. If it refuses for any request, please specify which request and the reason that it will not search for responsive documents.

- The parties discussed each of the requests for which PureWick indicated a meet and confer prior to producing responsive documents (e.g., RFP Nos. 1, 4-7, 11-12, 14, 20-24, 43, 51, 57, 61, 94). Some points that we discussed include:

  - For RFP Nos. 1, 4, and 5, PureWick conveyed its intent to produce for the Patents-In-Suit, Related Patents and Applications, and foreign applications, except for the 015 and 116 applications. Sage requested that PureWick reconsider given that PureWick agreed to produce documents for all applications in the prior case (*see, e.g.*, 2020 07 15 Antons Letter; 2020 07 21 Persichetti Email). As a follow-up, we note that the 116 application claims priority to the 078 provisional for which you agreed to produce documents, and the 015 application appears to have the same specification (and/or figures) as one or more priority applications as well. Thus, we so no reasonable basis to arbitrarily exclude those two applications. Please confirm that PureWick will produce for these two applications as well.

- o For RFP Nos. 12 and 94 related to the missing server, and RFP No. 61 related to meeting minutes, as Sage explained, we do not believe that any documents responsive thereto were ever produced in the prior case. Please confirm that the requested documents will be produced.

- o For RFP No. 11, PureWick asked the significance of May 1, 2020. Sage intended and intends for PureWick to produce all responsive documents not produced in the prior case. With that clarification, please confirm that the requested documents will be produced.

- o For RFP No. 51, Sage clarifies that the "product(s) or system(s)" referenced in the request may be limited to urine management. In other words, Sage is not seeking a document to identify BD product lines wholly unrelated to the urine management space at issue in this case.

- o For the remaining requests, PureWick agreed to take back to its team to see if it had any additional questions. Sage did not narrow any particular request. Please confirm that PureWick will be producing responsive documents for each of these requests.

- The parties also discussed the need for subpoenas to the Newtons and other named inventors. PureWick indicated that a subpoena was needed for each. Sage explained that a subpoena was not necessary for the Newtons, as PureWick treated both as a part of PureWick at trial (and Dr. Newton sat at counsel table as the "PureWick representative"). In any event, Quinn agreed to accept service of subpoenas on behalf of the Newtons and other named inventors.  We continue to contend that the Newtons should be supplementing their production both pursuant to their prior subpoenas and pursuant to the new requests on PureWick.

PureWick would endeavor to respond on any of the follow-up items above by Tuesday, November 15. We look forward to your response.

Regarding your letter, we are currently reviewing and expect to provide a supplement to Sage's interrogatory responses. We will also respond to the concerns raised in Sage's objections to PureWick's requests for production. Several members of our team were unavailable due to personal matters. We aim to provide these to you by the end of the week or early next week.

Regards,

Ryan

6

# EXHIBIT 6

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7346**

WRITER'S EMAIL ADDRESS
**nicolafelice@quinnemanuel.com**

November 22, 2022

**CONFIDENTIAL**
**VIA E-MAIL**
**RPIANETTO@MCANDREWS-IP.COM**

Ryan Pianetto
McAndrews, Held & Malloy, Ltd.
500 W Madison St. # 3400
Chicago, IL 60661

Re:    *PureWick Corporation v. Sage Products, LLC,* Case No. 22-102-MN (D. Del.)

Dear Ryan:

I write as a follow-up to your letter of October 28th, the parties' November 8th meet and confer, and your email of November 15th.

**Sage Request For Production Nos. 2, 3, 8, 10, 13, 16-19, 24, 27, 29, 32-39, 52, 54, 56, 61, 65-72, 74, 75, 77, 83, 88, 95:** During the meet and confer, PureWick explained that it had previously searched for, collected, and produced documents responsive to these requests in *PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN ("*PureWick I*"), and thus pursuant to Paragraph 8 of the Scheduling Order (D.I. 20), those documents are already available to Defendant in this action. Sage argued that "PureWick must go and update its search to produce what may have not been produced in the prior case," as well as "additional responsive documents that PureWick may have generated or became aware of since discovery in the prior case, etc." PureWick disputes that contention, especially given that many of these Requests are identical to those Sage propounded in *PureWick I* and relate to time periods long before *PureWick I* was initiated. Nonetheless, PureWick has re-reviewed these requests and confirms that, to the extent that any non-privileged documents responsive to these requests are located after a reasonable search that were not already produced in *PureWick I*, PureWick will produce them.

**Sage Request for Production Nos. 1, 4-7, 9, 26, 87:** These Requests relate generally to the "Patents-in-Suit or Related Patents and Applications," which PureWick reiterated on the meet and confer was an overly broad category to begin with, at least because it included two applications

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

that are not in the chain of priority for the Patents-in-Suit.  Moreover, many of these requests, like those in the above category, are identical to Requests Sage propounded in *PureWick I*.  In response to those prior Requests, PureWick already produced the prosecution files for the Patents-in-Suit, including any prior art contained in those files.  PureWick also produced non-privileged communications with third parties regarding the Patents-in-Suit.  To the extent the definition of "Patents-in-Suit or Related Patents and Applications" encompasses additional patents and applications over what was covered by that same definition in *PureWick I*, PureWick will produce the prosecution files for those patents, including any prior art contained in those files, and any non-privileged communications regarding those additional patents and/or applications that are within Plaintiff's possession, custody and control, and that can be located following a reasonable search.

**Sage Request for Production No. 22**: This request seeks "[a]ll documents relating to, referring to, or concerning this lawsuit."  As PureWick indicated in its objections and during the parties' meet and confer, this Request is both vague and overly broad.  Indeed, when PureWick asked Sage during the meet and confer to explain the relevance of this Request to the claims and defenses asserted in this action, Sage had no answer other than to say that documents about the lawsuit are relevant to the lawsuit.  That is wrong.  Documents relating to or referring to the lawsuit do not necessarily have any relevance to the underlying claims and defenses asserted in this action.  When PureWick, in an effort to resolve the dispute, asked Sage to explain in more detail what it sought to obtain with this Request, Sage stated that the Request was clear on its face, and it could not tell PureWick what to search for.  As Sage is aware, PureWick has already agreed to produce documents "concerning Plaintiff's decision to file this lawsuit including any communications regarding Plaintiff's decision not to file suit after it learned of the PrimaFit 2.0 in the PureWick I Litigation," in response Request No. 42.  It is not clear how any additional documents relating or referring to this lawsuit would be relevant to the asserted claims and defenses, and thus, to the extent Sage seeks additional documents over those sought by Request No. 42, please provide a detailed explanation of the categories of documents sought and their relevance.

**Sage Request for Production Nos. 57 and 86:**   These Requests seek all documents PureWick submitted to the FDA relating to "each external urine management system ever designed, made, offered for sale, or sold by Plaintiff," as well as "all documents related to reports to the FDA for any issues or problems with any PureWick female urine collection device."  As PureWick reiterated on the meet and confer, the PureWick product is a Class 1 exempt device, and thus is exempted from the FDA clearance process.  Moreover, Request No. 57 is identical to a Request Sage propounded in *PureWick I* and thus PureWick produced documents responsive to at least that request to the extent non-privileged, responsive documents existed, were in Plaintiff's possession, custody, or control, and could be located following a reasonable search.  To the extent there are any additional non-privileged documents responsive to these requests that were not produced in *PureWick I* and can be located following a reasonable search, PureWick will produce them in this action.

**Sage Request for Production Nos. 14, 51, and 70:** These Requests seek physical samples of the PureWick product, as well as iterations of any product made by Plaintiff.  As we discussed, PureWick already produced physical samples of the PureWick product, and we previously made available for inspection each model or iteration that was in PureWick's custody or control.  We

also produced documents identifying those models or iterations.  PureWick confirms that it will produce five physical samples of the current version of the PureWick Female External Catheter, as requested in RFP No. 15.  Sage has articulated no reason why any further discovery or inspections are necessary in response to these Requests.

**Sage Requests for Production Nos. 12 and 94:**  These requests seek documents and communications related to PureWick's lost server.  Sage already took discovery concerning this issue in *PureWick I* and never sought any relief from the Court during that case.  As PureWick explained during the meet and confer, PureWick's lost server is not relevant to any claim or defense in this action, and thus these Requests exceed the scope of permissible discovery under Rule 26.  Sage offered no explanation of how the discovery sought by Request Nos. 12 and 94 is relevant to this case other than to say it believed it was generally relevant to Sage's defenses.  Discovery concerning facts relating to PureWick's determination during *PureWick I* that its legacy server was lost is not relevant to any claim or defense that Sage has raised in this case.  In fact, neither Sage's Answer nor Sage's response to PureWick's interrogatory concerning Sage's affirmative defenses contain any mention at all of PureWick's legacy server.  Accordingly, PureWick stands on its objections to these requests.

**Sage Requests for Production No. 11:**  This request seeks "all communications of Camille Newton and Ray Newton after May 1, 2020, relating to any testing, offer for sale, sale, public use, disclosure to any third party, or any experimental use of any PureWick Female External Catheter."  As PureWick explained during the meet and confer, and as detailed in PureWick's Initial Disclosures, Ray and Camille Newton are third parties to this action.  Thus, Request No. 11 seeks the communications of third parties, which are outside of Plaintiff's possession, custody or control, and Sage must subpoena Ray and Camille Newton if it wishes to obtain discovery from them.  The contention that the Newtons are somehow not third parties because PureWick allegedly "treated both as a part of PureWick at trial" is completely unfounded, especially given Mr. Surrette's admission on the first day of trial in *PureWick I* that Ms. Newton was "a third party [who] d[id] not work for PureWick."  The same is true of Sage's argument that the Newtons are under an obligation to "supplement[] their production both pursuant to their prior subpoenas and pursuant to the new requests on PureWick."  That is incorrect.  Your email of November 15th provides no support for that position, and the parties never agreed to such an arrangement.  Rather, the parties agreed only that the documents and interrogatory responses exchanged in *PureWick I* would be "available to the parties for use in this action," not that there was any duty to supplement discovery requests in *PureWick I* in this litigation.  Moreover, and as PureWick reiterated during the meet and confer, this request seeks information not relevant to any claim or defense asserted in this action.  Specifically, what Camille and/or Ray Newton may have said about any testing, offer for sale, sale, public use, disclosure to any third party, or any experimental use of any PureWick Female External Catheter many years after the patents' critical date is irrelevant to Sage's invalidity and unenforceability defenses.  Accordingly, PureWick stands on its objection to this request.

**Sage Request for Production Nos. 20-21, 23, 43:**  As PureWick indicated in its objections and during the parties' meet and confer, these Requests are overly broad.  PureWick maintains that objection, but confirms that it will produce all non-privileged, responsive documents relating to

3

PrimaFit 2.0 and the infringement, non-infringement, validity, invalidity, enforceability, or unenforceability of the Patents-in-Suit or any Related Patents and Applications, to the extent they exist, are not privileged, were not previously produced in *PureWick I*, and can be located following a reasonable search.

