IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PUREWICK CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 22-102 (MN) |
| ) | |
| SAGE PRODUCTS, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

At Wilmington this 30th day of March 2023:

As announced at the hearing on February 17, 2023, IT IS HEREBY ORDERED that the disputed claim term of U.S. Patents Nos. 10,226,376 ("the '376 Patent") and 10,390,989 ("the '989 Patent") is construed as follows:

1. "fluid reservoir" / "reservoir" will be given its plain and ordinary meaning, which is "a space where urine can collect." ('376 Patent, 1, 5 and 10; '989 Patent 2, 3, 6 and 7).

The parties have previously litigated these patents which resulted in a jury verdict of infringement and no invalidity in *PureWick Corporation v. Sage Products, LLC*, C.A. No. 19-1508-MN ("*PureWick* I"). In *PureWick* I, the parties did not raise any claim construction dispute for the term "fluid reservoir" or "reservoir." In connection with the present case, Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on the grounds that collateral estoppel and *res judicata* barred certain of Defendant's defenses. (D.I. 12). During oral argument on the motion, the parties identified this claim construction dispute, and the Court agreed to hear the issue in an expedited manner to rule on the pending motion. The parties briefed the issues (*see* D.I. 94; D.I. 105) and submitted exhibits that included the patents at issue, excerpts from the patents' prosecution histories, expert testimony from *PureWick* I and other extrinsic

evidence (*see* D.I. 95; D.I. 105). The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim term, heard oral argument (*see* D.I. 116) and applied the following legal standards in reaching its decision:

I. **LEGAL STANDARDS**

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim must also be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom*

*Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely

3

to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.  Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II. THE COURT'S RULING

The Court's ruling regarding the disputed claim term of the '376 and '989 Patents was announced from the bench at the conclusion of the hearing as follows:

> At issue, there is one disputed claim term in two patents. These patents were previously litigated between these parties and resulted in a jury verdict of infringement and no invalidity of the claims asserted in that case. During that litigation, the parties agreed that the term "fluid reservoir" or "reservoir" should be given its plain and ordinary meaning. There was no dispute or disagreement about the scope of that term.
>
> In connection with this case, Plaintiff filed a motion for judgment on the pleadings on the grounds that collateral estoppel barred certain of Defendant's defenses. As part of its response to that motion, Defendant's brief asserted that there was a claim construction issue that precluded my grant of the motion but did not really identify what that issue was. During the argument on the 12(c) motion, Defendant asserted that Plaintiff was construing "reservoir" or "fluid reservoir" differently than it had in the prior litigation. Plaintiff disagreed. I agreed to hear this issue in an expedited manner so that I could understand the arguments and rule on the pending motion.
>
> I am now prepared to rule on the claim construction issue. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decision that although I am not issuing a written opinion, we have followed a full and thorough process before making the decision I am about to state. I have reviewed the patents in dispute. I have also reviewed the record from the prior litigation, *PureWick Corporation v. Sage Products, LLC*, C.A. No. 19-1508-MN, which I will call "*PureWick I*". I have read the parties' letters regarding construction and all of the other references submitted in the many pages of exhibits.[1]

---

[1]  (D.I. 77, 80, 82, 88, 94, 95, and 105).

There was full briefing on the disputed term and argument today. All of that has been carefully considered.

As to my ruling, I am not going to read into the record my understanding of claim construction law. I have a legal standard section that I have included in earlier opinions, including my claim construction order in *PureWick* I. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.[2]

The disputed term is "***fluid reservoir***" or "***reservoir***" in claims 1, 5 and 10 of the '376 patent and claims 2, 3, 6 and 7 of the '989 patent.[3] Both parties argue that the term has its plain and ordinary meaning. Plaintiff proposes that meaning is "a place where urine can collect." Defendant proposes that meaning is "a structure that aggregates urine."

The dispute centers on whether there is a difference between "aggregate" and "collect," whether the term requires urine to be held in the reservoir rather than be capable of being held there and whether we need to refer to the reservoir as a structure. Here, I think that Plaintiff's statement of the plain and ordinary meaning is the one supported by the intrinsic and extrinsic evidence and is consistent with how the claim term was used in the prior litigation. I will adopt that construction.

First, I can find no meaningful difference between "aggregate" and "collect" in the parties' constructions. According to Webster's New World College Dictionary and The Chambers Dictionary, the two generally mean the same thing.[4] And as I pointed out during the hearing, without objection or disagreement, looking at the online thesaurus, the two words are synonyms.[5]

Defendant, however, argues that there is a distinction between "aggregate" and "collect" in that "aggregate" suggests collecting and holding, while "collect" does not require actually holding of fluid. I do not, however, think that position is supported

---

[2] Neither party has suggested any differences in the definition of a POSA that are relevant to the claim construction issues.

[3] All citations are to common matter in the '376 Patent.

[4] (*See* D.I. 105 at 5).