**Sage Request for Production Nos. 25 and 30:**   PureWick confirms that it will produce agreements between the named inventors of the patents-in-suit and PureWick, C.R. Bard, and/or Becton Dickinson, as well as assignments and licenses relating to the Patents-in-Suit or Related Patents and Applications to the extent they exist, are not privileged, were not previously produced in *PureWick I*, and can be located following a reasonable search.

**Sage Request for Production Nos. 53 and 82:** PureWick previously produced documents responsive to these same or similar requests made in *PureWick I*.  To the extent that the previously produced marketing materials or manufacturing agreements have been updated or revised, are not privileged, and can be located following a reasonable search, PureWick will produce them.

**Sage Request for Production Nos. 88 and 89:**   PureWick previously produced documents relating to any secondary indicia of nonobviousness of the Patents-in-Suit.  To the extent that are any new documents in this category on which PureWick intends to rely, that are not privileged, and can be located following a reasonable search, PureWick will produce them.

Regards,

*Nicola R. Felice*

Nicola R. Felice

4

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUREWICK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 22-102-MN |
| v. | ) | |
| | ) | |
| SAGE PRODUCTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S SUPPLEMENTAL INITIAL DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Court's Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI"), Plaintiff PureWick Corporation ("PureWick") submits the following Supplemental Initial Disclosures. These Supplemental Initial Disclosures are being made on the basis of the information reasonably available to PureWick at the present time and prior to discovery relating to Defendant's contentions. PureWick reserves the right to supplement and/or amend these disclosures as additional information becomes available.

## INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

As presently advised, PureWick believes that the individuals identified below are likely to have discoverable information in their possession, custody, or control that PureWick may use to support its claims or defenses.[1] Any communications with current or former employees of PureWick or any affiliate of PureWick (including C.R. Bard or Becton Dickinson & Co.) should be directed through counsel for PureWick.

---

[1] PureWick has filed a motion for judgment on the pleadings. Depending on how that motion is resolved by the Court, one or more of these witnesses may no longer be necessary.

| Name | Address | Subject |
|------|---------|---------|
| Robert A. Sanchez | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | Information concerning the conception and reduction to practice of the inventions described in the patents-in-suit |
| Camille R. Newton | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | Information concerning the conception and reduction to practice of the inventions described in the '376 and '989 patents, PureWick's Products, and PureWick's business |
| Joseph M. Forehand | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | Information concerning the conception and reduction to practice of the inventions described in the '376 and '989 patents, PureWick's products, and PureWick's business |
| Raymond J. Newton | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | Information concerning the conception and reduction to practice of the inventions described in the '376 and '989 patents, PureWick's products, and PureWick's business |
| John Gohde | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | PureWick's business and the marketing and sales of PureWick's products |
| Richard Morgan | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | The market for and sales of PureWick's products, and PureWick's competition with Sage's PrimaFit product. |
| Gregory Mann | c/o Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor New York, NY 10010 | Research, design, development, manufacturing and other technical information concerning PureWick's products |

In accordance with Section 3(a) of the parties' Stipulation and Proposed Order Regarding Modified Default Standard for Discovery, PureWick identifies the following custodians of PureWick documents: John Gohde, Richard Morgan, and Greg Mann.

## IDENTIFICATION OF DOCUMENTS

As presently advised, PureWick believes that the following categories of documents may be used to support its claims or defenses:

- The patents-in-suit and their file histories;

- Documents relating to the conception and reduction to practice of the inventions claimed in the patents-in-suit;

- Documents relating to PureWick's ownership of the patents-in-suit;

- Documents relating to Sage's infringement of the patents-in-suit;

- Documents relating to the development, sale, and marketing of PureWick's products; and

- Documents relating to the damages resulting from Sage's infringement of the patents-in-suit.

PureWick's investigation into its claims and defenses is ongoing and, therefore, PureWick reserves all rights to supplement or amend this disclosure pursuant to Rule 26(e) and to use additional documents and information as its discovery and investigation proceed. PureWick also may rely on documents that are produced by any party to this litigation, including PureWick itself, Sage, or third parties. Furthermore, PureWick reserves the right to supplement or modify this disclosure based on information or documents subsequently identified as relevant.

## COMPUTATION OF DAMAGES

Given the ongoing nature of PureWick's injury, the state of discovery, and the need for expert testimony to assess the scope of the injury, PureWick is not yet in a position to precisely compute its damages in this action. Information needed for such computation is in the possession, custody, or control of Sage and has not been produced to PureWick.

PureWick will rely on a damages expert and, therefore, will provide a complete computation of damages at the time for expert disclosures.

At present, PureWick intends to seek to recover the full extent of its damages to which it is entitled, including, but not limited to, damages based on a calculation of lost profits or an amount no less than a reasonable royalty, and enhanced damages for Sage's willful infringement, plus interest and costs. PureWick will additionally seek a judgment that this case is exceptional and an award of attorneys' fees and costs. PureWick will also seek a permanent injunction against future sales by Defendant. PureWick seeks any other relief available under applicable law.

PureWick reserves the right to supplement, modify, or add to this response as circumstances dictate and in accordance with the Federal Rules and/or an order issued by the Court.

## INSURANCE

Not applicable.

## NON-CUSTODIAL DATA SOURCES

As presently advised, PureWick believes that the following non-custodial sources may contain non-duplicative discoverable information:

- Shared network drive containing documents concerning PureWick's products, PureWick's business, and/or the patents-in-suit.

## NOTICE

The following individuals identified above are third-parties who are not currently employed by PureWick or any affiliate of PureWick: Robert A. Sanchez, Camille R. Newton, Joseph M. Forehand, and Raymond J. Newton. Documents from these individuals that were produced in *PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN are already available to Sage pursuant to the Court's Scheduling Order. To the extent that Sage seeks any additional

discovery from these individuals it will need to be through a subpoena pursuant to Fed. R. Civ. P.

45.   Counsel for PureWick will cooperate with Sage to facilitate such discovery, including by

accepting service of subpoenas, as appropriate.   By identifying these individuals, however,

PureWick does not necessarily agree that any further discovery from them is necessary or

appropriate.


DATE:   December 6, 2022

                                      */s/ Brian P. Biddinger*
                                      SHAW KELLER LLP
                                      John W. Shaw (No. 3362)
                                      Andrew E. Russell (No. 5382)
                                      I.M. Pei Building
                                      1105 North Market Street, 12th Floor
                                      Wilmington, Delaware 19801
                                      (302) 298-0700
                                      jshaw@shawkeller.com
                                      arussell@shawkeller.com

OF COUNSEL:

Steven C. Cherny
Raymond Nimrod
Brian P. Biddinger
Nicola R. Felice
Jason C. Williams
Bianca Fox
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
(212) 849-7000

# EXHIBIT 8

**From:** Amanda Antons <amandaantons@quinnemanuel.com>
**Sent:** Wednesday, January 13, 2021 4:09 PM
**To:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

**CAUTION: External Email From:** amandaantons@quinnemanuel.com

Chris,

As you know, Sage is not entitled to choose more than ten additional terms.  We agreed to search more than ten additional terms as a compromise in order to resolve this dispute and those terms added thousands of additional emails to PureWick's production.  We are processing and producing them,even though we believe the vast majority of them will not prove useful, or be used, in the case.  The issue is not whether Sage's additional terms beyond what we have agreed to search are relevant terms, but the issue is proportionality, which is why the Court's default order, and the parties' agreed order, places a limit on search terms.  The prejudice to PureWick from searching additional terms clearly lies in the burden and expense to process, review, log and produce an excessive amount of documents that, again, are unlikely to be useful or even used, in the case.

We have been investigating the status of the legacy PureWick server.  As we  previously indicated, after Bard acquired PureWick in 2017 the email from PureWick's legacy server was not migrated to Bard's system.  Our understanding is that following the acquisition the use of that server was discontinued as the responsibilities for sales, marketing, R&D, etc. with respect to PureWick were assumed by Bard employees.  We further understand that the legacy PureWick facilities were shut down in early to mid-2019, including the PureWick email server.  We have contacted the IT personnel involved with that process and they have informed us that although the email server was initially copied to a back-up hard drive when it was shut down, they have been unable to locate that hard drive and believe that it no longer exists.  We have, however, searched for and collected several thousand emails to and from Mr. and Dr. Newton and Mr. Forehand's PureWick addresses that reside on the Bard server and will be producing those shortly.

Regards,
Amanda

**Amanda Antons**
*Associate,*
**Quinn Emanuel Urquhart & Sullivan, LLP**

191 N. Wacker Drive Suite 2700
Chicago, IL 60606
312-705-7409 Direct
312.705.7400 Main Office Number
312.705.7401 FAX

amandaantons@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Christopher Scharff [mailto:CSCHARFF@mcandrews-ip.com]
**Sent:** Thursday, January 7, 2021 5:00 PM
**To:** Amanda Antons <amandaantons@quinnemanuel.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

**[EXTERNAL EMAIL]**

Amanda:

Thank you for agreeing to search certain additional terms for Mr. Gohde and Mr. Mann. The remaining terms we provided, however, are also relevant and we are entitled to choose our search terms. The term "Newton," "Camille," and "Urine collect!" are obviously relevant. Additionally, you have agreed to conduct a search relating to the Medtech Dare-to-Dream award, but not a similar search for the term "connect" and "award." And the remaining terms (a. "Kuntz" or "4,747,166;" b. "Omni Medical," "AMXD," or "AMXDMax;" c. "NICMS," "Heuvel," or "Tinnion;" d. "Keane," "3,349,768," or "Mahnensmith," and e. "Hollister" or "Convatec") relate to prior art or competitor products; if, as you say Mr. Gohde and Mr. Mann are unlikely to have many emails with those terms, then those should be simple searches. Can you please confirm that you will search those terms or identify any prejudice with such searches?

With regard to the purewick.com emails, you represented that emails prior to Bard's acquisition of PureWick were not migrated to Bard's servers. Where are those emails?

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661

P: 312-775-8000
cscharff@mcandrews-ip.com
bio| v-card | website

**CONFIDENTIALITY NOTICE:**
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

**From:** Amanda Antons <amandaantons@quinnemanuel.com>
**Sent:** Wednesday, December 30, 2020 1:15 PM
**To:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>;agaza@ycst.com; Bryce Persichetti
<BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger
<brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton
<athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

Chris,

As I indicated in my November 30 email, the search terms that we have proposed to use were solely for
Mr. Gohde's and Mr. Mann's emails.  Both of these individuals first became involved with PureWick
when it was acquired by Bard in 2017.  Therefore, we do not understand why it would make sense to
search their email for prior art, prior public use or sales, or documents relating to the alleged
inventions.  Moreover, your assertion that Sage's proposed terms relate to highly-relevant and
responsive concepts would be true in all patent cases, and does not provide good cause for the
excessive number of terms you have proposed.