[5] (D.I. 116 at 10:20-24).

5

by the intrinsic evidence cited. First, the specification states that the "reservoir 110 can be any suitable shape and/or size capable of collecting fluid transported through the permeable support 140."[6] It then goes on to give implementations and examples where the reservoir collects and holds urine – either a large amount or a small amount or does so temporarily or more permanently. It also refers to the reservoir forming part of a passageway and a sump.[7] I do not read those subsequent statements, however, to require the reservoir to hold urine – particularly given the clear statement that the reservoir can be any shape or size capable of collecting fluid at the beginning of the paragraph before discussing embodiments. I also can discern no reason why holding urine would be required given that purpose of the inventions appears to be preventing urine leaking from the devices, i.e., removing it rather than holding it. I understand that the device needs to be capable of holding it when necessary but that is different from requiring it to hold fluid when not necessary.

Second, the prosecution read as a whole does not support Defendant's position. Defendant argues that during prosecution, Plaintiff distinguished the prior art reference Kuntz from its invention to overcome the Examiner's rejection.[8] Plaintiff argued that Kuntz does not have a reservoir, which Plaintiff defined using Webster's dictionary as "a cavity or part that holds some fluid secretion," because "the core material of Kuntz fills the entire internal space within Kuntz's backing layer 36, so there is no room for a reservoir within the casing between the permeable support and the casing."[9] There is no further discussion of holding fluid in the subsequent arguments made. Indeed, Plaintiff concludes its arguments, stating that "when read in light of the specification, Applicant's term 'reservoir' should be read as a cavity or void space.[10] So I think that the intrinsic evidence supports Plaintiff's proposed construction. And the only extrinsic evidence I have from a POSA as to the meaning agrees. At his deposition in the prior

---

[6]    ('376 Patent, col. 7, ll. 38-46).

[7]    ('376 Patent, col. 7, ll. 47-65).

[8]    (D.I. 94 at 3).

[9]    (D.I. 105 at 4).

[10]   (D.I. 95, Ex. 3 at 548).

case, Defendant's expert[11] testified that he "used fluid reservoir" to mean "the same thing that anyone, any ordinary person skilled in the art would understand. It's an area where fluid can collect."[12]

Defendant also asserts that Plaintiff is shifting its construction because in *PureWick* I, Plaintiff argued that the Van Den Heuval reference did not have a "fluid reservoir" because urine did not aggregate in the area Defendant identified as a reservoir, but is now asserting a broader construction to capture an "indeterminate 'place'" in the PrimaFit 2.0.[13] I am not making any determination about infringement in this case, but I think that Defendant is overreading what actually happened in *PureWick* I. During that litigation, Plaintiff's infringement expert referred to the reservoir as "the area . . . the volume where urine can accumulate."[14] As I just mentioned, Defendant's invalidity expert testified at his deposition that, to a POSA, a reservoir is "an area where fluid can collect."[15] At trial, though, he gave rather conclusory testimony that the prior art had a reservoir.[16] In addition, Plaintiff's counsel argued during his closing in connection with infringement that the accused product had an empty space where urine can accumulate.[17] And he argued in connection with validity that Van Den Heuvel did not have a "place for fluid to aggregate."[18] I think all of this testimony and argument from *PureWick* I is consistent with the plain and ordinary meaning as I understand it.[19]

---

[11]    (D.I. 116 at 4:3-6).

[12]    (D.I. 105, Ex. A at 76:24-77:5).

[13]    (D.I. 94 at 5-6).

[14]    Plaintiff did not offer expert testimony on validity.

[15]    (D.I. 105, Ex. A at 77:4-5).

[16]    (D.I. 105, Ex. B at 782:22-783:12).

[17]    (D.I. 105, Ex. B at 1162:3-4).

[18]    (D.I. 105, Ex. B at 1174:5).

[19]    Defendant cites to Plaintiff's expert, Mr. Jezzi's, expert report on Van Den Heuvel in *PureWick* I to support its construction. Mr. Jezzi, however, did not testify about Van Den Heuvel at trial in *PureWick* I, and therefore his expert report is not relevant to the jury's understanding of the term or the verdict in *PureWick* I.

So I am going to construe "reservoir" and "fluid reservoir" to have the plain and ordinary meaning to a POSA, i.e., a space where fluid can collect. I am not specifically adding the word "structure" to this definition. Plaintiff agrees the space has to be formed by something, some structure,[20] but both parties agree that the reservoir is not required to be a separate structure.[21] And thus, I think adding that the reservoir must be "a structure" may be confusing.

In conclusion, the intrinsic and extrinsic evidence support the plain and ordinary meaning "reservoir" or "fluid reservoir" as "a space where urine can collect." And that is how I will construe it.

The Honorable Maryellen Noreika
United States District Judge

---

[20]    (D.I. 116 at 29:17-20).

[21]    (D.I. 116 at 7:15-20).