We would, however, like to work with you to reach a reasonable accommodation and avoid a
dispute.  To that end, subject to our confirmation of the number of hits, we agree to search Mr. Gohde
and Mr. Mann's emails for the following additional terms from your list:

"cnewton@purewick.com"
"Robert Sanchez," "Bob Sanchez", "Rob Sanchez," or "Robert A. Sanchez"
"Forehand"
"External Catheter", "Female Catheter," or "External Male Catheter"
"candle"
"8287508" or "8,287,508
"10226376" or "10,226,376"
"10390989" or "10,390,989"
"10376407" or "10,376,407"
"Medtech Design," "Medtech Award," or "Dare-to-Dream"
"Tricity"
"Hilltop"

With respect to Camille Newton, Ray Newton and Joe Forehand, we are collecting and producing (without the use of search terms) emails in plaintiff's custody and control.  However, the legacy PureWick email accounts from prior to the 2017 acquisition by Bard were not migrated to Bard's servers after acquisition.   As we stated previously, Camille Newton, Ray Newton and Joe Forehand ceased being PureWick employees after the 2017 acquisition.  But as we also stated, we are happy to cooperate with you to search for and produce documents that are in their custody and control.  But we cannot search for and collect such documents without a subpoena.  This is why we have repeatedly informed you of the need to serve subpoenas and our willingness to accept service.


Regards,
Amanda

**Amanda Antons**
*Associate,*
**Quinn Emanuel Urquhart & Sullivan, LLP**

191 N. Wacker Drive Suite 2700
Chicago, IL 60606
312-705-7409 Direct
312.705.7400 Main Office Number
312.705.7401 FAX
amandaantons@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Christopher Scharff [mailto:CSCHARFF@mcandrews-ip.com]
**Sent:** Thursday, December 24, 2020 9:50 AM
**To:** Amanda Antons <amandaantons@quinnemanuel.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>;agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

**[EXTERNAL EMAIL]**

Amanda:

Our proposed terms are necessary because they relate to highly-relevant and responsive concepts such as prior art, prior public use or sales, the inventors, the patents, and other relevant documents relating to the alleged inventions requested by our document requests.  We did not believe the 4 terms that PureWick offered encompassed those concepts and thus supplementation was required. Even with these additional terms, many responsive documents will not be searched for or collected.

As you know we provided about 20 terms to be searched with our own custodians, and with PureWick's additional terms, there are about 30 terms being searched for Sage's custodians. We are simply

requesting something similar for PureWick's search.  Thus, we hope that you will search using our proposed terms so we can simply move forward in this case.

With regards to your second paragraph, we understand that you are stating that Robert Sanchez was not a PureWick employee; however, can you advise then whether PureWick has and will search Camille Newton's, Ray Newton's, and Joe Forehand's emails and confirm that you will be using the proposed search terms?

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio | v-card | website

**CONFIDENTIALITY NOTICE:**
This material is intended for the named recipient and, unless otherwise expressly indicated, is confidential and privileged information. Any dissemination, distribution or copying of this material is prohibited. If you received this message in error, please notify the sender by replying to this message and then deleting it from your system. Your cooperation is appreciated.

**From:** Amanda Antons <amandaantons@quinnemanuel.com>
**Sent:** Tuesday, December 22, 2020 7:14 PM
**To:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>;agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

Chris,

Can you please explain why you believe you have good cause to request so many additional search terms?

With respect to Mr. and Mrs. Newton, Mr. Forehand and Mr. Sanchez, we believe we understand the source of your confusion.  Although Camille Newton, Ray Newton and Joe Forehand all previously worked at PureWick, and previously had PureWick email addresses, these individuals ceased working for PureWick following its acquisition in 2017.  And Dr. Sanchez never worked for PureWick.  To the extent that PureWick has relevant, non-privileged documents in its possession, custody or control from any of these individuals we have been collecting and producing and will collect and produce those documents.  If, however, Sage wishes to seek discovery in the possession of these third-parties you will need to do so through subpoenas.  As we indicated in our initial disclosures, we will cooperate with Sage to facilitate such discovery, including by accepting service of subpoenas.

Regards,
Amanda

**Amanda Antons**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

191 N. Wacker Drive Suite 2700
Chicago, IL 60606
312-705-7409 Direct
312.705.7400 Main Office Number
312.705.7401 FAX
amandaantons@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Christopher Scharff [mailto:CSCHARFF@mcandrews-ip.com]
**Sent:** Tuesday, December 22, 2020 6:14 PM
**To:** Amanda Antons <amandaantons@quinnemanuel.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

**[EXTERNAL EMAIL]**

Dear Amanda:

We are following up on the below email.  Let us know if you will search our terms and please clarify your position regarding the inventors.

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio| v-card| website

**CONFIDENTIALITY NOTICE:**
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

**From:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>
**Sent:** Wednesday, December 16, 2020 5:31 PM
**To:** 'Amanda Antons' <amandaantons@quinnemanuel.com>; Sandra Frantzen
<SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>;agaza@ycst.com;
Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger
<brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton
<athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

Amanda:

Following up on your email below, with regard to our requests, the parties' stipulated discovery order
specifically states that a party can request additional search terms for "good cause." We believe we
have good cause to request the terms below based on the discovery in this case.

We do not understand your comments regarding Camille Newton, Raymond Newton, Joseph Forehand,
and Robert Sanchez. PureWick identified those individuals as its custodians in their Paragraph 3(a)
disclosures and at least some of those individuals have PureWick email addresses. Moreover, their
information is clearly in PureWick's possession, custody, or control as you have repeatedly relied on and
referenced it in this case and PureWick has produced documents and other information from those
individuals. Can you clarify your position?

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio| v-card| website

**CONFIDENTIALITY NOTICE:**
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

**From:** Amanda Antons <amandaantons@quinnemanuel.com>
**Sent:** Monday, December 7, 2020 4:43 PM
**To:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>;agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

Chris,

The parties' stipulated discovery order states that the parties may identify no more than ten additional search terms.  You have identified at least 27 additional terms, not including your request that we search for "related patents and application numbers."  Please reduce your list of terms to no more than 10.

With respect to your request concerning Camille Newton, Raymond Newton, Joseph Forehand, and Robert Sanchez, PureWick's initial disclosures clearly informed Sage that these are third-parties for whom Sage will need to serve a subpoena to obtain discovery.  As we stated in the initial disclosures, should Sage choose to serve subpoenas we expect that we can accept service on these individuals' behalf.

Regards,
Amanda

**Amanda Antons**
*Associate,*
**Quinn Emanuel Urquhart & Sullivan, LLP**

191 N. Wacker Drive Suite 2700

Chicago, IL 60606
312-705-7409 Direct
312.705.7400 Main Office Number
312.705.7401 FAX
amandaantons@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Christopher Scharff [mailto:CSCHARFF@mcandrews-ip.com]
**Sent:** Friday, December 4, 2020 4:57 PM
**To:** Amanda Antons <amandaantons@quinnemanuel.com>; Sandra Frantzen
<SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>;agaza@ycst.com;
Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger
<brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton
<athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

[EXTERNAL EMAIL]

---

Amanda:

Thank you for sending your proposed search terms for Mr. Gohde and Mr. Mann.  Please confirm that
PureWick has conducted an electronic search for the following additional paragraph 3(a) custodians:
Camille Newton, Raymond Newton, Joseph Forehand, and Robert Sanchez, and that other electronic
files of all custodians have been searched.

At this time, we request that you search the custodians electronic data using the following additional
terms:

"Newton", "Camille", or "cnewton@purewick.com,"
"Robert Sanchez," "Bob Sanchez", "Rob Sanchez," or "Robert A. Sanchez"
"Forehand"
"External Catheter", "Female Catheter," or "External Male Catheter"
"Urine collect!"
"candle"
The asserted patent numbers and related patents and application numbers
"Kuntz" or "4,747,166"
"Omni Medical", "AMXD" or "AMXDMax"
"NICMS" or "Heuvel" or "Tinnion"
"Keane" or "3,349,768" or "Mahnensmith"
"Hollister" or "Convatec"
"Medtech Design," "Medtech Award," or "Dare-to-Dream"
"connect" and "award"
"Tricity" or "Hilltop"

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio| v-card| website

**CONFIDENTIALITY NOTICE:**
**This material is intended for the named recipient and, unless otherwise expressly**
**indicated, is confidential and privileged information. Any dissemination, distribution**
**or copying of this material is prohibited. If you received this message in error,**
**please notify the sender by replying to this message and then deleting it from your**
**system. Your cooperation is appreciated.**

**From:** Amanda Antons <amandaantons@quinnemanuel.com>
**Sent:** Monday, November 30, 2020 12:09 PM
**To:** Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; Christopher Scharff <CSCHARFF@mcandrews-ip.com>;agaza@ycst.com; Bryce Persichetti <BPersichetti@mcandrews-ip.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; John Shaw <jshaw@shawkeller.com>
**Subject:** PureWick Corporation v. Sage Products, LLC, Case 1:19-cv-01508-MN

Counsel,

PureWick will be applying search terms to the potentially responsive email of custodians John Gohde and Greg Mann. Pursuant to paragraph 1 of the Scheduling Order (D.I. 24) and paragraph 5(b) of the Stipulated Modified ESI Order (D.I. 41), PureWick discloses the following search terms:

**John Gohde**:
- Sage
- Primafit
- Primofit
- Feature! /s (consumer! or customer!)

**Greg Mann**:

- Sage
- Primafit
- Primofit

Please let us know by Friday, Dec. 4 if Sage has any proposed terms to include in PureWick's Email search protocol.

Best regards,
Amanda

**Amanda Antons**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

191 N. Wacker Drive Suite 2700
Chicago, IL 60606
312-705-7409 Direct
312.705.7400 Main Office Number
312.705.7401 FAX
amandaantons@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT 9

**Page 1**

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4   PUREWICK CORPORATION,      )

5          Plaintiff,  )

6          vs.             ) No. 19-1508-MN

7   SAGE PRODUCTS, LLC,       )

8          Defendant.  )

9

10      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

11

12          The videotaped Rule 30(b)(6) deposition

13   of PUREWICK CORPORATION through BRIAN BURN and

14   BRIAN BURN, individually, called as a witness for

15   examination, taken via videoteleconference pursuant

16   to the Federal Rules of Civil Procedure of the

17   United States District Courts pertaining to the

18   taking of depositions, taken before VICTORIA C.

19   CHRISTIANSEN, a Certified Shorthand Reporter of the

20   State of Illinois, CSR No. 84-3192, on the 2nd day

21   of April, A.D. 2021, at 8:31 Mountain.

22

23

24

**Page 2**

1   PRESENT:

2      QUINN EMANUEL URQUART & SULLIVAN, LLP,
          (51 Madison Avenue, 22nd Floor,
3          New York, New York 10010,
          212-849-7000), by:
4      MR. BRIAN P. BIDDINGER,
          brianbiddinger@quinnemanuel.com,
5
          appeared via videoteleconference on
6          behalf of the Plaintiff;
7
8      McANDREWS, HELD & MALLOY, LTD.,
          (500 West Madison Street, 34th Floor,
9          Chicago, Illinois 60661,
          312-775-8000), by:
10      MR. ROBERT SURRETTE,
          bsurrette@mcandrews-ip.com, and
11      MR. RYAN PIANETTO,
          rpianetto@mcandrews-ip.com,
12
          appeared via videoteleconference on
13          behalf of the Defendant.
14
15
16
17
18
19
20
      VIDEOTAPED BY:  CONRAD SZULADZINSKI,
21          Legal Videographer,
          Esquire Deposition Solutions;
22
23
24   REPORTED BY:  VICTORIA C. CHRISTIANSEN, RPR, CRR,
          Illinois CSR No. 84-3192.

**Page 3**

1   THIS DEPOSITION IS BEING HELD VIA VIDEOCONFERENCING

2   EQUIPMENT.  THE WITNESS AND REPORTER ARE NOT IN THE

3   SAME ROOM.  THE WITNESS WILL BE SWORN IN REMOTELY

4   PURSUANT TO AGREEMENT OF ALL PARTIES.  THE PARTIES

5   STIPULATE THAT THE TESTIMONY IS BEING GIVEN AS IF

6   THE WITNESS WAS SWORN IN IN PERSON.

7          THE VIDEOGRAPHER:  We are now on the record.

8   The time is 7- -- 8:31 a.m. and the date is the 2nd

9   of April 2021.

10          This begins the videoconference

11   proceeding of Brian Burn taken in the matter of

12   PureWick Corporation vs. Sage Products, LLC called

13   in the United States District Court for the

14   District of Delaware, case number of which is

15   CA 19-1508-MN.

16          My name is Conrad Szuladzinski.  I'm

17   your remote videographer today.  The court reporter

18   is Vicki Christiansen.  We are representing Esquire

19   Deposition Solutions.

20          As -- as a courtesy, will everyone who

21   is not speaking please mute your audio and please

22   remember to unmute your audio when you are ready to

23   speak.

24          Will everyone present please identify

**Page 4**

1   themselves and state who -- who you represent,

2   after which the court reporter will swear in the

3   witness.

4      MR. SURRETTE:  Robert Surrette from McAndrews,

5   Held & Malloy on behalf of Sage Products, LLC.

6      MR. PIANETTO:  Ryan Pianetto of McAndrews,

7   Held & Malloy for Sage Products, LLC.

8      MR. BIDDINGER:  Brian Biddinger from Quinn

9   Emanuel representing the plaintiff, PureWick

10   Corporation, and the witness.

11          (WHEREUPON, the witness was duly

12          sworn.)

13          BRIAN BURN,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16          EXAMINATION

17   BY MR. SURRETTE:

18      Q.   Good morning, Mr. Burn.  Could you state

19   your full name for the record.

20      A.   Brian Mitchell Burn.

21      Q.   And what is your current address?

22      A.   My home address or work address?

23      Q.   Home address.

24      A.   21096 South Windy Peak Ridge Drive,

BRIAN BURN  Confidential                                      April 02, 2021
PUREWICK vs SAGE PRODUCTS                                     5—8

Page 5

1  Sandy, Utah 84094.
2      Q.    Have you ever been deposed before?
3      A.    Yes.
4      Q.    Well, I'll go over some ground rules
5  quickly.  Obviously you know the process if you've
6  been deposed before.
7          If you need a break, just ask for one,
8  except if it's in the middle of a question, I'll
9  ask you to finish answering the question before we
10  take a break.
11         Is that -- can we have agreement on
12  that?
13     A.    Sure.
14     Q.    And if you don't understand a question,
15  please ask me to clarify.  Otherwise, I'll assume
16  you understand the question.
17         Can we have agreement on that?
18     A.    Yes.
19     Q.    Your answers should be verbal as
20  everything is being recorded by the court reporter
21  and the videographer.
22         Can I have agreement on that?
23     A.    Yes.
24     Q.    Okay.  And this probably will apply more

Page 6

1  to me than you, but let's try to avoid talking at
2  the same time.  That makes it difficult for the
3  court reporter.
4          Can I have agreement on that?
5      A.    Yes.
6      Q.    And you understand that unless you're
7  instructed by your counsel not to answer, you
8  should answer all my questions?
9      A.    Yes, I do.
10     Q.    Is there anything today that would
11  prevent you from providing truthful and accurate
12  testimony?
13     A.    No.
14     Q.    Mr. Biddinger is not present with you in
15  the same room today, correct?
16     A.    Correct.
17     Q.    Okay.  And because of the remote aspect
18  of this deposition, I think there's a couple few
19  things we should go over.
20         Can you confirm that you don't have any
21  notes with you today relating to this deposition?
22     A.    Confirmed.
23     Q.    And you have no --
24     A.    Confirmed.

Page 7

1      Q.    Okay.  Thank you.  And you have no notes
2  today relating to the lawsuit that is the subject
3  of this deposition?
4      A.    Correct.
5      Q.    Can you confirm there's no one else in
6  the room with you today other than Mr. Biddinger --
7  I'm sorry.  Can you confirm that there is no one
8  else in the room with you today?
9      A.    Confirmed.
10     Q.    And if anyone else enters the room with
11  you at any point, can you please identify that
12  person immediately?
13     A.    Yes, sir.
14     Q.    And can you confirm you will not look at
15  any electronic messaging while the deposition is on
16  record?
17     A.    I will not.
18     Q.    Can you confirm you will not exchange
19  any notes, messages or signals with your counsel
20  that are not visible on the record?
21     A.    Confirmed.
22     Q.    And other than the documents that we
23  sent you, do you have any other documents in the
24  room with you relating to this deposition or the

Page 8

1  lawsuit that is the subject of this deposition?
2      A.    Yeah, but they're not easily accessible
3  to me.
4      Q.    Okay.  I assume that you're -- you're in
5  your home office and it's just your regular papers
6  that you're talking about there?
7      A.    Correct.  I have them stashed under some
8  stuff.
9      Q.    Okay.  Thank you.  And, now, with
10  respect to the exhibits we'll use in today's
11  deposition, you have access to the Esquire AgileLaw
12  website, correct?
13     A.    I do.
14     Q.    And you are currently logged in?
15     A.    Yes, sir.
16     Q.    Did you have an opportunity to test the
17  system before the deposition?
18     A.    I'm in the system now.  I didn't go in
19  and test AgileLaw.
20     Q.    Okay.  And you don't currently see any
21  documents in the AgileLaw portal, correct?
22     A.    That's correct.
23     Q.    All right.  You said you've been deposed
24  before.

Page 9

1    Have you ever been deposed remotely?
2    A.   No.
3    Q.   So the way I'll be introducing exhibits
4  is that I'll mark an exhibit and then introduce it
5  through the AgileLaw portal.  A few seconds after I
6  admit it, it should appear in the portal, okay?
7    A.   Okay.
8    Q.   And did you receive a box of documents
9  from us for this deposition?
10   A.   I did.
11   Q.   So throughout this deposition, I'll
12 primarily be introducing and showing you exhibits
13 through AgileLaw, but if at any point you would
14 prefer to refer to a hard copy, please feel free to
15 do so.
16   A.   Okay.
17   Q.   Now, I will state there's probably a
18 couple documents we weren't able to send you, some
19 documents came in to us last night that we weren't
20 able to get into your kit, but you should have the
21 overwhelming majority of exhibits in paper form, as
22 well.
23      Have you opened the box of exhibits?
24   A.   No.

Page 10

1    Q.   If you can do that now, that would be
2  great.
3      (WHEREUPON, there was a short
4       interruption.)
5  BY THE WITNESS:
6    A.   All right.
7  BY MR. SURRETTE:
8    Q.   Great.  Thank you.
9      Mr. Burn, who is your current employer?
10   A.   Becton Dickinson.
11   Q.   And how long have you been employed by
12 Becton Dickinson?
13   A.   I've been at C.R. Bard since 2005 and
14 with Becton Dickinson since Bard was acquired.
15   Q.   What year was that?
16   A.   I think the close was in 2018.
17   Q.   Thank you.  What is your current job
18 title?
19   A.   Assistant general counsel.
20   Q.   What are your responsibilities as
21 assistant general counsel?
22   A.   Managing intellectual property matters
23 for BD.
24   Q.   When you started at Bard in 2005, what

Page 11

1  was your position?
2    A.   My title?
3    Q.   Yes.  Sorry.
4    A.   It was division staff counsel.
5    Q.   What were your responsibilities as
6  division staff counsel?
7    A.   Managing intellectual property matters
8  for Bard.
9    Q.   And when you say "managing intellectual
10 property matters," what do you mean?
11   A.   Whatever the business needs were related
12 to intellectual property, whether it was managing
13 patent prosecution, performing legal assessments.
14   Q.   And obvi- --
15   A.   Whatever --
16   Q.   I'm sorry.  Go ahead.
17   A.   Whatever was requested of me.
18   Q.   And obviously as I'm asking these
19 questions, I'm not seeking any type of privileged
20 information, okay?
21   A.   Okay.
22   Q.   How long were you in your role as
23 division staff counsel?
24   A.   I believe it was just over three years.

Page 12

1    Q.   And did you assume -- assume a new
2  position after approximately three years?
3    A.   I did.  I -- I was promoted.
4    Q.   What role were you promoted to?
5    A.   To my current role.
6    Q.   As assistant general counsel?
7    A.   Yes.
8    Q.   And did your responsibilities change
9  when you moved from division staff counsel to
10 assistant general counsel?
11   A.   No.
12   MR. SURRETTE:  I'm marking Exhibit 270.
13      (WHEREUPON, a certain document was
14       marked Deposition Exhibit No. 270,
15       for identification.)
16 BY MR. SURRETTE:
17   Q.   And can you let me see when -- can you
18 let me know when that appears in your AgileLaw
19 portal?
20   A.   I see it.
21   Q.   Okay.  Do you recognize this document?
22   A.   No.
23   Q.   Okay.  I'll represent to you that it's a
24 copy of your LinkedIn profile, and I'd like to ask

BRIAN BURN  Confidential
PUREWICK vs SAGE PRODUCTS

April 02, 2021
41—44

Page 41

1    A.    Yes.
2    Q.    Are you prepared to testify on Topic 17?
3    A.    Yes.
4    Q.    Subject to your counsel's objections,
5  you're designated to testify on Topic 19, correct?
6    A.    Yes.
7    Q.    Are you prepared to testify on Topic 19?
8    A.    I am.
9    Q.    Subject to your counsel's objections,
10  you're designated to testify on Topic 20, correct?
11    A.    Yes.
12    Q.    Are you prepared to testify on Topic 20?
13    A.    Yes, sir.
14    Q.    Subject to your counsel's objections,
15  you're designated to testify on Topic 22, correct?
16    A.    Correct.
17    Q.    Are you prepared to testify on Topic 22?
18    A.    Yes, sir.
19    Q.    Subject to your counsel's objections,
20  you're designated to testify on Topic 25, correct?
21    A.    Yes, sir.
22    Q.    Are you prepared to testify on Topic 25?
23    A.    I am.
24    Q.    Subject to your counsel's objections,

Page 42

1  you're designated to testify on Topic 27, correct?
2    A.    Correct.
3    Q.    Are you prepared to testify on Topic 27?
4    A.    Yes.
5    Q.    Subject to your counsel's objections,
6  you're designated to testify on Topic 29, correct?
7    A.    Yes.
8    Q.    Are you prepared to testify on Topic 29?
9    A.    Yes, sir.
10    Q.    Subject to your counsel's objections,
11  you're designated to testify on Topic 31, correct?
12    A.    Correct.
13    Q.    Are you prepared to testify on Topic 31?
14    A.    Yes, sir.
15    Q.    And subject to your counsel's
16  objections, you're designated to testify on Topic
17  32, correct?
18    A.    Yes, sir.
19    Q.    Are you prepared to testify on Topic 32?
20    A.    Yes.
21    Q.    Thank you.  I've put on the screen
22  what's been previously marked as Deposition Exhibit
23  1.
24          Can you let me know when you see it?

Page 43

1    A.    I see it.
2    Q.    All right.  Do you recognize this
3  document?
4    A.    Yes, sir.
5    Q.    And it's US Patent No. 8,287,508,
6  correct?
7    A.    Correct.
8    Q.    And do you understand it to be one of
9  the patents-in-suit in the lawsuit between Sage and
10  PureWick?
11    A.    Yes, sir.
12    Q.    And if during the deposition today I
13  refer to the '508 patent, can we agree that I'm
14  referring to this patent?
15    A.    Yes.
16    Q.    Okay.  I've now uploaded what's been
17  previously marked as Exhibit 3.
18          Can you let me know when you see it?
19    A.    I see it.
20    Q.    This is US Patent No. 10,226,376,
21  correct?
22    A.    Correct.
23    Q.    And do you understand it to be one of
24  the patents-in-suit in the litigation between Sage

Page 44

1  and PureWick?
2    A.    I do.
3    Q.    And if I refer to this as the '376
4  patent today, can we agree that this is the patent
5  I'm referring to?
6    A.    Yes.
7    Q.    I'm now uploading another document,
8  what's been previously marked as Exhibit 2.
9          Can you let me know when you see it?
10    A.    I see it.
11    Q.    And this is US Patent No. 10,390,989,
12  correct?
13    A.    Correct.
14    Q.    Do you recognize it?
15    A.    I do.
16    Q.    And do you understand it to be one of
17  the patents-in-suit in the litigation between Sage
18  and PureWick?
19    A.    Yes.
20    Q.    And if I refer to this patent as the
21  '98- -- '989 patent today, can we have an
22  understanding that this is the patent I'm referring
23  to?
24    A.    Yes.

BRIAN BURN  Confidential                                        April 02, 2021
PUREWICK vs SAGE PRODUCTS                                       53–56

Page 53

1  BY MR. SURRETTE:
2      Q.   When did you last see the guidelines?
3      A.   It was yesterday.
4      Q.   So you saw them in preparation for
5  today's deposition?
6      A.   Yes.
7      Q.   And the guidelines you saw yesterday, do
8  they have any guidelines with respect to e-mail
9  retention?
10     A.   I didn't -- it spoke to many, many
11 different classes of documents, and I did not see
12 anything on there specific to e-mails.
13     Q.   At the time of Bard's acquisition of
14 PureWick in 2017, PureWick had a facility based in
15 California, correct?
16     A.   Correct.
17     Q.   And that facility had an e-mail server
18 associated with the employees at that facility,
19 correct?
20     A.   Yes, sir.
21     Q.   And for purposes of our discussion
22 today, can we refer to that as the PureWick legacy
23 e-mail server?
24     A.   Yes.

Page 54

1      Q.   And that server hosted e-mails of
2  employees of PureWick, correct?
3      A.   Correct.
4      Q.   And at the time of the acquisition,
5  those employees would have included Camille Newton,
6  correct?
7      A.   Correct.
8      Q.   It would have included Ray Newton,
9  correct?
10     A.   Correct.
11     Q.   It would include Joseph Forehand,
12 correct?
13     A.   Correct.
14     Q.   And it would include Mike Jackson,
15 correct?
16     A.   I don't know.
17     Q.   And that server was not migrated to
18 Bard's system after the acquisition, correct?
19     A.   Correct.
20     Q.   And the PureWick legacy e-mail server
21 contained PureWick e-mails from prior to the
22 acquisition, correct?
23     A.   Correct.
24     Q.   Following the acquisition, the use of

Page 55

1  that server was discontinued, correct?
2      A.   Correct.
3      Q.   And when was the -- when was the use of
4  that server discontinued?
5      MR. BIDDINGER:  Objection, outside the scope.
6  BY THE WITNESS:
7      A.   To my understanding, use of that server
8  was discontinued after the acquisition.
9  BY MR. SURRETTE:
10     Q.   Do you know when after the acquisition?
11     MR. BIDDINGER:  Same objection.
12 BY THE WITNESS:
13     A.   No, sir.
14 BY MR. SURRETTE:
15     Q.   And was that e-mail server copied to a
16 backup drive before it was discontinued?
17     A.   Yes.
18     Q.   And PureWick has been unable to locate
19 that backup drive, correct?
20     A.   Correct.
21     Q.   And PureWick believes that the hard
22 drive no longer exists, correct?
23     A.   Correct.
24     Q.   Does the e-mail server itself still

Page 56

1  exist?
2      A.   Not to PureWick's knowledge.
3      Q.   When did PureWick first learn that it
4  was unable to locate the backup?
5      A.   I don't know the date.
6      Q.   Do you -- do you know what year?
7      A.   Your question is do I know what year
8  PureWick was looking for the server?
9      Q.   I'll -- I'll ask again.
10          Do you know in what year PureWick first
11 learned that it was unable to locate the backup of
12 the legacy e-mail server?
13     A.   No, I don't know for sure.
14     Q.   I'm asking you in your capacity as a
15 30(b)(6) designee on behalf of PureWick.
16          Does PureWick know when it first learned
17 that the backup drive containing the legacy e-mail
18 server could not be found?
19     MR. BIDDINGER:  Objection, outside the scope.
20 BY THE WITNESS:
21     A.   Sitting here today, PureWick does not
22 recall the date.
23 BY MR. SURRETTE:
24     Q.   Has PureWick undertaken efforts to try

BRIAN BURN  Confidential                                           April 02, 2021
PUREWICK vs SAGE PRODUCTS                                          57–60

Page 57

1  and find the legacy e-mail server?
2     A.   Yes.
3     Q.   What efforts has PureWick undertaken?
4     A.   I understand PureWick un- -- reached
5  out to -- we started tracing back from California
6  where the server was located, and there were
7  discussions after that amongst BD associates trying
8  to find it.
9     Q.   When did PureWick undertake efforts to
10  try and find the legacy e-mail server?
11     A.   It was -- it was at some point after it
12  realized that it was missing.
13     Q.   But sitting here today, you can't
14  identify when PureWick had first knowledge that
15  this server was missing, correct?
16     A.   Correct.
17     Q.   Who was involved in the efforts to try
18  and find the legacy e-mail server?
19     A.   I know that we have an in-house
20  e-discovery specialist, and she was very involved
21  in trying to find it.  I understand that BD
22  associates reached out to former PureWick employees
23  in an effort to locate the server and additionally
24  reached out to try to find the backup hard drive.

Page 58

1     Q.   When did PureWick first learn that it
2  could not find the backup?
3     A.   I don't know when Pur- -- when PureWick
4  first learned it couldn't find the backup.
5     Q.   And did PureWick undertake efforts to
6  try and find the backup?
7     A.   Yes.
8     Q.   What efforts did PureWick undertake to
9  try and find the backup drive containing the legacy
10  PureWick e-mail server?
11     A.   It was sort of -- it was sort of
12  contract -- contact tracing almost, going back to
13  find out who would have had it and what happened to
14  it after that.
15     Q.   What former employees did BD associates
16  reach out to at PureWick?
17     A.   I -- I would be speculating if -- as to
18  specific employees.  I don't know.
19     Q.   Were you involved in trying to find
20  either the e-mail server or the backup?
21     A.   I was not.  I was aware of it, of -- of
22  some of the efforts at the time, but I wasn't
23  involved in the search myself.  That was being
24  conducted by others.

Page 59

1     Q.   Who performed the backup of the legacy
2  server?
3     A.   I don't know the individual's name.
4     Q.   Was it a PureWick employee or a Bard
5  employee?
6     A.   I don't know.
7     Q.   When was the backup performed?
8     A.   I don't know what date the backup was
9  performed.
10     Q.   Where was the backup stored?
11     A.   I don't know.  We're not -- we're not
12  able to locate it.
13     Q.   Is there a particular place it should
14  have been stored?
15     MR. BIDDINGER:  Objection, vague, calls for
16  speculation.
17  BY THE WITNESS:
18     A.   I don't know.
19  BY MR. SURRETTE:
20     Q.   Who was responsible for maintaining the
21  backup that was lost?
22     MR. BIDDINGER:  Objection, lacks foundation.
23  BY MR. SURRETTE:
24     Q.   I'll rephrase.  Who --

Page 60

1     A.   I don't know.
2     Q.   Was anyone -- I'll rephrase.
3           Was a particular department or person
4  responsible for maintaining the backup of the
5  legacy e-mail server?
6     A.   I'd just be speculating.
7     Q.   You can speculate.
8     A.   I would speculate the IT department
9  would have been involved.
10     Q.   And the IT department from which entity?
11     A.   I would speculate that it would have
12  begun at PureWick.
13     Q.   Why did -- strike that.
14           Why was a backup of the e-mail server
15  performed?
16     A.   To preserve the information, whatever
17  information existed on the server.
18     Q.   And that server would have been located
19  at the California facility, correct?
20     A.   Yes, sir.
21     Q.   That facility no longer exists, correct?
22     A.   Correct.
23     Q.   Has there been a litigation hold issued
24  in connection with PureWick's dispute with

Page 61

1    Stryker -- or, excuse me, Sage?
2        A.   Yes, sir.
3        Q.   When was that litigation hold issued?
4        A.   I don't know the date.
5        Q.   Do you know the year?
6        A.   I don't recall.
7        Q.   Was it prior to PureWick filing suit
8    against Sage?
9        A.   I don't recall.
10       Q.   Does Bard have a practice of when it
11   issues litigation hold notices?
12       A.   Other than to issue them timely to -- to
13   ensure that evidence is preserved.  Beyond that,
14   I'm not aware of anything.
15       Q.   Who would have received the litigation
16   hold notice related to the PureWick/Sage dispute?
17       A.   We would have cast a broad net to anyone
18   who we thought might potentially have discoverable
19   information.
20       Q.   And does PureWick seek and receive
21   acknowledgment from each recipient of the hold
22   notice that they receive and understood their
23   obligations under the hold?
24       A.   Yes, sir.

Page 62

1        Q.   And what obligations does the hold
2    impose on each recipient?
3        MR. BIDDINGER:  I just want to caution the
4    witness not to reveal attorney/client privileged
5    communications, but to the extent you can answer
6    that without doing so, you may answer.
7    BY THE WITNESS:
8        A.   Preserve information.
9    BY MR. SURRETTE:
10       Q.   Sitting here today testifying on behalf
11   of PureWick, you cannot tell me when PureWick
12   issued the litigation hold notice related to the
13   dispute between Sage and PureWick?
14       A.   I can't --
15       MR. BIDDINGER:  Objection --
16   BY THE WITNESS:
17       A.   -- give you the date it was issued.
18       MR. BIDDINGER:  -- outside the scope.
19   BY THE WITNESS:
20       A.   They are renewed on a -- on our -- on
21   somewhat of a regular tempo and -- and sent out to
22   custodians from time to time again, so it's kind of
23   difficult for me with that in mind because I've
24   seen those so many times in addition to initial

Page 63

1    legal hold notices, it's kind of difficult to pin
2    down a date when it first went out.
3        (WHEREUPON, a certain document was
4        marked Deposition Exhibit No. 272,
5        for identification.)
6    BY MR. SURRETTE:
7        Q.   On your screen should appear Exhibit
8    272.  When it appears, could you page through that
9    and let me know when you're done?
10       (WHEREUPON, there was a short
11       interruption.)
12   BY THE WITNESS:
13       A.   Okay.
14   BY MR. SURRETTE:
15       Q.   Do you recognize this document?
16       A.   Yes.
17       Q.   Have you seen it before?
18       A.   Yeah, I'm pretty sure I've seen this.
19       Q.   And -- and what is it?
20       A.   It is a letter from J.R. O'Farrell, who
21   is our commercial counsel, to Stryker Corporation's
22   GC.
23       Q.   And it's dated September 28, 2017?
24       A.   Yes, sir.

Page 64

1        Q.   And the subject is "Sage Products LLC -
2    Female External Collection Device," correct?
3        A.   Yes, sir.
4        Q.   Did you participate in the preparation
5    of this letter?
6        A.   I did not.
7        Q.   At the time -- and this letter is from
8    Mr. O'Farrell, correct?
9        A.   Yes, sir.
10       Q.   And who is he?
11       A.   He's commercial counsel for Bard Medical
12   Division.
13       Q.   And is he currently still employed at
14   Bard or BD?
15       A.   Yes -- excuse me, yes, sir.
16       Q.   Okay.  As of the date of this letter to
17   Mr. Hutchinson, had PureWick issued a litigation
18   hold notice regarding its dispute with Sage?
19       MR. BIDDINGER:  Objection, outside the scope.
20   BY THE WITNESS:
21       A.   I don't recall.
22       (WHEREUPON, a certain document was
23       marked Deposition Exhibit No. 273,
24       for identification.)

BRIAN BURN  Confidential
PUREWICK vs SAGE PRODUCTS

April 02, 2021
217–220

Page 217

1  confident it does, but...
2      MR. SURRETTE:  Okay.  Maybe it's just the way
3  it's described is not clear, but we can take that
4  for another day.
5  BY MR. SURRETTE:
6      Q.   Does PureWick have any opinions relating
7  to the invalidity of any asserted patent?
8      MR. BIDDINGER:  Objection, vague.
9  BY THE WITNESS:
10     A.   No, sir.
11 BY MR. SURRETTE:
12     Q.   Does PureWick have any opinions relating
13 to the unenforceability of any asserted patent?
14     MR. BIDDINGER:  Objection, vague.
15 BY THE WITNESS:
16     A.   No, sir.
17 BY MR. SURRETTE:
18     Q.   At the beginning of the day, you
19 testified that you had been deposed before, is that
20 correct?
21     A.   Yes --
22     Q.   How many times?
23     A.   -- that's correct.
24     Q.   How many times?

Page 218

1      A.   Between four and six times.
2      Q.   And were -- were all of those in your
3  role as counsel for Bard or Becton Dickinson?
4      A.   No.
5      Q.   Okay.  Can you generally describe each
6  time you've been deposed?
7      A.   I've been deposed in connection with a
8  personal matter.  I have been deposed twice in
9  Medline.  I have been deposed in connection with a
10 commercial dispute with another competitor.
11     Q.   When you say you've been deposed twice
12 in Medline, is there a dispute between Bard and
13 Medline?
14     A.   I'm sorry.  Yeah, I was assuming too
15 much.  So Bard and Medline are involved in patent
16 litigation right now.
17     Q.   Okay.  And have you ever provided trial
18 testimony?
19     A.   No.  Oh, I have, but it was also in
20 connection with a personal matter.
21     Q.   All right.  Thank you.  So I'd like to
22 return to our questions regarding the legacy e-mail
23 server.
24         Do you recall that -- the questions I

Page 219

1  asked you earlier today about that?
2      A.   I do.
3      Q.   Okay.  Do you know whether the backup
4  was created at the time of the acquisition?
5      A.   You mean on -- on that day?
6      Q.   No.  I meant was it -- was it in
7  existence at the time of the acquisition?
8      A.   Was the backup in existence at the time
9  of acquisition?  I don't believe so.
10     Q.   Was the backup in existence after the
11 commencement of this lawsuit?
12     A.   I don't know.
13     Q.   Do you know why PureWick created a
14 backup?
15     A.   I don't.
16     Q.   Mr. Burn, what did you do to prepare for
17 this topic today?
18     A.   Met with my counsel.
19     Q.   And did you talk to anyone at PureWick
20 or Bard about it?
21     A.   Not in -- I have previously, but not
22 in -- not this week.
23     Q.   The IT personnel that were in- -- that
24 was involved, was it PureWick personnel or Bard

Page 220

1  personnel?
2      MR. BIDDINGER:  Objection, asked and answered.
3  BY THE WITNESS:
4      A.   I don't know.
5  BY MR. SURRETTE:
6      Q.   Who would know?
7      A.   Who would know whether Bard or PureWick
8  did the backup --
9      Q.   No.
10     A.   -- at the time of the acquisition?
11     Q.   No.  What -- what I am trying to
12 understand, Mr. Burn, is -- your -- your counsel
13 has represented to us that "We have contacted the
14 IT personnel involved with that process, and they
15 have informed us that although the e-mail server
16 was initially copied to a backup drive when it was
17 shut down, they have been unable to locate that
18 hard drive and believe that it no longer exists" --
19     A.   Okay.
20     Q.   -- and what I'm trying to figure out is
21 who those IT personnel are.
22     A.   I don't know the answer.
23     Q.   And I'm asking you:  Who would know that
24 answer?

Page 221

1    A.   I don't know, Mr. Surrette.  I would --
2  I would have to ask around.  I would probably start
3  with my e-discovery colleague at Franklin Lakes.
4    Q.   So you understand you're designated on
5  the facts and circumstances relating to the missing
6  PureWick e-mail server, correct?
7    A.   Correct.
8    Q.   Okay.  But you are unable to tell me
9  about some of the facts and circumstances relating
10  to the missing e-mail server, right?
11    MR. BIDDINGER:  Objection, vague.
12  BY THE WITNESS:
13    A.   You said I'm not able to tell you some
14  of the facts and circumstances surrounding the
15  e-mail server, correct?
16  BY MR. SURRETTE:
17    Q.   Yeah.  You haven't been able to answer
18  some of my questions, correct?
19    A.   Correct.
20    Q.   Is there someone more knowledgeable than
21  you about the missing PureWick e-mail server?
22    A.   I -- I mean, it's possible.  It depends
23  on what specific information you're looking for.
24    Q.   Well, that's --

Page 222

1    A.   It's just --
2    Q.   I'm sorry.  I didn't mean to interrupt
3  you.
4    A.   I -- I don't know.  Like we've done an
5  investigation, and, you know, the server nor the
6  backup exist.  So internally, you know, we've --
7  we've established that.  We've looked for it.  We
8  can't find it.
9    Q.   But one of the questions that I've asked
10  that I think you're unable to answer is when did
11  you -- when did PureWick first learn that the
12  server was missing.
13    A.   Right, and I -- I don't -- I -- I don't
14  know when they -- when they determined it was
15  missing.  I understand that there were questions
16  initially about it, where -- where is the server?
17  Who has it?  Can someone go look for it?  And I was
18  apprised from time to time that, you know, we were
19  still looking for it and very concerned about the
20  fact that we were not able to find it, but at the
21  end of the day, the -- the -- or many days, the
22  investigation concluded that neither of them
23  existed anymore, and PureWick doesn't know where
24  they are and does not know what became of them.

Page 223

1    Q.   And so you said "concluded that neither
2  of them exist," so you mean the server and the
3  backup, correct?
4    A.   Correct.
5    Q.   And you can't tell me whether the server
6  and backup went missing before or after the lawsuit
7  commenced?
8    A.   That's correct.
9    Q.   You testified earlier that you received
10  litigation hold notices related to this lawsuit,
11  correct?
12    A.   Correct.
13    Q.   And do you still have those hold
14  notices?
15    A.   To the extent they're still in my e-mail
16  system, yes, and I expect they would be.
17    Q.   Would you be able to find -- would you
18  be able to find them, if necessary?
19    A.   I would imagine so.  I won't know until
20  I look.
21    MR. SURRETTE:  Mr. Biddinger, I have --
22  BY THE WITNESS:
23    A.   It's --
24  BY MR. SURRETTE:

Page 224

1    Q.   I'm sorry.  Go ahead.
2    A.   It's -- I'm sorry.  I was just going to
3  add it's a system -- it's -- it's not like a
4  regular e-mail that goes out.  It's something with
5  an embedded link to click that the obligation is
6  acknowledged, and I -- I don't know if the e- -- if
7  it disappears after the acknowledgment or what,
8  but...
9    MR. SURRETTE:  Okay.  Thank you.
10    Mr. Biddinger, I'm -- I'm going to
11  continue the deposition.  Obviously we're concerned
12  about the answers we've received related to the
13  e-mail server, and so I'm -- I'm going to continue
14  the deposition.  I -- I suspect you disagree with
15  that, and we can just take it offline afterwards.
16    MR. BIDDINGER:  Yes, that's -- that's fine.
17  We do disagree and -- but we can certainly take it
18  up after.
19    Are -- does that mean you're done with
20  questioning?
21    MR. SURRETTE:  Yes.
22    MR. BIDDINGER:  Okay.  I wanted to do -- I
23  have a couple of questions quickly.  I also want
24  to, before I forget, mark the transcript to the

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PUREWICK CORPORATION,

      Plaintiff/Counterclaim Defendant,

      v.

SAGE PRODUCTS, LLC,

      Defendant/Counterclaim Plaintiff.

C. A. No. 19-1508-MN

**SAGE'S FIRST NOTICE OF DEPOSITION OF PUREWICK CORPORATION**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

      PLEASE TAKE NOTICE that, Defendant and Counterclaim Plaintiff Sage Products, LLC ("Sage"), by their attorneys, will take the deposition of Plaintiff and Counterclaim Defendant PureWick Corporation ("PureWick") regarding the subject matters set forth in the attached Schedule A, pursuant to Fed. R. Civ. P. 30(b)(6), starting at 9:00 a.m. on March 11, 2021 at McAndrews, Held & Malloy, Ltd., 500 West Madison Street, Suite 3400, Chicago, IL 60661, or if a mutually agreeable location cannot be agreed upon, the deposition will take place at Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801. The deposition will be taken upon oral examination before an officer authorized to administer oaths and will continue from day to day until completed. The deposition will be recorded stenographically and may be recorded by videographic means.

      Pursuant to Rule 30(b)(6), PureWick is required to designate one or more officers, directors, managing agents, or other consenting persons to testify on its behalf with respect to the matters set forth in Schedule A attached to this Notice. PureWick shall inform counsel for Sage of such designation(s) at a reasonable time prior to the deposition(s), but no later than eight business

days prior to the deposition(s), by identifying the person(s) designated to testify with respect to each topic on behalf of PureWick.


Dated: February 12, 2021

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ Bryce R. Persichetti

Of Counsel:

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)

Robert A. Surrette
Sandra A. Frantzen
Christopher M. Scharff
Bryce R. Persichetti
McAndrews, Held & Malloy, Ltd
500 West Madison Street
Chicago, IL 60661
(312) 775-8000
bsurrette@mcandrews-ip.com
sfrantzen@mcandrews-ip.com
cscharff@mcandrews-ip.com
bpersichetti@mcandrews-ip.com

Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendant and Counterclaim Plaintiff Sage Products, LLC*

## **TOPICS FOR DEPOSITION**

PureWick is required to produce a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) with sufficient knowledge to testify on behalf of the corporation on the following topics.

1.      The conception, reduction to practice, invention, design, and development of any invention claimed in the Asserted Patents and Related Patents and Applications, including the date(s) of conception and reduction to practice, all documentary evidence corroborating such conception and reduction to practice, and the person(s) who participated in such conception and reduction to practice.

2.      The identification, structure, function, operation, research, development, design, marketing, promotion, sale, and use of the Covered PureWick Products and Non-Covered PureWick Products, including the utility, distinguishing features, and alleged benefits and advantages of such products and documents relating thereto (including schematics). This topic includes the design and development of the PureWick Female and Male External Catheters as well as the identification of individuals and entities involved in such design and development.

3.      The first demonstration, offer for sale, first sale, first third party use, first public use, first disclosure to any third party, and any experimental use of any alleged invention claimed in the Asserted Patents and Related Patents and Applications and any PureWick Female and Male External Catheter.

4.      All third party uses, experimental or public uses, demonstrations or disclosures to third parties, offers for sale, and sales to any third party of the PureWick Female and Male External Catheter prior to December 31, 2015.

the nexus between such consideration and the elements of the asserted claims of the Patents-In-Suit.

25.     Marking or lack of marking of the PureWick Female and Male External Catheters including the marking or lack of marking by any licensees.

26.     Financial statements and reports for PureWick from 2010 to the present. This includes annual, quarterly, and monthly financial statements concerning the PureWick Female External Catheter.

27.     The economic value or lack of economic value of any External Urine Management Patents or Applications including the Patents-In-Suit and Related Patents and Applications. This topic includes valuations prepared by PureWick or on behalf of PureWick.

28.     Features, factors, characteristics, and reasons that influence the purchasing decisions of customers or potential customers in the market for products and methods for urine collection and management including features, factors, characteristics, and reasons that drive the marketing and sales of PureWick Female and Male External Catheter and other products for collecting or managing urine.

29.     Communications between PureWick and any other person concerning the Patents-In-Suit or Related Patents and Applications.

30.     Communications between any Named Inventor and Robert Sanchez or his wife prior to December 31, 2012.

31.     PureWick's organization and corporate structure.

32.     PureWick's document retention policies and procedures including facts and circumstances relating to the missing PureWick email server.

# EXHIBIT 10

Message

| | |
|---|---|
| **From:** | Camille Newton, MD [cnewton@purewick.com] |
| **on behalf of** | Camille Newton, MD <cnewton@purewick.com> [cnewton@purewick.com] |
| **Sent:** | 2/1/2019 8:50:08 PM |
| **To:** | Skelton, Sarah [Sarah.Skelton@crbard.com]; Jackson, Benjamin [Benjamin.Jackson@crbard.com] |
| **Subject:** | [External] Fwd: Fw: ▮▮▮▮▮▮ |

**Caution: This email came from outside BD. Do not open attachments or click on links if you do not recognize the sender.**

Sarah,

See forwarded message below.  I still have not been able to speak directly with ▮▮▮▮▮▮▮, her phone has been busy.

Camille

---

Camille Newton, M.D.
PureWick Corporation
ph 619-660-0734 fax 619-660-5459 www.purewick.com
2017 Simon Foundation Innovating for Continence – 1st Place Scientific Poster
2016 Athena Pinnacle Award Winner
2015 Winner, Most Innovative Product Award – Medical Device and Pharmaceuticals
2014 MD&DI Design Finalist

-------- Original Message --------

> **Subject:** Fw: ▮▮▮▮▮▮
> **Date:** 2019-02-01 12:47
> **From:** Camille Newton <cnewski@att.net>
> **To:** Camille Newton <cnewton@purewick.com>

----- Forwarded Message -----
**From:** Lanys Kaye-Eddie <lanysgf@gmail.com>
**To:** Camille Newton <cnewski@att.net>
**Sent:** Friday, February 1, 2019, 12:31:16 PM PST
**Subject:** ▮▮▮▮▮▮

Camille: I heard that apparently there is an adjacent hospital to the Rochester, also servicing Mayo Clinic patients, that had a Purewick unit, that they sent over for her.  She was very relieved, although is still in a bad way.  However, at least that problem seems to have been alleviated.
See you soon, I hope.

CONFIDENTIAL

Lanys

CONFIDENTIAL

# EXHIBIT 11

| Message | |
|---|---|
| **From:** | Brian Burn [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=77B6B417D88B44E7AF7DB3BE4751832C-BRIAN BURN] |
| **Sent:** | 2/1/2022 1:40:56 AM |
| **To:** | docnewton [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user6fcd4939] |
| **Subject:** | RE: consulting agreement |

Hi Camille,

# Redacted

Brian

---

**From:** Doc Newton <docnewton@att.net>
**Sent:** Wednesday, January 26, 2022 10:49 AM
**To:** Brian Burn <Brian.Burn@bd.com>; JR OFarrell <JR.OFarrell@bd.com>
**Subject:** Re: consulting agreement


**EXTERNAL EMAIL - Use caution opening attachments and links.**

Thanks J.R.,

## Redacted

Camille


Camille Newton, M.D.
Founder - PureWick, Inc.
DocNewton@att.net

*Camille is proud to have received the Athena Pinnacle Award in 2016 for Women who Champion Women in the Health Care Industry.  PureWick, a 2015 Most Innovative Product, was acquired by Becton Dickinson in 2017.*


On Wednesday, January 26, 2022, 09:26:08 AM PST, JR OFarrell <jr.ofarrell@bd.com> wrote:

# Redacted

CONFIDENTIAL

BDPureWick_00001197



*J. R. O'Farrell*

*Associate General Counsel, Commercial*

*BD Urology and Critical Care*

jr.ofarrell@bd.com

1 Becton Drive

Franklin Lakes, NJ 07417

Tel: +1 (201) 847-6855

Fax: +1 (201) 847-7064

**bd.com**



**From:** Doc Newton <docnewton@att.net>
**Sent:** Friday, January 14, 2022 2:18 PM
**To:** Brian Burn <Brian.Burn@bd.com>; JR OFarrell <JR.OFarrell@bd.com>
**Subject:** consulting agreement

**EXTERNAL EMAIL - Use caution opening attachments and links.**

J.R.,

# Redacted

CONFIDENTIAL

Camille


Camille Newton, M.D.
Founder - PureWick, Inc.

DocNewton@att.net


*Camille is proud to have received the Athena Pinnacle Award in 2016 for Women who Champion Women in the Health Care Industry.  PureWick, a 2015 Most Innovative Product, was acquired by Becton Dickinson in 2017.*


*********************************************************************
IMPORTANT MESSAGE FOR RECIPIENTS IN THE U.S.A.:
This message may constitute an advertisement of a BD group's products or services or a solicitation of interest in them. If this is such a message and you would like to opt out of receiving future advertisements or solicitations from this BD group, please forward this e-mail to optoutbygroup@bd.com. [BD.v1.0]
*********************************************************************

This message (which includes any attachments) is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, use, copy or distribute this message. If you received this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*********************************************************************

Corporate Headquarters Mailing Address: BD (Becton, Dickinson and Company) 1 Becton Drive Franklin Lakes, NJ 07417 U.S.A.

BDPureWick_00001199

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUREWICK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 22-102-MN |
| | ) | |
| SAGE PRODUCTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF
DOCUMENTS AND THINGS (NOS. 1-51)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.")

and the applicable Local Civil Rules for the United States District Court for the District of

Delaware, Plaintiff PureWick Corporation ("PureWick" or "Plaintiff"), by and through its

undersigned attorneys, requests that Defendant Sage Products, LLC ("Sage" or "Defendant")

produce and permit Plaintiff to inspect and copy each of the documents and things requested below,

in accordance with those rules and the following Definitions and Instructions.

Unless otherwise agreed, production is to be made on or within thirty (30) days at the

offices of Quinn Emanuel Urquhart & Sullivan, LLP at 51 Madison Avenue, New York, NY,

10010.

**DEFINITIONS**

The following definitions apply to each request for the production of documents and things:

1.      Plaintiff incorporates by reference each of the Definitions set forth in Plaintiff's

First Set of Interrogatories.

## **INSTRUCTIONS**

The following instructions apply to each request for the production of documents and things:

1.     Defendant shall produce documents and things in its possession, custody, or control, as well as documents and things in the possession, custody, or control of Defendant's employees, agents, attorneys, accountants, representatives, and anyone acting on behalf of Defendant or under the control of Defendant.

2.     If Defendant is not in possession of documents or things responsive to any one request, Defendant shall state so in writing in response to the request.

3.     In the event that more than one copy of a document or thing exists, Defendant shall produce the original and each non-identical copy of each document or thing requested herein that is in Defendant's possession, custody, or control.

4.     If any document or thing is withheld based on a claim of any privilege or immunity, including attorney-client privilege or work-product immunity, Defendant shall identify the privilege or immunity that is claimed and indicate whether any such documents or things exist. Defendant shall further identify the general subject matter of the withheld document or thing, the date of its creation or preparation, and all Persons who authored, received, or viewed the document or thing. This shall take the form of a "privilege log."

5.     If Defendant knows of the existence, past or present, of any document or thing responsive to a request, but such document or thing is not presently in Defendant's possession, custody, or control, Defendant shall so state in response to the request, identify such document or thing in response to the request, and identify the Person in whose possession, custody, or control the document or thing was last known to reside.

6.      If any requested document or thing has been destroyed, transferred, or lost, Defendant shall identify the document and provide an explanation of the circumstances (e.g., when, how, by whom, and why) surrounding the document's destruction, transfer, or loss, and any and all records pertaining to its destruction, transfer, or loss.

7.      Defendant shall produce the requested documents and things as they are kept in the usual course of business or produce documents and things organized and labeled to correspond with the categories in these requests.

8.      Defendant shall produce a complete original or copy of each document or thing even if only a portion of such document or thing is responsive to one of the requests herein.

9.      These requests are continuing in nature and require further and supplemental production under Fed. R. Civ. P. 26(e) whenever Defendant acquires or discovers additional information or responsive documents or things between the time of initial production and the time of trial in this Action.  If Defendant obtains any other documents or things that would supplement or modify the documents or things produced in response to these requests, Defendant is directed to give timely notice of such documents and things and to furnish the additional documents or things to Plaintiff without delay.

## DOCUMENTS AND THINGS REQUESTED

**REQUEST FOR PRODUCTION NO. 1:**

Documents sufficient to show the structure, design, dimensions, materials, and operation of the Accused Product.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and Things relating to the research, design, development, testing, and evaluation of Defendant's Accused Product, including without limitation all lab notebooks,

product specifications, drawings, prototypes, reports, test specifications, test results, or survey results.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Things that refer or relate to the instructions for use of Defendant's Accused Product, including without limitation user manuals, instructional guides, training manuals, package inserts or labels.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents and Things concerning Defendant's rationale and reasons for creating and/or developing the Accused Product.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show when Defendant began to research, design, develop, market, and sell the Accused Product.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and Things concerning alternative designs or alternative features considered in connection with the research, design and development of the Accused Product.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to show the names of the individuals who participated in the research, design, and development of the Accused Product.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and Things concerning any evaluation, criticism, complaint, or report relating to the Accused Product.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and Things concerning any problems, difficulties, or delays that Defendant experienced in preparing to bring to market the Accused Product.

**REQUEST FOR PRODUCTION NO. 10:**

Documents sufficient to show the location of manufacture and manufacturing process for the Accused Product.

**REQUEST FOR PRODUCTION NO. 11:**

All marketing materials, product brochures, patient materials, or advertisements for the Accused Product.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents and Things relating to any actual or perceived benefits of the Accused Product over other urinary catheter products.

**REQUEST FOR PRODUCTION NO. 13:**

All publications or articles relating to the Accused Product.

**REQUEST FOR PRODUCTION NO. 14:**

Five samples of Defendant's Accused Product, including without limitation the original packaging and all written materials provided with Defendant's Accused Product.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents and Things relating to meeting agendas, meeting minutes, internal memoranda, newsletters, presentations, and other documents of Defendant's board of directors, board committees, or management referring to or relating to the Patents-in-Suit or PureWick.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents and Things relating to the Patents-in-Suit, including without limitation analysis of the scope, validity, or enforceability of the claims, or the strength or value of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents and Things supporting, refuting, or otherwise relating to any contention by Defendant that the Patents-in-Suit are unenforceable.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and Things supporting, refuting, or otherwise relating to any contention by Defendant that it does not infringe the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents and Things relating to any effort, attempt, implementation, or consideration by or for Defendant, to design around any claims of the Patents-in-Suit, including without limitation the feasibility, cost, customer acceptance, and time for any such design around, and any analysis or opinion of counsel.

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Things relating to any investigation, opinion, evaluation, search, study, or analysis, whether oral or written, of whether the manufacture, use, or sale of the Accused Product would infringe any claim of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient to identify each customer of an Accused Product.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents and Things relating to any presentations, training manuals, instructional materials, or training programs provided to any customer, potential customer or end user of the Accused Product, or provided to Defendant's sales people to assist them in selling the Accused Product to customers or educating customers about the Accused Product.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents and Things relating to labeling, marketing, promotion, or advertising for the Accused Product.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to show any training relating to the Accused Product that has been provided to a third party by or on behalf of Defendant.

**REQUEST FOR PRODUCTION NO. 25:**

Organizational charts sufficient to show Defendant's organizational structure and the names, positions, titles, duties, and reporting relationships of directors, officers, employees, and other personnel in any groups, divisions, or departments who have or have had responsibility for or duties related to the research, design, development, testing, manufacture, repair, distribution, operation, sales, marketing, promotion, advertising, licensing, competitive analysis, or enforcement of any subject matter relating to the Accused Product.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents and Things relating to Defendant's business plans, strategic plans, marketing plans, consultant reports, or strategy reviews concerning the Accused Product.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents and Things relating to any marketing, distribution, sales, or offers for sale of the Accused Product by Defendant, including any financial projections, market share projections, marketing plans, business plans, or strategic plans concerning the Accused Product.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents and Things relating to the market for the Accused Product, including competitive analyses, market projections and market projection models, projected market

penetration and market share studies, market surveys, customer satisfaction surveys, industry reports, sales data, and forecasts.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents and Things relating to the marketing and sale of the Accused Product, including relating to the use, importance, or demand for the Accused Product.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents and Things relating to PureWick's FEC.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents and Things that show or relate to any competitive or market analysis regarding PureWick's FEC or the Accused Product.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents and Things comparing the Accused Product to any competitive products, including without limitation, sales and engineering documents.

**REQUEST FOR PRODUCTION NO. 33:**

All Documents and Things relating to license agreements, settlement agreements, covenants-not-to-sue, license proposals or license negotiations concerning patents or technology used in the Accused Product, relating to catheters, or comparable to the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents and Things relating to the manufacture, distribution, or sale of the Accused Product by Defendant.

**REQUEST FOR PRODUCTION NO. 35:**

All Documents and Things relating to any Communication between Defendant and any third party concerning the manufacture or potential manufacture, distribution, or sale of the Accused Product.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents and Things relating to use of the Accused Product by any third party.

**REQUEST FOR PRODUCTION NO. 37:**

All Documents and Things relating to any agreement or contract concerning the Accused Product.

**REQUEST FOR PRODUCTION NO. 38:**

All Documents and Things relating to any actual, planned, or contemplated Communication between Defendant and any medical doctor, pharmacist, hospital, nurse, health maintenance organization, insurance company, or trade association concerning the Accused Product or PureWick's FEC.

**REQUEST FOR PRODUCTION NO. 39:**

All Documents and Things relating to any consumer survey or consumer analysis concerning the Accused Product or urinary catheters.

**REQUEST FOR PRODUCTION NO. 40:**

Documents sufficient to show, on a monthly basis by customer, Defendant's unit sales, gross revenues, net revenues, gross profits, net profits, and costs for the Accused Product.

**REQUEST FOR PRODUCTION NO. 41:**

Documents sufficient to show Defendant's pricing for the Accused Product, including base prices and any discounts offered at any time.

**REQUEST FOR PRODUCTION NO. 42:**

All Documents and Things relating to any determination by Defendant of the pricing or suggested pricing of the Accused Product.

**REQUEST FOR PRODUCTION NO. 43:**

All Documents and Things relating to Defendant's actual or projected share of the market in which the Accused Product is sold.

**REQUEST FOR PRODUCTION NO. 44:**

All Documents and Things relating to Defendant's forecasted or projected sales for the Accused Product.

**REQUEST FOR PRODUCTION NO. 45:**

All Documents and Things supporting, refuting, or otherwise relating to any of the allegations, contentions, defenses, counterclaims, and requested relief contained in any pleading filed by Defendant.

**REQUEST FOR PRODUCTION NO. 46:**

For each defense, whether affirmative or otherwise, asserted by Defendant in this action, all Documents and Things supporting, refuting, or otherwise relating to such defense.

**REQUEST FOR PRODUCTION NO. 47:**

All Documents and Things relating to Defendant's calculation of damages in this case.

**REQUEST FOR PRODUCTION NO. 48:**

All documents that Defendant or its counsel supplied to any declarant, witness, or expert for use in this litigation.

**REQUEST FOR PRODUCTION NO. 49:**

All Documents and Things that Defendant obtains through third-party discovery in connection with this litigation.

**REQUEST FOR PRODUCTION NO. 50:**

All Documents and Things that Defendant may use as an exhibit in any trial, hearing, submission to the court, or deposition in this litigation.

**REQUEST FOR PRODUCTION NO. 51:**

All Documents and Things identified or referred to in, or relied upon to prepare,

Defendant's responses to any interrogatory in this litigation.


<table>
<tr><td></td><td>/s/ John W. Shaw</td></tr>
<tr><td></td><td>John W. Shaw (No. 3362)</td></tr>
<tr><td>OF COUNSEL:</td><td>Andrew E. Russell (No. 5382)</td></tr>
<tr><td>Steven C. Cherny</td><td>SHAW KELLER LLP</td></tr>
<tr><td>Raymond Nimrod</td><td>I.M. Pei Building</td></tr>
<tr><td>Brian P. Biddinger</td><td>1105 North Market Street, 12th Floor</td></tr>
<tr><td>Nicola R. Felice</td><td>Wilmington, DE 19801</td></tr>
<tr><td>Jason C. Williams</td><td>(302) 298-0700</td></tr>
<tr><td>Bianca Fox</td><td>jshaw@shawkeller.com</td></tr>
<tr><td>QUINN EMANUEL URQUHART</td><td>arussell@shawkeller.com</td></tr>
<tr><td>  & SULLIVAN, LLP</td><td>*Attorneys for Plaintiff*</td></tr>
<tr><td>51 Madison Ave., 22nd Floor</td><td></td></tr>
<tr><td>New York, New York 10010</td><td></td></tr>
<tr><td>(212) 849-7000</td><td></td></tr>
</table>

Dated: August 5, 2022

# EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GN NETCOM, INC.,                        )
                                        )
               Plaintiff,                )
                                        )
       v.                              )    C.A. No.  12-1318-LPS
                                        )
PLANTRONICS, INC.,                      )
                                        )
             Defendant.                )

## <u>JURY INSTRUCTIONS</u>

## 1.   <u>Introduction</u>

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. I will start by explaining your duties and the general rules that apply in every civil case. I will explain some rules that you must use in evaluating particular testimony and evidence. I will explain the positions of the parties and the law you will apply in this case. Last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 5.  <u>Spoliation</u>

I instruct you that Plantronics failed to preserve evidence after its duty to preserve arose. This failure to preserve is known as "spoliation of evidence." In other words, spoliation is the destruction or material alteration of evidence or the failure to preserve evidence for another's use in pending or reasonably foreseeable litigation.

Based on Plantronics' spoliation, you may, but are not required, to presume that the lost evidence would have been relevant and helpful to GN's case and/or would have been harmful to Plantronics' case. Alternatively, you may infer that the evidence not produced would merely have been duplicative of, or similar to, the evidence before you.

In other words, your role is to determine whether Plantronics' spoliation tilted the playing field against GN. If so, the permission given to you by the Court to infer that the missing documents would have been relevant and helpful to GN and/or harmful to Plantronics is designed to allow you to balance that playing field, should you feel it is necessary.

It is up to you to decide the extent to which the lost evidence was relevant and helpful to GN and/or harmful to Plantronics. Of course, it is impossible to know exactly what evidence was lost – although the parties have tried – so you must make these determinations to the best of your ability based on all of the facts and circumstances of this case. You must then decide how much weight and effect to give to your belief about spoliation in reaching your verdict.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, tablet, or computer, the Internet, any Internet service or tool, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, LinkedIn, YouTube, Instagram, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way.